No. 14-4522

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

————————————

**UNITED STATES OF AMERICA,**
*Plaintiff/Appellee,*

**v.**

**WILLIAM GAZAFI,**
*Defendant/Appellant.*

————————————

**On Appeal from the United States District Court
for the District of Maryland, Southern Division
(The Honorable Roger W. Titus)**

————————————

**JOINT APPENDIX**

**VOLUME I**

————————————

| | |
|---|---|
| **ROD J. ROSENSTEIN** | **JAMES WYDA** |
| **United States Attorney** | **Federal Public Defender** |
| **THOMAS SULLIVAN** | **MEGHAN S. SKELTON** |
| **Assistant U.S. Attorney** | **Appellate Attorney** |
| **6500 Cherrywood Lane** | **6411 Ivy Lane** |
| **Suite 200** | **Suite 710** |
| **Greenbelt, MD  20770** | **Greenbelt, MD  20770** |
| **(301) 344-4433** | **(301) 344-0600** |
| | |
| *Counsel for Appellee* | *Counsel for Appellant* |

## TABLE OF CONTENTS

Page

**Volume I**

District Court Docket Sheet. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Indictment (Docket Entry 13). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Defendant's Correspondence re: Plea (Docket Entry 25). . . . . . . . . . . . . . . . . 19

Government's Correspondence re: Plea (Docket Entry 26). . . . . . . . . . . . . . . . 25

Plea Hearing Transcript (April 21, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Sentencing Transcript (June 23, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

Judgment in Criminal Case (June 23, 2014)(Docket Entry 51). . . . . . . . . . . . 170

Notice of Appeal (Docket Entry 53). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

**Volume II  -  (UNDER SEAL)**

Presentence Report. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

Defendant's Sentencing Memorandum. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 197

Government's Sentencing Memorandum. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 276



APPEAL,CLOSED

# U.S. District Court
## District of Maryland (Greenbelt)
## CRIMINAL DOCKET FOR CASE #: 8:13-cr-00472-RWT All Defendants

Case title: USA v. Gazafi
Magistrate judge case number: 8:13-mj-02053-WGC

Date Filed: 09/11/2013
Date Terminated: 07/01/2014

---

Assigned to: Judge Roger W Titus

Appeals court case number: 14-4522
USCA

**Defendant (1)**

| | |
|---|---|
| **William Gazafi**<br>*TERMINATED: 07/01/2014* | represented by **Amy Steffan Fitzgibbons**<br>Office of the Federal Public Defender<br>6411 Ivy Lane Ste 710<br>Greenbelt, MD 20770<br>13013446600<br>Fax: 13013440019<br>Email: amy_fitzgibbons@fd.org<br>*ATTORNEY TO BE NOTICED*<br>*Designation: Public Defender or*<br>*Community Defender Appointment*<br><br>**John Chamble**<br>Office of the Federal Public Defender<br>6411 Ivy Ln Ste 710<br>Greenbelt, MD 20770<br>13013440600<br>Fax: 13013440019<br>Email: john_chamble@fd.org<br>*ATTORNEY TO BE NOTICED*<br>*Designation: Public Defender or* |

*Community Defender Appointment*

**Pending Counts**

**Disposition**

18:2251(a), 18:2253; Sexual Exploitation of Minor for Purpose of Producing Child Pornography, Forfeiture

(1)

Imprisonment for a Total Term of 360 Months as to each Counts 1, 2, 3, and 4 Consecutive to Each Other and 360 Months as to each of Counts 5 and 6 Concurrent to all Counts for a Total of 1,440 Months; Supervised Release for a Term of LIFE as to 1, 2, 3, 4, 5, and 6; Special Assessment $600.00

18:2251(a), 18:2253; Sexual Exploitation of Minor for Purpose of Producing Child Pornography, Forfeiture

(2)

Imprisonment for a Total Term of 360 Months as to each Counts 1, 2, 3, and 4 Consecutive to Each Other and 360 Months as to each of Counts 5 and 6 Concurrent to all Counts for a Total of 1,440 Months; Supervised Release for a Term of LIFE as to 1, 2, 3, 4, 5, and 6; Special Assessment $600.00

18:2251(a), 18:2253; Sexual Exploitation of Minor for Purpose of Producing Child Pornography, Forfeiture

(3)

Imprisonment for a Total Term of 360 Months as to each Counts 1, 2, 3, and 4 Consecutive to Each Other and 360 Months as to each of Counts 5 and 6 Concurrent to all Counts for a Total of 1,440 Months; Supervised Release for a Term of LIFE as to 1, 2, 3, 4, 5, and 6; Special Assessment $600.00

18:2251(a), 18:2253; Sexual Exploitation of Minor for Purpose of Producing Child Pornography, Forfeiture

(4)

Imprisonment for a Total Term of 360 Months as to each Counts 1, 2, 3, and 4 Consecutive to Each Other and 360 Months as to each of Counts 5 and 6 Concurrent to all Counts for a Total of 1,440 Months; Supervised Release for a Term of LIFE as to 1, 2, 3, 4, 5, and 6; Special Assessment $600.00

18:2251(a), 18:2253; Sexual Exploitation of Minor for Purpose of Producing Child Pornography, Forfeiture

(5)

Imprisonment for a Total Term of 360 Months as to each Counts 1, 2, 3, and 4 Consecutive to Each Other and 360 Months as to each of Counts 5 and 6 Concurrent to all Counts for a

**2**

18:2251(a), 18:2253; Sexual
Exploitation of Minor for Purpose of
Producing Child Pornography,
Forfeiture
(6)

Total of 1,440 Months; Supervised
Release for a Term of LIFE as to 1, 2,
3, 4, 5, and 6; Special Assessment
$600.00

Imprisonment for a Total Term of
360 Months as to each Counts 1, 2, 3,
and 4 Consecutive to Each Other and
360 Months as to each of Counts 5
and 6 Concurrent to all Counts for a
Total of 1,440 Months; Supervised
Release for a Term of LIFE as to 1, 2,
3, 4, 5, and 6; Special Assessment
$600.00

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| None | |

**Highest Offense Level
(Terminated)**

None

| **Complaints** | **Disposition** |
| --- | --- |
| 18:2251(a) production of child
pornography, 18:2252A(a)(2)
production of child pornography | |

---

**Plaintiff**

| **USA** | represented by | **LisaMarie Freitas** |
| --- | --- | --- |
| | | United States Department of Justice
1400 New York Ave NW Ste 600
Washington, DC 20005
12023530263
Fax: 12025141793
Email: lisamarie.freitas@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney* |

**Thomas M Sullivan**
Office of the United States Attorney
6500 Cherrywood Lane Ste 200
Greenbelt, MD 20770
13013440173
Fax: 13013444516
Email: thomas.sullivan@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Rod J Rosenstein**
Office of the United States Attorney
Do Not Mail
Baltimore, MD 21201
14102094800
Email: rod.rosenstein@usdoj.gov
*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/29/2013 | 1 | SEALED CRIMINAL COMPLAINT as to William Gazafi (1). (Attachments: # 1 Affidavit) (jcs, Deputy Clerk)[8:13-mj-02053-WGC] (Additional attachment(s) added on 9/12/2013: # 2 Criminal Complaint - Redacted, # 3 Affidavit In Support of Criminal Complaint - Redacted) (pkfs, Deputy Clerk). (Entered: 08/29/2013) |
| 08/29/2013 | 2 | Motion to Seal and Order "GRANTING" same as to William Gazafi. Signed by Magistrate Judge William Connelly on 08/28/2013. (jcs, Deputy Clerk) [8:13-mj-02053-WGC] (Entered: 08/29/2013) |
| 09/03/2013 | 4 | Initial Appearance as to William Gazafi (Defendant informed of Rights.) held on 9/3/2013 before Magistrate Judge William Connelly. (Ionetz - 3B) (jcs, Deputy Clerk) [8:13-mj-02053-WGC] (Entered: 09/03/2013) |
| 09/03/2013 | | Case unsealed as to William Gazafi (jcs, Deputy Clerk) [8:13-mj-02053-WGC] (Entered: 09/03/2013) |
| 09/03/2013 | 5 | CJA 23 Financial Affidavit by William Gazafi (jcs, Deputy Clerk) [8:13-mj-02053-WGC] (Entered: 09/04/2013) |
| 09/03/2013 | 6 | ORDER APPOINTING FEDERAL PUBLIC DEFENDER as to William Gazafi. Signed by Magistrate Judge William Connelly on 09/03/2013. (jcs, Deputy Clerk) [8:13-mj-02053-WGC] (Entered: 09/04/2013) |
| 09/03/2013 | 7 | ORDER OF TEMPORARY DETENTION as to William Gazafi. Signed by Magistrate Judge William Connelly on 09/03/2013. (jcs, Deputy Clerk) [8:13-mj-02053-WGC] (Entered: 09/04/2013) |

| | | |
|---|---|---|
| 09/05/2013 | 8 | NOTICE OF ATTORNEY APPEARANCE: John Chamble as Public Defender appearing for William Gazafi (Chamble, John) [8:13-mj-02053-WGC] (Entered: 09/05/2013) |
| 09/06/2013 | 9 | Detention Hearing as to William Gazafi held on 9/6/2013 before Magistrate Judge William Connelly. (Hatcher-3B.) (chs, Deputy Clerk) [8:13-mj-02053-WGC] (Entered: 09/09/2013) |
| 09/06/2013 | 10 | ORDER OF DETENTION as to William Gazafi. Signed by Magistrate Judge William Connelly on 09/06/2013. (chs, Deputy Clerk) [8:13-mj-02053-WGC] (Entered: 09/09/2013) |
| 09/09/2013 | 11 | NOTICE OF ATTORNEY APPEARANCE: Amy Steffan Fitzgibbons as Public Defender appearing for William Gazafi (Fitzgibbons, Amy) [8:13-mj-02053-WGC] (Entered: 09/09/2013) |
| 09/10/2013 | 12 | NOTICE OF ATTORNEY APPEARANCE Thomas M Sullivan appearing for USA. (Sullivan, Thomas) [8:13-mj-02053-WGC] (Entered: 09/10/2013) |
| 09/11/2013 | 13 | INDICTMENT as to William Gazafi (1) count(s) 1-6. (ebs2, Deputy Clerk) (Entered: 09/11/2013) |
| 09/12/2013 | 15 | SEALED MOTION To Replace the Complaint Affidavit (Docket NO. 1) With Redacted Version by USA as to William Gazafi. (pkfs, Deputy Clerk) (Entered: 09/12/2013) |
| 09/12/2013 | 16 | SEALED ORDER granting 15 Motion To Replace the Complaint Affidavit (Docket NO. 1) With Redacted Version as to William Gazafi (1). Signed by Magistrate Judge Thomas M. DiGirolamo on 9/11/13. (pkfs, Deputy Clerk) (Entered: 09/12/2013) |
| 09/13/2013 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to William Gazafi. PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 9/13/2013. An interpreter will not be needed. Arraignment set for 9/19/2013 01:45 PM in Courtroom 2A, 6500 Cherrywood Lane, Greenbelt, Maryland 20770, before Magistrate Judge Charles B. Day. Initial Appearance set for 9/19/2013 01:45 PM in Courtroom 2A, 6500 Cherrywood Lane, Greenbelt, Maryland 20770, before Magistrate Judge Charles B. Day. (Freitas, LisaMarie) (Entered: 09/13/2013) |
| 09/19/2013 | 17 | Initial Appearance as to William Gazafi (Defendant informed of Rights.) held on 9/19/2013, Arraignment as to William Gazafi (1) Count 1-6 held on 9/19/2013, Plea entered by William Gazafi Not Guilty on counts 1-6 of the Indictment. before Magistrate Judge Charles B. Day. (Hatcher-2A.) (chs, Deputy Clerk) (Entered: 09/20/2013) |
| 09/19/2013 | 18 | Memorandum Order as to William Gazafi scheduling trial to begin November 12, 2013 at 9:00 a.m.; Pretrial motions due on or before October |

| | | |
|---|---|---|
| | | 7, 2013; Telephone conference with counsel scheduled for October 9, 2013 at 5:30 p.m. Signed by Judge Roger W. Titus on 9/19/2013. (chs, Deputy Clerk) (Entered: 09/20/2013) |
| 09/23/2013 | 19 | Joint MOTION to Exclude *Time Under Speedy Trial Act* by William Gazafi. Responses due by 10/10/2013 (Attachments: # 1 Text of Proposed Order)(Fitzgibbons, Amy) (Entered: 09/23/2013) |
| 10/09/2013 | 20 | MOTION to Suppress *Tangible Evidence* by William Gazafi. Responses due by 10/28/2013 (Chamble, John) (Entered: 10/09/2013) |
| 10/09/2013 | | Telephone Conference as to William Gazafi held on 10/9/2013 before Judge Roger W Titus. (hbm, Deputy Clerk) (Entered: 10/25/2013) |
| 10/11/2013 | 21 | ORDER Continuing trial date; setting pre-trial motions deadlines; scheduling hearing for January 27, 2014, at 1:00 p.m. on defendant's pretrial motions; scheduling telephone status conference for December 10, 2013, at 5:30 p.m.; denying as moot 19 motion to exclude time under Speedy Trial Act as to William Gazafi (1). Signed by Judge Roger W Titus on 10/11/13 (cags, Deputy Clerk) (Entered: 10/11/2013) |
| 12/10/2013 | | Telephone Status Conference as to William Gazafi held on 12/10/2013 before Judge Roger W Titus. (hbm, Deputy Clerk) (Entered: 12/27/2013) |
| 12/11/2013 | 22 | ORDER setting pre-trial deadlines; rescheduling the hearing currently scheduled for January 27, 2014 for March 31, 2014 at 4:00 p.m; scheduling a further telephone status conference on February 25, 2014, at 5:30 p.m., as to William Gazafi. Signed by Judge Roger W Titus on 12/11/2013. (am2s, Deputy Clerk) (Entered: 12/11/2013) |
| 02/26/2014 | 23 | ORDER setting pretrial deadlines; rescheduling the hearing currently scheduled for March 31, 2014 for April 29, 2014 at 3:00 p.m.; setting a further telephone status conference on March 26, 2014, at 5:30 p.m., as to William Gazafi. Signed by Judge Roger W Titus on 2/25/2014. (am2s, Deputy Clerk) (Entered: 02/26/2014) |
| 03/27/2014 | 24 | ORDER that a plea hearing in this matter is SCHEDULED for April 21, 2014 at 9:00 a.m. Signed by Judge Roger W Titus on 3/26/14. (am2s, Deputy Clerk) (Entered: 03/27/2014) |
| 04/09/2014 | 25 | Correspondence re: plea (Fitzgibbons, Amy) (Entered: 04/09/2014) |
| 04/16/2014 | 26 | Correspondence re: plea (Sullivan, Thomas) (Entered: 04/16/2014) |
| 04/17/2014 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to William Gazafi. *Rearraignment/Guilty Plea scheduled for 4/21/2014.* PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 4/17/2014. An interpreter will not be needed. Rearraignment set for 4/21/2014 09:00 AM in Courtroom 2C, 6500 Cherrywood Lane, Greenbelt, Maryland 20770, before Judge Roger W |

| | | |
|---|---|---|
| | | Titus. (Freitas, LisaMarie) (Entered: 04/17/2014) |
| 04/21/2014 | 27 | Rearraignment as to William Gazafi (1) Counts 1-6 held on 4/21/2014, Plea entered by William Gazafi (1) Guilty Counts 1-6. before Judge Roger W Titus. (Court Reporter: Lisa Bankins) (hbms, Deputy Clerk) (Additional attachment(s) added on 4/21/2014: # 1 Corrected Minutes) (hbms, Deputy Clerk). (Entered: 04/21/2014) |
| 04/21/2014 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to William Gazafi. *Sentencing Scheduled for 6/23/2014.* PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 4/21/2014. An interpreter will not be needed. Sentencing set for 6/23/2014 01:00 PM in Courtroom 2C, 6500 Cherrywood Lane, Greenbelt, Maryland 20770, before Judge Roger W Titus. (Freitas, LisaMarie) (Entered: 04/21/2014) |
| 04/21/2014 | 28 | Regular Sentencing Order as to William Gazafi. Signed by Judge Roger W Titus on 4/21/14. (rss, Deputy Clerk) (Entered: 04/21/2014) |
| 06/04/2014 | 30 | NOTICE by USA *Govt. Sentencing Witnesses* (Attachments: # 1 Exhibit A)(Freitas, LisaMarie) (Entered: 06/04/2014) |
| 06/04/2014 | 31 | MOTION to Seal by William Gazafi. Responses due by 6/23/2014 (Attachments: # 1 Text of Proposed Order)(Fitzgibbons, Amy) (Entered: 06/04/2014) |
| 06/04/2014 | 32 | **PROPOSED SEALED DOCUMENT** (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit)(Fitzgibbons, Amy) (Entered: 06/04/2014) |
| 06/11/2014 | 33 | -SEALED- MOTION to Seal by USA as to William Gazafi. Responses due by 6/30/2014 (Freitas, LisaMarie) (Entered: 06/11/2014) |
| 06/11/2014 | 34 | **PROPOSED SEALED DOCUMENT** (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit E, # 5 Exhibit F, # 6 Exhibit G, # 7 Exhibit H, # 8 Exhibit I, # 9 Exhibit J, # 10 Exhibit K, # 11 Exhibit L)(Freitas, LisaMarie) (Entered: 06/11/2014) |
| 06/12/2014 | 35 | (FILED IN ERROR) **PROPOSED SEALED DOCUMENT** (Attachments: # 1 Exhibit M)(Freitas, LisaMarie) Modified on 6/13/2014 (rss, Deputy Clerk). (Entered: 06/12/2014) |
| 06/13/2014 | 36 | QC NOTICE: 35 Proposed Sealed Document filed by USA was filed incorrectly. *\*\*Page 2 of the Exhibit is upside down. Please ensure all pages are right-side up and re-file the entire filing. This entry has been noted as FILED IN ERROR, and the document link has been disabled.* (rss, Deputy Clerk) (Entered: 06/13/2014) |
| 06/17/2014 | 37 | **PROPOSED SEALED DOCUMENT** (Freitas, LisaMarie) (Entered: 06/17/2014) |

| 06/20/2014 | 38 | MOTION to Seal by William Gazafi. Responses due by 7/10/2014 (Attachments: # 1 Text of Proposed Order)(Fitzgibbons, Amy) (Entered: 06/20/2014) |
| 06/20/2014 | 39 | **PROPOSED SEALED DOCUMENT** (Attachments: # 1 Exhibit)(Fitzgibbons, Amy) (Entered: 06/20/2014) |
| 06/20/2014 | 40 | MOTION for Forfeiture of Property by USA as to William Gazafi. Responses due by 7/10/2014 (Freitas, LisaMarie) (Entered: 06/20/2014) |
| 06/23/2014 | 41 | -SEALED- MOTION to Seal by USA as to William Gazafi. Responses due by 7/10/2014 (Freitas, LisaMarie) (Entered: 06/23/2014) |
| 06/23/2014 | 42 | **PROPOSED SEALED DOCUMENT** (Attachments: # 1 Text of Proposed Order)(Freitas, LisaMarie) (Entered: 06/23/2014) |
| 06/23/2014 | 43 | ORDER GRANTING 41 Motion to Seal as to William Gazafi (1). Signed by Magistrate Judge William Connelly on 6/23/2014. (rss, Deputy Clerk) (Entered: 06/23/2014) |
| 06/23/2014 | 44 | Sentencing as to William Gazafi held on 6/23/2014 before Judge Roger W Titus. (Court Reporter: Lisa Bankins) (hbms, Deputy Clerk) (Entered: 06/23/2014) |
| 06/23/2014 | 45 | Stipulation Regarding Return of Exhibits to Counsel (rss, Deputy Clerk) (Entered: 06/24/2014) |
| 06/23/2014 | 46 | ORDER GRANTING 31 Motion to Seal as to William Gazafi (1). Signed by Judge Roger W Titus on 6/23/2014. (rss, Deputy Clerk) (Entered: 06/24/2014) |
| 06/23/2014 | 47 | ORDER GRANTING 38 Motion to Seal as to William Gazafi (1). Signed by Judge Roger W Titus on 6/23/2014. (rss, Deputy Clerk) (Entered: 06/24/2014) |
| 06/23/2014 | 48 | ORDER DIRECTING FORFEITURE OF PROPERTY as to William Gazafi. Signed by Judge Roger W Titus on 6/23/2014. (rss, Deputy Clerk) (Entered: 06/24/2014) |
| 06/23/2014 | 49 | Sealed Document (rss, Deputy Clerk) (Entered: 06/24/2014) |
| 07/01/2014 | 50 | Sealed Document (hbm, Deputy Clerk) (Entered: 07/01/2014) |
| 07/01/2014 | 51 | JUDGMENT as to William Gazafi (1), Imprisonment for a Total Term of 360 Months as to each Counts 1, 2, 3, and 4 Consecutive to Each Other and 360 Months as to Each of Counts 5 and 6 Concurrent to all Counts for a Total of 1,440 Months; Supervised Release for a Term of LIFE as to 1, 2, 3, 4, 5, and 6; Special Assessment $600.00. Signed by Judge Roger W Titus on 7/1/2014. (Attachments: # 1 Copy of Order of Forfeiture) (rss, Deputy Clerk) (Entered: 07/01/2014) |

| 07/07/2014 | 53 | NOTICE OF APPEAL by William Gazafi Fee Status: Federal Public Defender. (Fitzgibbons, Amy) (Entered: 07/07/2014) |
|---|---|---|
| 07/08/2014 | 54 | Transmission of Notice of Appeal and Docket Sheet as to William Gazafi to US Court of Appeals re 53 Notice of Appeal - Final Judgment (rss, Deputy Clerk) (Entered: 07/08/2014) |
| 07/08/2014 | 55 | USCA Case Number 14-4522 as to William Gazafi for 53 Notice of Appeal - Final Judgment filed by William Gazafi. Case Manager - Barbara H. Rowe. (rss, Deputy Clerk) (Entered: 07/09/2014) |
| 07/08/2014 | 56 | ORDER of USCA APPOINTING FPD as to William Gazafi re 53 Notice of Appeal - Final Judgment (rss, Deputy Clerk) (Entered: 07/09/2014) |
| 07/29/2014 | 57 | TRANSCRIPT ORDER Acknowledgment of USCA establishing a deadline for court reporter, Lisa Bankins to 9/4/14 to file the transcripts of rearraignment of 4/21/14 and sentencing of 6/23/14 as to William Gazafi re 53 Notice of Appeal - Final Judgment (krc, Deputy Clerk) (Entered: 07/29/2014) |
| 08/19/2014 | 58 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to William Gazafi for dates of 04/21/2014 before Judge Titus, re 53 Notice of Appeal - Final Judgment Court Reporter/Transcriber L. Bankins, Telephone number 301-344-3912. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 9/9/2014. Redacted Transcript Deadline set for 9/19/2014. Release of Transcript Restriction set for 11/17/2014. (lkb, Court Reporter) (Entered: 08/19/2014) |
| 08/19/2014 | 59 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to William Gazafi for dates of 06/23/2014 before Judge Titus, re 53 Notice of Appeal - Final Judgment Court Reporter/Transcriber L. Bankins, Telephone number 301-344-3912. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - Y. Redaction Request due 9/9/2014. Redacted Transcript Deadline set for 9/19/2014. Release of Transcript Restriction set for 11/17/2014. (lkb, Court Reporter) (Entered: 08/19/2014) |

---

**PACER Service Center**

**Transaction Receipt**

08/25/2014 13:18:17

**9**

| PACER Login: | fp0068 | Client Code: | |
|---|---|---|---|
| Description: | Docket Report | Search Criteria: | 8:13-cr-00472-RWT |
| Billable Pages: | 10 | Cost: | 1.00 |



LME/TMS: USAO 2013R00607

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND** 2013 SEP 11  A 11: 14

CLERK'S OFFICE
AT GREENBELT

| | |
|---|---|
| **UNITED STATES OF AMERICA** | * |
| | * |
| v. | * **CRIMINAL NO.** RWT 13 CR 0472 |
| | * |
| **WILLIAM GAZAFI,** | * (Sexual Exploitation of Minor for |
| | * Purpose of Producing Child |
| **Defendant** | * Pornography, 18 U.S.C. § 2251(a); |
| | * Forfeiture, 18 U.S.C. § 2253) |
| | * |

*******

## INDICTMENT

### COUNT ONE

The Grand Jury for the District of Maryland charges that:

Between on or about April 3, 2012 and on or about April 7, 2012, in the District of

Maryland and elsewhere, the defendant,

### WILLIAM GAZAFI,

did knowingly employ, use, persuade, induce, entice, and coerce a minor to engage in sexually

explicit conduct as defined in Title 18, United States Code, Section 2256(2) for the purpose of

producing a visual depiction of such conduct – including but not limited to images depicting a

prepubescent female (a) restrained at the ankle with handcuffs with the soles of her feet together

and her legs spread apart, and (b) bound with restraints on her ankles connected through her

underwear to display her genitalia – that was produced and transmitted using materials that had

been mailed, shipped, and transported in and affecting interstate and foreign commerce by any

means, including by computer.

18 U.S.C. § 2251(a)

## COUNT TWO

The Grand Jury for the District of Maryland further charges that:

On or about June 16, 2012, in the District of Maryland and elsewhere, the defendant,

## WILLIAM GAZAFI,

did knowingly employ, use, persuade, induce, entice, and coerce a minor to engage in sexually

explicit conduct as defined in Title 18, United States Code, Section 2256(2) for the purpose of

producing a visual depiction of such conduct – including but not limited to an image that depicts

a seven-year-old female, lying on a bed exposing her genitalia – that was produced and

transmitted using materials that had been mailed, shipped, and transported in and affecting

interstate and foreign commerce by any means, including by computer.


18 U.S.C. § 2251(a)

2

## COUNT THREE

The Grand Jury for the District of Maryland further charges that:

On or about June 24, 2012, in the District of Maryland and elsewhere, the defendant,

## WILLIAM GAZAFI,

did knowingly employ, use, persuade, induce, entice, and coerce a minor to engage in sexually explicit conduct as defined in Title 18, United States Code, Section 2256(2) for the purpose of producing a visual depiction of such conduct – including but not limited to five images that depict a toddler female with defendant's hand pulling aside her underwear exposing her genitalia – that was produced and transmitted using materials that had been mailed, shipped, and transported in and affecting interstate and foreign commerce by any means, including by computer.

18 U.S.C. § 2251(a)

3

## COUNT FOUR

The Grand Jury for the District of Maryland further charges that:

On or about July 4, 2012, in the District of Maryland and elsewhere, the defendant,

## WILLIAM GAZAFI,

did knowingly employ, use, persuade, induce, entice, and coerce a minor to engage in sexually

explicit conduct as defined in Title 18, United States Code, Section 2256(2) for the purpose of

producing a visual depiction of such conduct – including but not limited to a video that depicts

the defendant holding his penis above the genitalia of a five- to six-month old baby, while

exposing her genitalia and placing her feet on his erect penis – that was produced and transmitted

using materials that had been mailed, shipped, and transported in and affecting interstate and

foreign commerce by any means, including by computer.

18 U.S.C. § 2251(a)

4

## COUNT FIVE

The Grand Jury for the District of Maryland further charges that:

Between on or about August 1, 2012 and on or about June 1, 2013, in the District of
Maryland and elsewhere, the defendant,

### WILLIAM GAZAFI,

did knowingly employ, use, persuade, induce, entice, and coerce a minor to engage in sexually
explicit conduct as defined in Title 18, United States Code, Section 2256(2) for the purpose of
producing a visual depiction of such conduct – including but not limited to a video file that
depicts the defendant using his feet to rub the buttocks of and expose the genitalia of a
seven-year-old female – that was produced and transmitted using materials that had been mailed,
shipped, and transported in and affecting interstate and foreign commerce by any means,
including by computer.

18 U.S.C. § 2251(a)

## COUNT SIX

The Grand Jury for the District of Maryland further charges that:

Between on or about April 14, 2013 and on or about April 19, 2013, in the District of

Maryland and elsewhere, the defendant,

### WILLIAM GAZAFI,

did knowingly employ, use, persuade, induce, entice, and coerce a minor to engage in sexually

explicit conduct as defined in Title 18, United States Code, Section 2256(2) for the purpose of

producing a visual depiction of such conduct – including but not limited to two images that

depict the defendant attempting to anally penetrate a toddler female – that was produced and

transmitted using materials that had been mailed, shipped, and transported in and affecting

interstate and foreign commerce by any means, including by computer.


18 U.S.C. § 2251(a)

6

**16**

## **FORFEITURE ALLEGATION**

The Grand Jury for the District of Maryland further finds that:

1.      Pursuant to Fed. R. Crim. P. 32.2 notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 2253, in the event of the defendant's conviction under Counts One through Six of this Indictment.

2.      Pursuant to Title 18, United States Code, Section 2253, upon a conviction of the offenses set forth in Count One through Six of this Indictment, in violation of Title 18, United States Code, Section 2251(a), the defendant,

## **WILLIAM GAZAFI,**

shall forfeit to the United States of America:

a.      Any visual depiction described in Title 18, United States Code, sections 2251, 2251A, or 2252, or any book, magazine, periodical, film, videotape, or other matter which contains any such visual depiction, which was produced, transported, mailed, shipped or received in violation of Title 18, United States Code, Chapter 110;

b.      Any property, real or personal, constituting or traceable to gross profits or other proceeds obtained from the offenses; and

c.      Any property, real or personal, used or intended to be used to commit or to promote the commission of the offenses, including and not limited to the residence of 743 Lazy River Road, Lusby, Maryland 20657.

7

3.    If any of the property described above, as a result of any act or omission

of the defendant:

      a.    cannot be located upon the exercise of due diligence;

      b.    has been transferred or sold to, or deposited with, a third party;

      c.    has been placed beyond the jurisdiction of the court;

      d.    has been substantially diminished in value; or

      e.    has been commingled with other property which cannot be divided without

         difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21,

United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section

2253(b).

18 U.S.C. § 2253

Rod J. Rosenstein
United States Attorney

A TRUE BILL:

**SIGNATURE REDACTED**

Foreperson

9-11-2013

Date

8

18

USCA4 Appeal: 14-4522      Doc: 12      Filed: 10/09/2014      Pg: 21 of 178

**OFFICE OF THE FEDERAL PUBLIC DEFENDER**
**DISTRICT OF MARYLAND**

6411 Ivy Lane, Suite 710
Greenbelt, Maryland 20770
Phone: 301-344-0600
Fax:   301-344-0019

JAMES WYDA
FEDERAL PUBLIC DEFENDER

AMY S. FITZGIBBONS
ASSISTANT FEDERAL PUBLIC DEFENDER

April 2, 2014

Honorable Roger W. Titus
U.S. District Court for the District of Maryland
6500 Cherrywood Lane
Greenbelt, Maryland 20770

> Re: *United States v.  William Shaun Gazafi*,
> Crim. No. RWT-13-0472

Dear Judge Titus:

This Office represents Mr. Gazafi in the above-referenced matter.  The government and the defense could not reach agreement regarding the terms of his guilty plea.  Accordingly, Mr. Gazafi will be pleading guilty to the Indictment without the benefit of a plea agreement.  As a result, I am submitting the following letter to memorialize the factual basis for Mr. Gazafi's plea, to confirm that Mr. Gazafi has knowingly and voluntarily agreed to plead guilty, and to assist the Court in the Rule 11 colloquy.

## Offenses of Conviction

1.      The Defendant agrees to plead guilty to Counts One through Six of the Indictment now pending against him, which charges him with six counts of Production of Child Pornography in violation of 18 U.S.C. § 2251(a).  The Defendant admits that he is, in fact, guilty of the offenses and will so advise the Court.

## Elements of the Offense

2.      The elements of the offenses to which the Defendant has agreed to plead guilty, and which the Government would prove if the case went to trial are as follows: (1) that the Defendant knowingly employed, used, persuaded, induced, enticed or coerced a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct; and (2) the visual depictions were produced using materials that had been mailed, shipped and transported in and affecting interstate and foreign commerce.

## Penalties

3. The maximum sentence provided by statute for each offense to which the Defendant is pleading guilty is: imprisonment for not less than 15 years and not more than 30 years for each count. All counts are subject to a term of supervised release of not more than life and a fine of $250,000. In addition, the Defendant must pay $100 as a special assessment, per count, pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing. If a fine is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise. The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked - even on the last day of the term - and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release. The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

## Waiver of Rights

4. The Defendant understands that by pleading guilty, he surrenders certain rights as outlined below:

a. If the Defendant had persisted in his plea of not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, the Government, and the Court all agreed.

b. If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Undersigned counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and the Defendant would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. Similarly, all twelve jurors would have to agree in order for the Defendant to be found not guilty. If a unanimous verdict of guilty or not guilty did not occur, the government could retry the case as many times as is necessary in order to have a jury reach a unanimous verdict. The Court would instruct the jury that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof that satisfied the jury beyond a reasonable doubt.

c. If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

d. The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify. If he chose not to testify, the Court would instruct the jury that it could not draw any adverse inference from his decision not to testify. In other words, the Court would tell the jury that it could not believe that the Defendant was guilty simply because he did not testify.

-2-

USCA4 Appeal: 14-4522    Doc: 12    Filed: 10/09/2014    Pg: 22 of 178

USCA4 Appeal: 14-4522      Doc: 12      Filed: 10/09/2014      Pg: 23 of 178

     e.     If the Defendant were found guilty after a trial, he would have the right to appeal the verdict to see if any errors were committed which would require a new trial or dismissal of the charges against him.

     f.     By pleading guilty, the Defendant will be giving up all of these rights, except the right to appeal the sentence. By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

     g.     If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

     h.     By pleading guilty, the Defendant will also be giving up certain valuable civil rights, and understands that he will be subject to possible deportation after conviction.

## Advisory Sentencing Guidelines Apply

     5.     The Defendant understands that a sentencing guidelines range for this case (henceforth the "advisory guidelines range") will be determined by the Court pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, and must take into account the advisory guidelines range. At this time, the parties have no agreement with respect to the applicable guidelines factors.

## Factual Stipulation

     6.     The parties understand and agree that if this case had proceeded to trial, the government would have proven the following facts beyond a reasonable doubt:

The defendant WILLIAM GAZAFI was a resident of Lusby, Maryland.

GAZAFI engaged in numerous on-line chats with an undercover officer (UC). The last chat occurred on August 15, 2013. During the course of these chats, GAZAFI sent the UC several images of child pornography, which GAZAFI produced. The images produced by GAZAFI and sent to the UC were sent by GAZAFI from the State of Maryland to the District of Columbia and therefore traveled in interstate commerce.

During GAZAFI's arrest, numerous digital media items were seized from his person and forensically examined. Search warrants were also executed at GAZAFI's residence. A search of GAZAFI's residence uncovered, among other things, computers, electronic storage medica, a bottle of Ambien (a sleeping aid) prescribed to GAZAFI, a bottle of generic sleep aid, a pair of handcuffs, and child sized lingerie.

-3-

USCA4 Appeal: 14-4522      Doc: 12      Filed: 10/09/2014      Pg: 24 of 178

Following a forensic examination of the digital media in GAZAFI's possession when he was arrested, law enforcement identified numerous images and videos produced by GAZAFI. The following are some of4 the images and videos produced by GAZAFI:

a.     Seven images produced by GAZAFI between April 3, 2012 and April 7, 2012. Each photo depicts a seven year old female, unconscious, wearing underwear and lingerie. In each photo, the child is bound at the ankles with either a set of handcuffs or hair ties so that their legs are spread apart and their vaginal area is visible. There are two different children depicted amongst the seven photos. These images form the basis of Count One of the Indictment.

b.     Two images produced by GAZAFI on June 16, 2012, that depict two seven year old females lying naked in a bathtub. The focus of the pictures is on the genitalia of the children. One image produced by GAZAFI on June 16, 2012 that depicts a seven year old female holding her legs up by her ears, exposing her genitalia. The focus of the picture is on the child's genitalia. These images of child pornography form the basis for Count Two of the Indictment.

c.     Five images produced by GAZAFI on June 24, 2012 that depict a toddler female wearing underwear as GAZAFI pulls back the underwear to expose her vagina. These images of child pornography form the basis for Count Three of the Indictment.

d.     A video produced by GAZAFI on July 4, 2012, that depicts GAZAFI attempting to have a five month old baby masturbate him with her feet by placing his erect penis in front of the baby, who was naked from the waist down, and placing the baby's feet on his penis. The video is 1:17 minutes in length. This video of child pornography form the basis for Count Four of the Indictment.

e.     Videos and images produced by GAZAFI between August 4, 2012 and June 1, 2013 that depict: (1) GAZAFI lying in front of a seven year old female who is naked. GAZAFI places his feet on each side of the child's buttocks and spreads them apart, opening the child's anus and vagina. The video is :24 second in length; (2) three images that depict GAZAFI pulling aside the underwear of a prepubescent female and placing his finger in her vagina; and (3) GAZAFI masturbating over the feet of a seven year old female who is not awake. GAZAFI repeatedly touches the feet while he is masturbating. The video is :54 seconds in length. These images and videos of child pornography form the basis for Count Five of the Indictment.

f.     Two images produced by GAZAFI on April 14, 2013 and April 19, 2013 that depict the partial anal penetration of a toddler child by GAZAFI. These images form the basis for Count Six of the Indictment.

A forensic examination of the digital media items seized from GAZAFI's residence in Lusby, Maryland, yielded over 4,000 images of child pornography not produced by GAZAFI but downloaded from the Internet.

USCA4 Appeal: 14-4522      Doc: 12      Filed: 10/09/2014      Pg: 25 of 178

The computers and hard drives that GAZAFI used to save, store and transport child pornography were not manufactured in the State of Maryland, and therefore traveled in interstate commerce.

## Criminal History

7.     The Defendant understands that there is no agreement as to his criminal history, which will be determined, in part, by the preparer of the Pre-Sentence Report, and that his criminal history could alter his offense level and his advisory guideline range.

## Registration as a Sex Offender

8.     The Defendant understands and agrees that as a consequence of his conviction for the crimes to which he is pleading guilty, he will be required to register as a sex offender, and to keep that registration current, in the place where he resides, where he is employed and where he is a student, pursuant to the Sex Offender Registration and Notification Act (SORNA), and the laws of the state of his residence.  Failure to do so may violate the terms of his supervised release and subject him to new criminal charges pursuant to 18 U.S.C. § 2250.

## Sentence Within the Discretion of the Court

9.     The Defendant  understands that under the current state of the law in the federal system, the sentence to be imposed is within the sole discretion of the Court.  The Defendant understands that the Court will, with the aid of the Presentence Report, determine the facts relevant to sentencing.  In determining the factual basis for the sentence, the Court will consider the stipulated statement of facts, together with the results of the presentence investigation, and any other relevant information.  The Defendant understands that the Court is under no obligation to accept any recommendation from the Defendant or the government  regarding the sentence, and the Court has the power to impose a sentence up to and including the statutory maximum stated above.  The Defendant understands that if the Court should impose any sentence up to the maximum established by statute, the Defendant cannot, for that reason alone, withdraw his guilty plea, and will remain bound to his guilty plea.  The Defendant understands that neither the prosecutor, his counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive.  The Defendant agrees that no one has made such a binding prediction or promise.

-5-

**23**

USCA4 Appeal: 14-4522      Doc: 12      Filed: 10/09/2014      Pg: 26 of 178

### Conclusion

I have carefully reviewed every part of this letter with Mr. Gazafi. To my knowledge, his decision to plead guilty to the offense charged in the Indictment as set forth in this letter is an informed and voluntary one.

Respectfully Submitted,

Amy S. Fitzgibbons
Assistant Federal Public Defender

I have carefully discussed this letter with my attorney. I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

2 APR 14
Date

William Gazafi

cc:     Lisa-Marie Freitas, Assistant United States Attorney

-6-

**24**



**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*
*Southern Division*

---

Rod J. Rosenstein                United States Courthouse          DIRECT: 301-344-4338
United States Attorney            6500 Cherrywood Lane              MAIN: 301-344-4433
                                  Greenbelt, MD 20770-1249          FAX: 301-344-4516
LisaMarie Freitas                                                   TTY/TDD: 301-344-2426
Special Assistant United States Attorney

April 16, 2014

Honorable Roger W. Titus
United States District Judge
District of Maryland
Greenbelt, Maryland 20770

Re:    <u>United States of America v. William Gazafi,</u>
       Criminal No. RWT 13-0472

Dear Judge Titus:

In light of the Defendant's decision to plead guilty to the Indictment without the benefit of a plea agreement, this letter sets forth the minimum and maximum statutory penalties of incarceration, fines and terms of supervised release for each count to which the Defendant seeks to plead guilty, and addresses a number of matters the Government submits will be relevant to the Court's Rule 11 colloquy.

<u>Offenses of Conviction</u>

1.    The Government believes the Defendant will plead guilty to Counts One through Six of the Indictment now pending against him, each charging him with Production of Child Pornography in violation of 18 U.S.C. § 2251(a).   The Government believes the Defendant will admit that he is, in fact, guilty of these offenses and will so advise the Court.

<u>Elements of the Offenses</u>

2.    The elements of the offenses to which the Defendant will plead guilty, and which the Government would prove if the case went to trial, are as follows: (1) that the Defendant knowingly employed, used, persuaded, induced, enticed or coerced minors to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct; and (2) the visual depictions were produced using materials that had been mailed, shipped and transported in and affecting interstate and foreign commerce.

<u>Penalties</u>

3.      The maximum sentence provided by statute for each offense to which the Defendant is pleading guilty is as follows:   imprisonment for not less than 15 years and not more than thirty 30 years for each count.   All counts are subject to a term of supervised release of a mandatory minimum of five years and a maximum of life, and a fine of $250,000.    In addition, the Defendant must pay $600 as a special assessment pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing.   This Court may also order the Defendant to make restitution pursuant to 18 U.S.C. §§ 2259, 3663, 3663A, and 3664.[1] If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise.   The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked - even on the last day of the term - and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release.   The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

<u>Waiver of Rights</u>

4.      The Government submits that by pleading guilty, the Defendant surrenders certain rights as outlined below:

a.      If the Defendant had persisted in his pleas of not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel.   That trial could be conducted by a judge, without a jury, if the Defendant, the Government, and the Court all agreed.

b.      If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community.   Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count.   The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c.      If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt.   The Defendant would have the right to confront and cross-examine the government's witnesses.   The Defendant would not have to present any defense witnesses or evidence whatsoever.   If the Defendant wanted to call

---

[1]      Pursuant to 18 U.S.C. § 3612, if the Court imposes a fine in excess of $2,500 that remains unpaid 15 days after it is imposed, the Defendant shall be charged interest on that fine, unless the Court modifies the interest payment in accordance with 18 U.S.C. § 3612(f)(3).

2

witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

       d.    The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify.   If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

       e.    If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against him.   By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

       f.    The Government submits that by pleading guilty, the Defendant will be giving up all of these rights.   By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case.   Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

       g.    If the Court accepts the Defendant's pleas of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

       h.    By pleading guilty, the Defendant will be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status.   If the Defendant is not a citizen of the United States, pleading guilty may have consequences with respect to his immigration status.   Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including his attorney or the Court, can predict with certainty the effect of a conviction on immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any potential immigration consequences.

<u>Advisory Sentencing Guidelines Apply</u>

       5.    The Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998.   The Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

       6.    There is no agreement as to the Defendant's criminal history or criminal history category, and that his criminal history could alter his offense level if he is a career offender or if the instant offense was a part of a pattern of criminal conduct from which he

<div align="center">3</div>

derived a substantial portion of his income.

7.    If the Defendant wishes to argue for any factor that could take the sentence outside of the advisory guidelines range, he should notify the Court, the United States Probation Officer and government counsel at least 14 days in advance of sentencing of the facts or issues he intends to raise, unless the Court orders otherwise.

<u>Obligations of the United States Attorney's Office</u>

8.    The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct, including the conduct that is the subject of the counts of the Indictment.

<u>Registration as a Sex Offender</u>

9.    The Government submits that as a consequence of convictions for the crimes to which the Defendant is pleading guilty, he will be required to register as a sex offender, and to keep that registration current, in the place where he resides, where he is employed, and where he is a student, pursuant to the Sex Offender Registration and Notification Act (SORNA), and the laws of the state of his residence.  The Government submits that failure to do so will violate the terms of his supervised release and subject him to new criminal charges pursuant to 18 U.S.C. § 2250.

<u>Forfeiture</u>

10.    The Government will request that the Court, upon acceptance of the Defendant's guilty pleas, enter an order of forfeiture as part of his sentence, and that the order of forfeiture may include assets directly traceable to his offenses, substitute assets and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses. Specifically, the Court may order the forfeiture of:

a.    Any visual depiction described in Title 18, U.S.C. §§ 2251, 2251A, or 2252A, or any book, magazine, periodical, film, videotape, or other matter which contains any such visual depiction, which was produced, transported, mailed, shipped or received in violation of Title 18, United States Code, Chapter 110;

b.    Any property, real or personal, constituting or traceable to gross profits or other proceeds obtained from the offenses; and

c.    Any property, real or personal, used or intended to be used to commit or to promote the commission of the offenses.

4

Restitution

11.    The Government may seek Restitution for the full amount of the victims' losses pursuant to 18 U.S.C. §§ 2259, 3663 and 3663A and §§ 3563(b)(2) and 3583(d).    Should the Government be successful, the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct set forth in the Government's Statement of Facts, set forth in Attachment A.

Factual and Advisory Guidelines Stipulation

12.    The Government would prove beyond a reasonable doubt the factual allegations contained in Attachment A, as well as the following applicable sentencing guidelines factors:

Count One:

a.    The base offense level is **32**, pursuant to U.S.S.G. § 2G2.1(a).

b.    Pursuant to U.S.S.G. § 2G2.1(b)(1)(A), there is a **4** level increase to a **36**, because the offense involved minors who had not attained the age of twelve (12) years.

c.    Pursuant to U.S.S.G. § 2G2.1(b)(2)(B), there is a **4** level increase to a **40**, because the offense involved the commission of a sexual act, and conduct described in 18 U.S.C. § 2241(b), specifically § 2241(b)(1)-that the minors were rendered unconscious and § 2241(b)(2)-the defendant administered to another person without the knowledge or permission of the minor, a drug, intoxicant or other similar substance and thereby (A) substantially impaired the ability of the minors to appraise or control conduct; and (B) engaged in sexual acts with the minor(s).

d.    Pursuant to U.S.S.G. § 2G2.1(b)(4), there is a **4** level increase to a **44**, because the material portrays sadistic or masochistic behavior.

e.    Pursuant to U.S.S.G. § 2G2.1(b)(5), there is a two **2** level increase to a **46**, because the defendant was a parent, relative or legal guardian of one of the minors involved in the offense and one or more of the minors were in the custody, care or supervisory control of the Defendant.

f.    Pursuant to U.S.S.G. § 2G2.1(d)(1), the offenses charged in the Indictment involve the exploitation of more than one minor.    Therefore, U.S.S.G., Chapter 3, Part D, shall be applied as if the exploitation of each minor had been contained in a separate count of conviction.    Counts One through Six allege multiple acts of Sexual Exploitation of a Minor for Purpose of Producing Child Pornography, involving multiple victims, and occurring on different dates.    Therefore, pursuant to U.S.S.G. § 3D1.2, Counts One through Six do not group. Below is the government's grouping analysis:

5

| Counts Two, Three and Four: | Base Offense Level (U.S.S.G. § 2G2.1(a)) | 32 |
|---|---|---|
| | Offense Involved Minor Who Had Not Attained The Age Of Twelve Years (U.S.S.G. § 2G2.1(b)(1)(A)) | +4 |
| | Defendant Was Parent, Relative, or Legal Guardian of Minor Involved in Offense (U.S.S.G. § 2G2.1(b)(5)) | +2 |
| | Adjusted Offense Level | 38 |
| Count Five: | Base Offense Level (U.S.S.G. § 2G2.1(a)) | 32 |
| | Offense Involved Minor Who Had Not Attained The Age Of Twelve Years (U.S.S.G. § 2G2.1(b)(1)(A)) | +4 |
| | Offense Involved Commission of Sexual Act or Sexual Contact (U.S.S.G. § 2G2.1(b)(2)(A)) | +2 |
| | Offense Involved Distribution (U.S.S.G. § 2G2.1(b)(5)) | +2 |
| | Defendant Was Parent, Relative, or Legal Guardian of Minor Involved in Offense (U.S.S.G. § 2G2.1(b)(5)) | +2 |
| | Adjusted Offense Level | 42 |
| Count Six: | Base Offense Level (U.S.S.G. § 2G2.1(a)) | 32 |
| | Offense Involved Minor Who Had Not Attained The Age Of Twelve Years (U.S.S.G. § 2G2.1(b)(1)(A)) | +4 |
| | Offense Involved Commission of Sexual Act or Sexual Contact (U.S.S.G. § 2G2.1(b)(2)(A)) | +2 |

6

| | |
|---|---|
| Material Portrays Sadistic or Masochistic Conduct (U.S.S.G. § 2G2.1(b)(4) | +2 |
| Defendant Was Parent, Relative, or Legal Guardian of Minor Involved in Offense (U.S.S.G. § 2G2.1(b)(5)) | +2 |
| Adjusted Offense Level | 44 |

Multiple Count Adjustment

| | |
|---|---|
| Number of Units (U.S.S.G. §§ 3D1.1; 3D1.2(d)) | 4½ Units |
| Offense Level Adjustment (U.S.S.G. § 3D.1.4(a) | +4 |
| Adjusted Offense Level (Count One) | 46 |

Combined Adjusted Offense Level          50

       g.    The Government does not oppose a two-level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for his criminal conduct.  The Government agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional 1-level decrease in recognition of the Defendant's acceptance of personal responsibility for his conduct.  The Government may oppose *any* adjustment for acceptance of responsibility if Defendant (a) fails to admit sufficient facts to support pleas of guilty to each and every count in the Indictment; (b) denies involvement in the offenses; (c) gives conflicting statements about his involvement in the offenses; (d) is untruthful with the Court, the Government or the United States Probation Officer; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his pleas of guilty.  The final anticipated adjusted offense level is **47**.

<div align="center">7</div>

There are no agreements, promises, undertakings or understandings between the Defendant and the Government.

<div style="margin-left: 40%;">

Very truly yours,

Rod J. Rosenstein
United States Attorney


_/s/_____
LisaMarie Freitas
Special Assistant United States Attorney

Thomas M. Sullivan
Assistant United States Attorney

</div>

cc:    John Chamble, Esq.
       Amy Steffan Fitzgibbons, Esq.

<div style="text-align:center;">8</div>

### ATTACHMENT A:
### GOVERNMENT'S STATEMENT OF FACTS – WILLIAM GAZAFI

*If this case had proceeded to trial, the Government would have proven the following facts beyond a reasonable doubt.   The following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

The defendant, **WILLIAM GAZAFI ("GAZAFI"),** was a resident of Lusby, Maryland.

On August 15, 2011, an undercover officer ("UC") communicated with a user with the screen name "Bill_James" on a chatroom dedicated to discussing incest (sexual activities with family members, including children).   "Bill_James," later identified as **GAZAFI,** identified his location as the Washington D.C. and southern Maryland region and stated that he had a sexual interest in children.   During this chat, **GAZAFI** sent a total of five (5) images to the UC.   The images depicted prepubescent females clothed or in various stages of undress.   None of the images sent by **GAZAFI** during this chat constituted child pornography and appeared to be commercial images not produced by **GAZAFI.**

The UC and **GAZAFI** did not have any further contact until August 2012.   On August 22, 2012, the UC was contacted online via Instant Messenger by an individual utilizing the screen name "footfan_bill," later identified as **GAZAFI.**   The following is a portion of the pertinent chat between the UC and **GAZAFI.**

| UC: | how long has it been for you since you had one young? |
| **GAZAFI:** | well last time I got to play with it was fairly innocent, about a month ago |
| **GAZAFI:** | buddy has two little girls aged 8mos and 18mos |
| UC: | mmmmmmmm |
| **GAZAFI:** | had about three hours alone while they went out to dinner and drinks |
| **GAZAFI:** | something so incredibly erotic about having your cock out in front of lil girls isnt it |

On August 23, 2012, the UC was contacted online via instant messaging by **GAZAFI** utilizing the screen name "footfan_bill."   During this chat, **GAZAFI** told the UC, "I take private pics sometimes yeah but don't share till I get to know someone better."

On April 29, 2013, the UC was contacted online via Instant Messenger by **GAZAFI** utilizing the screen name "Bill_James."   **GAZAFI** stated to the UC that he had hardcore images available.   On this date, **GAZAFI** did not send any images to the UC.

On August 15, 2013, the UC was online in an incest predicated chatroom and engaged in a private on-line chat with **GAZAFI** who used the screen name "Bill_James." The following is the pertinent portion of the chat between the UC and "Bill_James":

| **GAZAFI:** | dc area here, in MD, ▮▮▮▮▮▮ |
| UC: | age? |

9

**33**

GAZAFI: im 41
GAZAFI: █████
UC: my daughter is 12 and my gf daughter is 7 and we play, she is actually here with me now

\*\*\*\*\*

UC: do you 2 play or just peeks
GAZAFI: now its just naked, cuddling etc and play time after bedtime
UC: nice
GAZAFI: from 8mos to around 4 it was a bunch more
UC: i have proof pics of mine you have any?
GAZAFI: i do, but i typically dont share personal pics till ive talked to someone abit..too many take them and run
UC: cool, ive noticed alot of fakes so lately i either go one for one or take a homemade pic with a message so others no im real
GAZAFI: i can do the same ████████ or something for now. ████████████

GAZAFI sent the UC an image depicting two (2) clothed prepubescent girls sitting on the floor of a playroom.  GAZAFI then sent the UC an image depicting the legs and feet of a child with ejaculate on the child's feet.  GAZAFI then sent a third image, depicting a prepubescent child lying on her stomach, legs apart, wearing underwear and a nightshirt.  The UC and GAZAFI then engaged in the following chat:

UC: you have any like that last, wow
GAZAFI: whatcha mean?
UC: cum pics
GAZAFI: lots of cum pics on her feet yes
GFAZAFI: thats why ive lately been more active towards her bff that always comes over
GAZAFI: if you dont want to mess with pics candid lil cam shots are fine too

\*\*\*\*\*

GAZAFI: friend
GAZAFI: like i said ive focused on her lately
GAZAFI: when they have a sleepover if you are on ill show you her too
UC: mmmmmmmmmmmmmmmm
UC: is she a hard sleeper to
GAZAFI: oh yes
GAZAFI: love it
UC: i love that any more
UC: mmmm
GAZAFI: even gave her ambien once

10

**34**

**GAZAFI** then sent a fourth image to the UC an image depicting a prepubescent female laying on her back, legs apart, wearing a pair of underwear with an adult male index finger moving the underwear aside to reveal the vagina of the prepubescent female. **GAZAFI** and the UC resumed their chat after **GAZAFI** sent the image:

| | |
|---|---|
| **GAZAFI:** | i have lots trust me |
| UC: | maybe 2 more pics each before we go |
| UC: | was that your cock or finger in the last one |
| **GAZAFI:** | finger |
| UC: | nice |
| **GAZAFI:** | gonna try and get her to take a whole ambien next time, maybe have lots of fun |
| UC: | you take those pics a while ago or recent |
| **GAZAFI:** | less than a year ago |
| UC: | nice |
| **GAZAFI:** | maybe we can work up to watching me cum on her friends feet while she sleeps |

**GAZAFI** then sent two additional images to the UC.   The first image depicts a prepubescent female lying on her back, legs apart, wearing a pair of underwear pushed to the side, exposing her vagina.   The second image sent by **GAZAFI** depicts a prepubescent female lying on her stomach, legs apart, wearing a pair of underwear with an adult male index finger digitally penetrating her vagina through the underwear.

The UC and **GAZAFI** then continued their conversation:

| | |
|---|---|
| UC: | that would be great what is the furthest you gone wih your daughter and friend |
| **GAZAFI:** | when my daughter was young she sucked me and i did same to her as well as lick kiss and finger her ass |
| **GAZAFI:** | also play with the two little girls of a friend that i watch for them sometimes |
| **GAZAFI:** | about 1 and 2 years old |

The images produced by **GAZAFI** and sent to the UC were sent by **GAZAFI** from the State of Maryland to the District of Columbia and therefore traveled in interstate commerce.

Shortly after the August 15, 2013 chat, **GAZAFI** was identified and arrested.   During his arrest, numerous digital media items were seized from his person.   These items were searched and forensically examined pursuant to a search warrant.   Search warrants were also executed at **GAZAFI**'s residence.   A search of **GAZAFI**'s residence uncovered, among other things, computers, electronic storage media, a bottle of Ambien (a sleeping aid) prescribed to **GAZAFI**, a bottle of a generic sleep aid, a pair of handcuffs, and child size lingerie.

11

Following a forensic examination of the digital media in **GAZAFI**'s possession when he was arrested, law enforcement identified numerous images and videos produced by **GAZAFI**. The following are some of the images and videos produced by **GAZAFI**:

1.     Seven images produced by **GAZAFI** between on or about April 3, 2012 and on or about April 7, 2012.  Each photo depicts a seven (7) year old female, unconscious, wearing underwear and lingerie.  In each photo, the child is bound at the ankles with either a set of handcuffs or hair ties so that the child's legs are spread apart and their vaginal area is visible.  There are two different children depicted amongst the seven photos.  These images of child pornography form the basis for Count One of the Indictment.

2.     Two images produced by **GAZAFI** on or about June 16, 2012, that depict two seven (7) year old females lying naked in a bathtub.  The focus of the pictures is on the genitalia of the children.  One image produced by **GAZAFI** on or about June 16, 2012, that depicts a seven (7) year old female holding her legs up by her ears, exposing her genitalia.  The focus of the picture is on the child's genitalia.  These images of child pornography form the basis for Count Two of the Indictment.

3.     Five images produced by **GAZAFI** on or about June 24, 2012, that depict a toddler female wearing underwear as **GAZAFI** pulls back the underwear to expose her vagina. These images of child pornography form the basis for Count Three of the Indictment.

4.     A video produced by **GAZAFI** on or about July 4, 2012, that depicts **GAZAFI** attempting to have a five (5) month old baby masturbate him with the baby's feet by placing his erect penis in front of the baby, who was naked from the waist down, and placing the baby's feet on his penis.  The video is 1:17 in length. This video of child pornography forms the basis for Count Four of the Indictment.

5.     Videos and images produced by **GAZAFI** between on or about August 4, 2012 and on or about June 1, 2013 that depict:  (a) **GAZAFI** laying in front of a seven (7) year old female who is naked.  **GAZAFI** places his feet on each side of the child's buttocks and spreads them apart, exposing the child's vagina and anus.  The video is 0:24 in length; (b) three images that depict **GAZAFI** pulling aside the underwear of a prepubescent female and placing his finger in her vagina; and (c) **GAZAFI** masturbating over the feet of a seven (7) year old female who is not awake.  **GAZAFI** repeatedly touches the feet of the seven (7) year old female while he is masturbating.  The video is 0:54 in length. These images and videos of child pornography form the basis for Count Five of the Indictment.

6.     Two images produced by **GAZAFI** on or about April 14, 2013 and on or about April 19, 2013 that depict the partial anal penetration of a toddler child by **GAZAFI**.  These images of child pornography form the basis for Count Six of the Indictment.

12

**GAZAFI** produced more images and videos of child pornography depicting the vaginal penetration, bondage and lascivious exhibition of prepubescent children, some of whom appear to be unconscious in the images.

A forensic examination of the digital media items seized from **GAZAFI**'s residence in Lusby, Maryland, yielded over 4,000 images of child pornography not produced by **GAZAFI**, but downloaded from the Internet.

The computers and hard drives that **GAZAFI** used to save, store and transport the child pornography were not manufactured in the State of Maryland, and therefore traveled in interstate commerce.

**GAZAFI** was either (a) a parent, relative or legal guardian of the minors involved in Counts One through Six; or (b) the minors involved in Counts One through Six were otherwise in the custody, care or supervisory control of **GAZAFI**.

13

1              UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MARYLAND
2                  SOUTHERN DIVISION

3   UNITED STATES OF AMERICA      Criminal No.  RWT-13-0472

4          v.                     Greenbelt, Maryland

5   WILLIAM S. GAZAFI,            April 21, 2014

6              Defendant.         9:00 a.m.

7   -------------------------/

8                   TRANSCRIPT OF GUILTY PLEA
           BEFORE THE HONORABLE ROGER W. TITUS
9              UNITED STATES DISTRICT JUDGE

10  APPEARANCES:

11  For the Government:  United States Department of Justice
                        By: LISAMARIE FREITAS, ESQUIRE
12                      1400 New York Avenue, NW
                        Suite 600
13                      Washington, D.C. 20005

14                      United States Attorney's Office
                        By: THOMAS M. SULLIVAN, ESQUIRE
15                      6500 Cherrywood Lane
                        Suite 200
16                      Greenbelt, Maryland 20770

17  For the Defendant:  Office of the Federal Public Defender
                        By: AMY S. FITZGIBBONS, ESQUIRE
18                          JOHN CHAMBLE, ESQUIRE
                        6411 Ivy Lane
19                      Suite 710
                        Greenbelt, Maryland 20770
20

21  Court Reporter      Lisa K. Bankins RMR
                        United States District Court
22                      6500 Cherrywood Lane
                        Greenbelt, Maryland 20770
23

24  Proceedings recorded by mechanical stenography,
    transcript produced by notereading.
25

```
 1                    P R O C E E D I N G S
 2              THE COURT:  Good morning.
 3              MS. FREITAS:  Good morning, Your Honor.  The
 4     government calls the case of the United States of America
 5     versus William Gazafi, Criminal Number RWT-13-0472.
 6     LisaMarie Freitas and Thomas Sullivan for the government.
 7     Also with us is FBI Special Agent Jacqueline Dougher and
 8     Office of Special Investigations for the Air Force,
 9     Special Agents Webber and Castillo.
10              THE COURT:  Good morning.
11              MS. FITZGIBBONS:  Good morning, Your Honor.  Amy
12     Fitzgibbons and John Chamble with the Federal Public
13     Defender's Office on behalf of Mr. Gazafi who is present.
14              THE COURT:  All right.  Bea, you may proceed.
15              THE CLERK:  Mr. Gazafi, would you please stand
16     and raise your right hand?
17              (Defendant sworn.)
18              THE CLERK:  What's your age?
19              THE DEFENDANT:  41.
20              THE CLERK:  And what year were you born?
21              THE DEFENDANT:  1972, ma'am.
22              THE CLERK:  On September the 19, 2013, you
23     appeared before the United States Magistrate judge for the
24     purpose of arraignment at which time you entered plea of
25     not guilty as to Counts 1 through 6 of the indictment.  Do
```

1    you wish to change your plea at this time?

2            THE DEFENDANT:  Yes, ma'am.

3            THE CLERK:  And how do you wish to plead?

4            THE DEFENDANT:  Guilty, ma'am.

5            THE CLERK:  Guilty as to which counts?

6            THE DEFENDANT:  All counts.

7            THE CLERK:  All counts.  So your plea is guilty

8    as to Counts 1 through 6 of the indictment.  Is that

9    correct?

10           THE DEFENDANT:  Yes, ma'am.

11           THE CLERK:  Okay.  Thank you.  You should remain

12   standing.

13           THE COURT:  Good morning, sir.  You've just

14   announced a decision to enter a plea of guilty to certain

15   federal criminal offenses and that's a very important

16   decision.  I want to have a discussion with you about your

17   decision.

18           First of all, do you understand that you are now

19   under oath and if you were to answer any of my questions

20   falsely, any false answers could be used against you at a

21   later time in another prosecution for perjury or making a

22   false statement.  Do you understand that?

23           THE DEFENDANT:  Yes, sir.

24           THE COURT:  All right.  How far did you go in

25   school?

1          THE DEFENDANT:  I have a Bachelor's Degree, sir.

2          THE COURT:  Where were you born?

3          THE DEFENDANT:  In Mexico.

4          THE COURT:  Are you a U.S. citizen?

5          THE DEFENDANT:  I am.

6          THE COURT:  Have you been treated recently for

7    any mental illness or addiction to narcotic drugs of any

8    kind?

9          THE DEFENDANT:  No, sir.

10         THE COURT:  Are you currently under the

11   influence of any drug, medication or alcoholic beverage of

12   any kind?

13         THE DEFENDANT:  No, sir.

14         THE COURT:  Have you received a copy of the

15   indictment in this case?  In other words, the document

16   that contains the charges against you.

17         THE DEFENDANT:  Yes, sir.

18         THE COURT:  And have you discussed the charges

19   in the indictment and the case in general with your

20   attorneys, Mr. Chamble and Ms. Fitzgibbons?

21         THE DEFENDANT:  Yes, sir.

22         THE COURT:  Are you fully satisfied with the

23   counsel, representation and advice that's been provided to

24   you in this case by Mr. Chamble and Ms. Fitzgibbons?

25         THE DEFENDANT:  I am, sir.

```
1              THE COURT:  All right.  I understand that you

2      are intending to enter or you've entered a plea in this

3      case without the benefit of any plea agreement.  Is that

4      correct?

5              THE DEFENDANT:  That is correct, sir.

6              THE COURT:  All right.  Now I have in front of

7      me a letter that was sent to me dated April 2nd from your

8      attorney, Ms. Fitzgibbons.  Do you have a copy of that

9      letter there in front of you?

10             THE DEFENDANT:  Yes, sir.

11             THE COURT:  And I want to go through some of the

12     provisions of that letter with you.  First of all, is that

13     your signature dated April 2nd on page 6 of the letter?

14             THE DEFENDANT:  Yes, sir.

15             THE COURT:  All right.  Now I just want to

16     review with you some of the contents of this letter.

17     First of all, you signed this letter and you approved it

18     and your lawyers sent it to me.  Did you review it before

19     you signed it?

20             THE DEFENDANT:  I did, sir.

21             THE COURT:  And you discussed its contents with

22     your lawyers?

23             THE DEFENDANT:  Yes, sir.

24             THE COURT:  Do you think you understand the

25     provisions of this agreement?
```

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  All right.  What I want to do is to

3    go over some of the provisions of this with you.  First of

4    all, you've indicated that you're entering a plea of

5    guilty to Counts 1 through 6 of the indictment and that's

6    been received by the courtroom deputy and noted for the

7    record.

8          Second, I want to make certain if you understand

9    the potential punishment in this case.  Those penalties

10   are set forth in paragraph 3 of your letter on page 2.

11         Let me ask the government.  Are there any

12   significant differences between your letter and the

13   defense letter?

14         MS. FREITAS:  Your Honor, there are only a few

15   sections that are different between our two letters,

16   specifically forfeiture and restitution.  There's some

17   language omitted about the consequences of deportation.

18   But I just don't feel that applies to this defendant as a

19   citizen.  So other than the -- and of course, the

20   government provided a guideline calculation.  Defense did

21   not.  There's not an agreement to it.

22         THE COURT:  Okay.

23         MS. FREITAS:  Our facts, our statement of facts

24   are fully, more fully incorporate the acts of the

25   defendant.  However, the acts articulated by defense

1    counsel certainly allow each of the elements of each of

2    the six counts to be met.  So for purposes of this

3    hearing, we are happy to adopt their statement of facts.

4    We just wanted the Court to be aware that it is not all

5    encompassing.

6         THE COURT:  Okay.  All right.  Well, let me go

7    through some of the provisions that are set forth in your

8    attorneys' letter to me to make sure you really do

9    understand that.

10         First of all, do you understand that by statute,

11   the maximum offense for each offense to which you're

12   pleading guilty is not less than 15 and not more than 30

13   years per count.  Do you understand that?

14         THE DEFENDANT:  Yes, sir.

15         THE COURT:  And do you understanded that all of

16   those counts are subject to a term of supervised release

17   of not more than life and a fine of $250,000.  Do you

18   understand that?

19         THE DEFENDANT:  Yes, sir.

20         THE COURT:  And you understand that with respect

21   to each of the counts of conviction, I'm required to

22   impose a special assessment of $100 per count, which would

23   be a total of $600 in this case.  Do you understand that?

24         THE DEFENDANT:  Yes, sir.

25         THE COURT:  Do you understand that if you were

1   to be sentenced to a term of imprisonment by me and then

2   placed on supervised release at the end of that term of

3   imprisonment and then were to violate any provision of

4   supervised release even on the last day, you could be

5   brought back before me and given still more time in

6   prison.  Do you understand that?

7          THE DEFENDANT:  Yes, sir.

8          THE COURT:  Do you understand that in connection

9   with the imposition of sentence in a federal criminal

10   case, I have the authority to order you to make an

11   order -- make restitution to any victims of your crime?

12   Do you understand that?

13          THE DEFENDANT:  Yes, sir.

14          THE COURT:  And that is something that will be

15   determined by me at the time of sentencing in this case

16   unless there is agreement between the parties as to an

17   amount for restitution.

18          Now I want to discuss with you the rights that

19   you give up by pleading guilty and they are essentially

20   set forth in paragraph 4 on page 2 of your attorney's

21   letter.  But I want to run them by you specifically.

22   First of all, had you not pled guilty as you're doing this

23   morning, you would have had a right to a speedy jury trial

24   with the assistance of competent attorneys such as

25   Mr. Chamble and Ms. Fitzgibbons.  Do you understand that?

**45**

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  And unless everybody here, meaning

3    you, the government and I, all three of us were to agree

4    that it could be a nonjury trial, it would have to be a

5    jury trial.  The bottom line is you are in the driver's

6    seat.  If you want a jury trial, you will have one.

7          Now in order to provide you with the right of

8    trial by jury, we would bring prospective jurors into this

9    courtroom to be considered for service as jurors in your

10   case.  Those prospective jurors would be placed under oath

11   and asked a lot of questions by me with followup questions

12   by the lawyers.  That process is described as a voir dire

13   examination, which in French means to tell the truth.

14   That process is designed to develop information that the

15   parties and I can then use to decide whether one or more

16   of those potential jurors should be excused for cause

17   meaning that some reason why that juror could not be fair

18   and impartial to both sides.  And that information would

19   also be used by the parties to make a decision to exercise

20   what are called peremptory strikes.  Each side has the

21   right in a criminal case to excuse a certain number of

22   jurors for no reason at all which is called a peremptory

23   strike.  And there is no limit on the number of jurors who

24   can be challenged by either side for cause.  As I've just

25   explained to you, that means that there is a reason that a

1    juror might not be able to be fair and impartial to both

2    sides.

3         Once we finish the process of jury selection, we

4    would place twelve jurors in the box to your right and

5    they would be placed under another oath to be fair and

6    impartial jurors in your case.  They would be told a

7    number of things by me as in preliminary instructions that

8    they would be obligated to follow.  They would be first of

9    all told that you are presumed to be innocent and that

10   presumption of innocence would remain with you until the

11   conclusion of their deliberations.  They would also be

12   told that they could not return a verdict of guilt on any

13   count unless two conditions were to exist.  First of all,

14   they would have to be unanimous in their decision that

15   you're guilty on one or more counts.  In other words,

16   there is no such thing as a majority verdict.  They would

17   all have to agree upon it.  Secondly, they would have to

18   be satisfied that the government had proven your guilt

19   beyond a reasonable doubt, which is the highest level of

20   proof in our court system.  In order for the government to

21   meet its heavy burden of proving your guilt beyond a

22   reasonable doubt, they would be required to call to the

23   witness stand their witnesses to testify against you.

24   That would then trigger a very important constitutional

25   right called the right of confrontation and

1    cross-examination, which in simple terms means that those

2    government witnesses would not go unchallenged and that

3    your lawyers could ask them a lot of questions.  Do you

4    understand that?

5              THE DEFENDANT:  Yes, sir.

6              THE COURT:  Now in a criminal trial, the burden

7    of proof never shifts to you to prove that you're

8    innocent.  That burden remains on the government to prove

9    your guilt beyond a reasonable doubt and that burden never

10   shifts to you.  You have no obligation to prove that

11   you're innocent and you cannot be compelled to testify

12   against yourself unless you voluntarily decide to do so.

13   Do you understand that?

14             THE DEFENDANT:  Yes, sir.

15             THE COURT:  Now because of that, you have no

16   obligation to put on a defense or call any witnesses

17   whatsoever.  However, you could decide to put on a defense

18   and call witnesses and that would trigger another

19   important constitutional right called the right of

20   compulsory process which in simple terms means that you

21   would have the right to have the clerk of this court issue

22   subpoenas that would then be served on persons you

23   identify who would then be required to come here and

24   testify for you even if they didn't want to.  Do you

25   understand that?

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  You understand that if I accept your

3    plea today, there would be no further proceedings of any

4    kind.  All that would remain is to bring you back here for

5    sentencing.  Do you understand that?

6          THE DEFENDANT:  Yes, sir.

7          THE COURT:  Has anybody threatened you or tried

8    to force you to plead guilty?

9          THE DEFENDANT:  No, sir.

10          THE COURT:  And you understand that if you were

11    found guilty after a trial or even after entering your

12    plea of guilty in this case, you have a right to appeal

13    your conviction and sentence to the United States Court of

14    Appeals for the Fourth Circuit, which is the federal

15    appellate court that has jurisdiction over decisions of

16    this court and there would be no restrictions on issues

17    you could raise in connection with that appeal.  Do you

18    understand that?

19          THE DEFENDANT:  Yes, I do, sir.

20          THE COURT:  You understand that the offenses to

21    which you're pleading guilty are felonies.  And that if I

22    accept your plea and you're adjudged guilty of those

23    offenses, that those adjudications may deprive you of

24    valuable civil rights, such as the right to vote, the

25    right to hold public office, the right to serve on a jury,

**49**                                        12

```
1    and the right to possess any kind of firearm.  Do you
2    understand that?
3              THE DEFENDANT:  Yes, sir.
4              THE COURT:  Ms. Fitzgibbons, have all plea
5    offers by the government been communicated to the
6    defendant?
7              MS. FITZGIBBONS:  Yes, Your Honor.
8              THE COURT:  Do you understand that conviction
9    for the offenses involved in this case will likely result
10   in substantial future restrictions on where you may live
11   or work and with whom you may associate?
12             THE DEFENDANT:  Yes, sir.
13             THE COURT:  Going back to the prospect of a
14   trial, do you understand that in your own defense, you
15   could take the stand and testify just like any other
16   ordinary witness.  But if you were to not testify, I would
17   specifically instruct the jury that they could not infer
18   anything adverse to you as a result of your decision not
19   to testify.  Do you understand that?
20             THE DEFENDANT:  Yes, sir.
21             THE COURT:  Now in this case, your attorneys'
22   letter to me mentions the applicability of the sentencing
23   guidelines, but does not discuss how they might actually
24   be applied in your case.  The government's letter, on the
25   other hand, gives their view of how the guidelines might
```

1    be applied.  Are you aware of that?

2            THE DEFENDANT:  Yes, sir.

3            THE COURT:  Have you seen the government's

4    letter to me?

5            THE DEFENDANT:  Yes, sir.

6            THE COURT:  All right.  Well, let me discuss

7    with you the sentencing guidelines and let's talk about

8    them in several respects.  First of all, how they work

9    generally.  Secondly, how they might apply in this case

10   based on the government's view of it, which is not

11   necessarily binding on you in any sense.  And third, what

12   role they will actually play in deciding what your

13   sentence should be.

14           The sentencing guidelines require that I make a

15   determination of what your offense level is and what your

16   criminal history category is and that then produces a

17   range of sentence that's recommended to me expressed in

18   months, not years.  In general, the higher the offense

19   level, the more serious the offense.  And in general, the

20   higher the criminal history category, the more serious the

21   person's criminal record may be.

22           Now I put on the table in front of you there the

23   table from the U.S. Sentencing Guidelines.  And as you can

24   see, it begins with offense level 1 and goes up to 43,

25   going from the top to the bottom of the page on the left

**51**

14

1      hand side.  And with regard to criminal history category,

2      I think it needs to be pulled down a little bit, Ms.

3      Freitas, so we can see that part.  It has criminal history

4      categories that go from 1 to 6.  Do you see that?

5                  THE DEFENDANT:  Yes, sir.

6                  THE COURT:  Now as I said, in general, the worse

7      a person's record is, the higher the criminal history

8      category.  Now let me take something that has nothing to

9      do with your case and show you how it works.  If I were to

10     conclude at the time of sentencing that your offense level

11     was 21 and your Criminal History Category was 3, do you

12     see where those two columns intersect?  It says 46-57.

13                 THE DEFENDANT:  Yes, sir.

14                 THE COURT:  That would be the recommended range

15     of sentence expressed in months, not years.  Do you

16     understand that?

17                 THE DEFENDANT:  Yes, sir.

18                 THE COURT:  Now in this case, there is no

19     agreement between the parties as to how the guidelines

20     should be applied.  There is, however, a position set

21     forth by the government in its letter to me of April 16

22     and they --

23                 MS. FREITAS:  On page 7, Your Honor.

24                 THE COURT:  Page 7.  Their view of the

25     application of the guidelines begins on page 5 in

```
 1    paragraph 12.  And I'm not going to walk you through the
 2    whole thing, but they basically believe that after
 3    applying the guidelines and grouping the counts together,
 4    that they believe the combined offense level would be a
 5    50, which is higher than the highest level under the
 6    guidelines, which is 43.  Do you understand that?
 7              THE DEFENDANT:  Yes, sir.
 8              THE COURT:  So that would essentially amount to
 9    a life sentence in terms of a recommendation.  Do you
10    understand that?
11              THE DEFENDANT:  Yes, sir.
12              THE COURT:  Now I can't tell you today what my
13    application of the guidelines will be.  That is only going
14    to be determined after we go through a process that
15    involves the preparation of a presentence report by a
16    probation officer, its presentation to both sides to make
17    any objection that they wish to make.  It's placed in
18    final form.  Comes before me at the time of the sentencing
19    and at the time of sentencing, I then consider the
20    arguments of either side and make a final decision on what
21    your offense level is.  Then and only then do I have in
22    front of me what that will be.  So the government's view
23    may be -- the government's view it may not be what I
24    conclude the offense level should be.  Do you understand
25    that?
```

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  And there are a variety of

3    circumstances under which offense levels can be changed

4    upward or down under the guidelines and there's also

5    procedures for adjustments to the guidelines for what are

6    called departures.  I'm not going to go into detail on all

7    of those procedures, but there are -- there is room for

8    disagreement between the parties.  The government's

9    position is its position and you're not obligated by their

10   position.  But their position is that you are beyond the

11   highest level in the guidelines.  Do you understand that?

12          THE DEFENDANT:  Yes, sir.

13          THE COURT:  Now you'll notice that the first

14   time that the guidelines are mentioned, it refers to them

15   as advisory guidelines.  That's what your lawyer's letter

16   says to me.  And that's the normal way it's referred to in

17   plea agreements.  I want to explain to you why that word

18   "advisory" is there and this is what I told was the third

19   thing I wanted to talk to you about the guidelines, which

20   is what role they will actually play.

21          And Congress in this case has set forth certain

22   ranges of punishment with minimums and maximums that I've

23   already reviewed with you.  In terms of determining what

24   the actual sentence is subject to the congressional

25   requirements of a mandatory minimum and a maximum, I'm

**54**

1    required to impose a sentence that will be sufficient, but

2    not greater than necessary to comply with the purposes of

3    sentencing that are set forth in Section 3553 of Title 18

4    of United States Code.

5            Now that section used to have in it the

6    provision that mandated that all sentences in federal

7    criminal cases be within the ranges established by

8    application of these guidelines under most, but not all

9    circumstances.  That mandatory aspect of the guidelines

10   was struck down in a pair of decisions of the Supreme

11   Court of the United States in 2005.  In the wake of those

12   decisions, the guidelines are still alive and well and I

13   am required to and will apply those guidelines, which will

14   then produce as I've explained to you a potential range of

15   sentence that's recommended for your case.

16           I am not obligated to follow the guidelines.  In

17   fact I'm not even to give them a presumption of

18   correctness.  But I am required to consider the resultant

19   recommended sentence by application of the guidelines.  I

20   respect it in the sense that it represents the collective

21   wisdom of the members and staff of the United States

22   Sentencing Commission.  But I give it no presumption of

23   correctness and I'm not obligated to follow it.  It's

24   advisory only.

25           What I am required to do is to follow federal

1    law.  And federal law has some general requirements that

2    govern what I do in determining your sentence.  They are

3    set forth, as I said, in Section 3553(A) of Title 18 of

4    the United States Code.  That section generally requires

5    that I impose a sentence that will be sufficient, but not

6    greater than necessary to comply with the purposes of

7    sentencing.  So let me review those with you.

8            I am, first of all, required to consider the

9    need for the sentence imposed to reflect the seriousness

10   of the offense, to promote respect for the law and to

11   provide just punishment for the offense, to afford

12   adequate deterrence to criminal conduct, to protect the

13   public from further crimes of the defendant and to provide

14   the defendant with needed educational or vocational

15   training, medical care or other correctional treatment in

16   the most effective manner.  I'm required to consider the

17   kinds of sentences available, the need to avoid

18   unwarranted sentence disparities among defendants with

19   similar records who have been found guilty of similar

20   conduct, the need to provide restitution of any victims of

21   the offense.  Those are the factors that I must and will

22   consider in connection with the imposition of sentence in

23   your case.  Do you understand that?

24           THE DEFENDANT:  Yes, sir.

25           THE COURT:  And as I said, I will consider it --

1    I'm bound by those factors I will consider, but give no

2    presumption of correctness to the range of sentence

3    developed by application of sentencing guidelines.

4           Now in your letter that you signed and your

5    lawyer submitted to me, there's a factual stipulation

6    that's set forth in paragraph 6 on pages 3, 4 and 5 of

7    that letter.  You indicated to me already you've read this

8    letter and reviewed it with your lawyers.  Is that right?

9           THE DEFENDANT:  Yes, sir.

10           THE COURT:  And is the factual statement

11    contained in here correct?

12           THE DEFENDANT:  Yes, sir.

13           THE COURT:  Let me first go back to paragraph I

14    think it's 2 of your letter and tell you what that is

15    there for.  This is the one entitled Elements of the

16    Offense.  I want to explain to you why that's important.

17    Elements of the Offense is an enumeration of the essential

18    facts that any prosecutor prosecuting any defendant for

19    the crimes charged in the indictment in this case would

20    have to prove beyond a reasonable doubt in order to secure

21    a conviction.  It's not specific to you.  It's general.

22    All prosecutors would have to do this with all defendants

23    charged with these crimes.  Do you understand that?

24           THE DEFENDANT:  Yes, sir.

25           THE COURT:  Now in order for me to accept a

1    guilty plea, I have to have a basis to find you guilty.  I

2    cannot simply accept a guilty plea by somebody walking

3    into my courtroom and saying judge, I'm guilty.  I have to

4    have a basis to find you guilty.  Now that could result

5    from putting the whole case on, but in guilty pleas

6    typically that's done some other ways such as the

7    government making a proffer of what it expects to prove or

8    the parties reaching an agreement on certain facts that

9    may be pertinent or as in this case, you are agreeing to

10    certain facts that you believe are true and correct.  So I

11    will ask you are the facts set forth in paragraph 6 of

12    your letter on pages 3, 4 and 5 true and correct?

13            THE DEFENDANT:  Yes, sir.

14            THE COURT:  Now if the facts set forth in those

15    paragraphs are true and correct and that they satisfy the

16    elements of the offenses set forth in paragraph 2, then I

17    can accept your plea.  Otherwise, I cannot.  Now I'm not

18    going to read this to you because you've indicated that

19    you have a college degree and you've read it and you

20    understand it and your lawyers have read it.  But it

21    basically indicates that you are a resident of Lusby,

22    Maryland, that you engaged in numerous online chats with

23    an undercover officer, that you sent images of pornography

24    which you have produced and it goes on to indicate that

25    there was an arrest.  Numerous items were seized as a

 1    result of that arrest.  And a number of devices were

 2    seized from the computer containing digital images.  Other

 3    matters were taken including sleeping aids, generic sleep

 4    aid, a pair of handcuffs and child-sized lingerie.  And

 5    then a forensic examination was done on the digital media

 6    in your possession and numerous images were found that had

 7    been produced by you.  And then there is a list of

 8    examples of images that are referred to in paragraphs A

 9    through F on page 4 of the letter.  I am not going to go

10    through each and every one of them, but they are graphic

11    descriptions of child pornography.  Do you understand

12    that?

13            THE DEFENDANT:  Yes, sir.

14            THE COURT:  And the bottom line is that a

15    forensic examination.  You had over 4,000 images of child

16    pornography, not produced by you, but downloaded from the

17    Internet.  And that the computers and hard drives you used

18    to save, store and transport them were not manufactured in

19    the State of Maryland and therefore traveled in interstate

20    commerce.  Do you understand that?

21            THE DEFENDANT:  Yes, sir.

22            THE COURT:  Now you understand that the

23    government takes the position that it has additional facts

24    that it would prove beyond those set forth in your plea

25    letter to me, but they've indicated to me that while they

**59**

1    have additional facts they could prove, that the facts

2    that you're admitting to in your letter are sufficient to

3    satisfy the elements of the six counts to which you're

4    pleading guilty.  Do you understand that?

5              THE DEFENDANT:  Yes, sir.

6              THE COURT:  I'm entitled to consider additional

7    information and may do so at the time of sentencing.  Do

8    you understand that?

9              THE DEFENDANT:  Yes, sir.

10             THE COURT:  Now in this case, there's no

11   agreement between you and the government as to your

12   criminal history and as you have seen from that chart,

13   depending on where I come out on offense level, this could

14   have an impact on your sentence depending on where you are

15   going from left to right on that table from 1 to 6 using

16   Roman numerals.

17             You understand that as a consequence of your

18   conviction, you will be required to register as a sex

19   offender and keep that registration current in the place

20   where you reside, employed or a student in accordance with

21   the provisions of federal law.  Do you understand that?

22             THE DEFENDANT:  Yes, sir.

23             THE COURT:  The government in its letter to me

24   in paragraph 10 on pages 4 and 5 has included provisions

25   relating to forfeiture and restitution.  I already

1    discussed with you generally the right that I have to make

2    an order of restitution and that will be something I have

3    to determine at the time of your sentencing.  Do you

4    understand that?

5              THE DEFENDANT:  Yes, sir.

6              THE COURT:  And in paragraph 10 on page 4, the

7    government has indicated they are going to request that I

8    order you to forfeit to the government, in other words,

9    these matters will become government property, all the

10   matters set forth in paragraphs 10-A, -B and -C as set

11   forth on page 4 of your plea letter.  Do you understand

12   that?

13             THE DEFENDANT:  Yes, sir.

14             THE COURT:  So essentially at the time of

15   sentencing they will become government property.  Do you

16   understand that?

17             THE DEFENDANT:  Yes, sir.

18             THE COURT:  And you do understand that if I

19   accept your plea today, there will be no further

20   proceedings of any kind.  All that will remain is to bring

21   you back here for sentencing.  Do you understand that?

22             THE DEFENDANT:  Yes, sir.

23             THE COURT:  Are you pleading guilty because you

24   are in fact guilty?

25             THE DEFENDANT:  Yes, sir.

1          THE COURT:  Is there anything about the

2    proceedings today that you do not understand?

3          THE DEFENDANT:  No, sir.

4          THE COURT:  All right.  Ms. Freitas, anything

5    else you want to bring to the Court's attention before I

6    proceed?

7          MS. FREITAS:  No, Your Honor.  I believe the

8    Court has covered everything in both letters.

9          (Bench conference:)

10         (It is the policy of this court that every

11   guilty plea and sentencing proceeding include a bench

12   conference concerning whether the defendant is or is not

13   cooperating.)

14         (In open court:)

15         THE COURT:  Okay.  All right.  It is my finding

16   in the case of United States of America versus William

17   Gazafi that he is fully competent and capable of entering

18   an informed plea, that he is aware of the nature of the

19   charges and the consequences of his plea and that his plea

20   of guilty to Counts 1 through 6 of the indictment is a

21   knowing and voluntary plea supported by an independent

22   basis in fact containing each of the essential elements of

23   the offenses charged in those counts of the indictment.  I

24   therefore accept your plea and you're now adjudged guilty

25   of those offenses.

```
 1              Now let me review with you the process that will

 2     be followed to prepare for your sentencing.  Does either

 3     side think I should have more than one hour set aside for

 4     sentencing?

 5              MS. FREITAS:  Your Honor, the government is

 6     requesting two hours.  We have five victims and the

 7     families are all going to speak.  I certainly don't want

 8     to interfere with the Court's trial schedule, but one of

 9     the families is getting reassigned by the military and is

10     leaving in early August and we were hoping for a slot in

11     July.  I know your calendar is pretty booked with trial --

12              THE COURT:  Well, I'm allegedly a senior judge.

13     Did you know that?

14              MS. FREITAS:  I was not aware of that, Your

15     Honor.

16              THE COURT:  Congress has not yet cooperated with

17     my replacement.  So I have the highest caseload of anybody

18     in the District of Maryland right now.  So getting in my

19     calendar is not easy.

20              MS. FREITAS:  I know that, Your Honor.  And I

21     certainly don't want to interfere with trial, particularly

22     given that --

23              THE COURT:  Well, let me see what I can find for

24     you.

25              MS. FREITAS:  -- one is my co-counsel's.
```

**63**

26

```
 1              THE COURT:  Under the sentencing order that I
 2     have in front of me, the final presentence report will be
 3     coming in in early July.  So I need to find some time --
 4     and when is this person leaving?
 5              MS. FREITAS:  The family is moving in early
 6     August.  They didn't give me an exact date.  She's advised
 7     for early August, which I know is a very tight window.
 8              THE COURT:  Let me see what I got.  What date in
 9     August are they leaving?
10              MS. FREITAS:  They told me early August, Your
11     Honor.  I think we're probably safe the first week, but I
12     don't want to gamble that it's not the second week.
13              THE COURT:  How about July 30th?
14              MS. FITZGIBBONS:  I'm sorry, Your Honor.  I have
15     plane tickets and I will be out that week.
16              THE COURT:  The whole week?
17              MS. FITZGIBBONS:  The whole week.
18              THE COURT:  Mr. Chamble won't do?
19              MS. FITZGIBBONS:  No, I don't think so, Your
20     Honor, with all respect to Mr. Chamble.
21              (Laughter.)
22              THE COURT:  You're not essential, Mr. Chamble.
23              (Laughter.)
24              MS. FITZGIBBONS:  We were also looking at -- I
25     know June may be a little early given what the Court --
```

```
 1              THE COURT:  The presentence report won't be
 2    ready until July 1.
 3              MS. FREITAS:  I think, Your Honor, we'll work
 4    with Mr. Tabersky to make it happen if it's necessary I
 5    think.
 6              THE COURT:  Is he here?  We're talking about
 7    you, Mr. Tabersky.  Can you go faster than the schedule?
 8              MR. TABERSKY:  Yes, Your Honor.
 9              THE COURT:  All right.  Let me see what I can
10    find.  What about June 23rd at 1?
11              MS. FREITAS:  That works for the government,
12    Your Honor.
13              MR. CHAMBLE:  I actually have a sentence with
14    the Court on June 23rd at noon -- at 11.
15              THE COURT:  At 11, yes.
16              MR. CHAMBLE:  Similar, but --
17              THE COURT:  So you'll be available.  How about
18    Ms. Fitzgibbons?
19              MR. CHAMBLE:  That's fine.
20              MS. FITZGIBBONS:  Yes, Your Honor.
21              THE COURT:  What I have on my schedule right now
22    on that date is a large multi-defendant death eligible
23    case motions hearing.  But when that was set, there were
24    like three defendants and it's now got six or seven
25    defendants that were just brought into the case.  So I
```

28

1    think that hearing is going to have to move because of

2    necessity of new defendants.  So I can set it for that

3    date, subject to Mr. Tabersky having to go on a fast

4    track.  But I think I have a conference call in that case

5    coming up pretty soon.  And if for some reason it doesn't

6    move, I'll have to revisit the time of the sentencing with

7    you.

8            Let me see what I can do to make this process

9    work.  Mr. Tabersky, this is your life we're talking

10   about.  How much faster than June 3rd can you do for a

11   first cut of the presentence report?

12           MR. TABERSKY:  Your Honor, I'll accommodate

13   whatever the Court --

14           THE COURT:  No.  It's your life.  I don't want

15   to ruin your life.  Let me look at my calendar as to dates

16   that might make it go faster.  If it's now due June 3rd

17   and we want to get this sentencing in in June, it is going

18   to have to be in May.  Would May 9th work?

19           MR. TABERSKY:  I'm not sure I can get it done by

20   May 9th, Your Honor.

21           THE COURT:  How about the 16th?  I'm negotiating

22   with you.

23           MR. TABERSKY:  That would be better, Your Honor.

24           THE COURT:  That would be better.  All right.

25   May 16th.  All right.  Okay.  I think this will work.  All

1    right.  I think we are going to have to go pretty fast in

2    this case because it's going to result in -- if I'm

3    putting the normal gaps between things and I'm going to

4    clean this order up and make it look better when I'm

5    finished.

6              MR. CHAMBLE:  Just so the Court knows, Your

7    Honor, we have a lot of records already that we could make

8    available to probation to expedite matters.

9              THE COURT:  Okay.

10             MS. FREITAS:  And I think a lot of what he'll

11   need he can cut and paste from what the government has

12   done as well.  So I think --

13             THE COURT:  Okay.  Well, let me just review the

14   dates I'm putting in right now and see if this causes any

15   heartburn.  Mr. Tabersky has graciously agreed to ruin his

16   month of May and get this in by May 16th.  If I give the

17   parties -- can you go faster than two weeks to submit

18   objections to him?

19             MS. FREITAS:  Yes, we can, Your Honor.

20             MS. FITZGIBBONS:  Yes, Your Honor.

21             THE COURT:  All right.  Well, then let me

22   compress that to give a little more room here.  Let me

23   make the date for objections be May 23rd, which will be

24   one week and then we could get the final version in by

25   May 30th.  Maybe give it a little bit longer for

1    Mr. Tabersky.  How about I give until May 27th?  If that's

2    the date that the final PSR arrives, then I think we could

3    have a rational schedule for submission of things to me

4    that would be -- how about if I make the date for

5    submission of any witnesses and sentencing memorandum be

6    June 4 and opposition June 11th?  Will that work?

7              MS. FREITAS:  Yes, Your Honor.

8              MS. FITZGIBBONS:  That's fine, Your Honor.

9              THE COURT:  Okay.  All right.  I'm going to have

10    Ms. Merez prepare a not-so-messed-up version of this.

11              Now I have a conference call coming up in this

12    other multi-defendant death eligible gang case and I don't

13    think there will be a problem.  But if there is, I will

14    get you on the phone for a conference call and we will

15    pick another date.  But I think this will work and I

16    express the Court's appreciation to Mr. Tabersky for

17    getting this moving along quicker.

18              MS. FREITAS:  Thank you, Your Honor.

19              THE COURT:  And if you wait just a moment,

20    Ms. Merez is going to prepare a clean order and we can get

21    that to you.

22              Okay.  I will just review it with you again.

23    The date for the initial disclosure of the PSR will be May

24    16th.  The date for any objections to it will be May 23rd.

25    The date for the final submission from Mr. Tabersky will

1    be May 27th.  And the date for disclosure of witnesses and

2    any sentencing memorandum will be June 4 and the date for

3    any responsive memorandum will be June 11.  And then we

4    will have sentencing on June 23rd at 1.

5           All right.  We will see you on June 23rd.  Thank

6    you very much.

7           MS. FREITAS:  Thank you, Your Honor.

8           (The proceedings were concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          <u>CERTIFICATE OF REPORTER</u>

2

3          I, Lisa K. Bankins, an Official Court Reporter

4    for the United States District Court for the District of

5    Maryland, do hereby certify that I reported, by machine

6    shorthand, in my official capacity, the proceedings had

7    and testimony adduced upon the guilty plea in the case of

8    the United States of America versus William S. Gazafi,

9    Criminal Action Number RWT-13-0472, in said court on the

10   21st day of April, 2014.

11          I further certify that the foregoing 32 pages

12   constitute the official transcript of said proceedings, as

13   taken from my machine shorthand notes, together with the

14   backup tape of said proceedings to the best of my ability.

15          In witness whereof, I have hereto subscribed my

16   name, this 17th day of August, 2014.

17

18

19                              *Lisa K. Bankins*

20                              Lisa K. Bankins
                                Official Court Reporter
21

22

23

24

25

1        UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF MARYLAND
2              SOUTHERN DIVISION

3    UNITED STATES OF AMERICA      Criminal No.  RWT-13-0472

4         v.                       Greenbelt, Maryland

5    WILLIAM S. GAZAFI,            June 23, 2014

6         Defendant.              1:00 p.m.

7    --------------------------/

8              TRANSCRIPT OF SENTENCING
       BEFORE THE HONORABLE ROGER W. TITUS
9          UNITED STATES DISTRICT JUDGE

10   APPEARANCES:

11   For the Government:  United States Department of Justice
                          By: LISAMARIE FREITAS, ESQUIRE
12                        1400 New York Ave NW
                          Suite 600
13                        Washington, D.C. 20005

14                        United States Attorney's Office
                          By: THOMAS M. SULLIVAN, ESQUIRE
15                        6500 Cherrywood Lane
                          Suite 200
16                        Greenbelt, Maryland 20770

17   For the Defendant:   Office of the Federal Public Defender
                          By: AMY S. FITZGIBBONS, ESQUIRE
18                            JOHN CHAMBLE, ESQUIRE
                          6411 Ivy Lane
19                        Suite 710
                          Greenbelt, Maryland 20770

20

21   Court Reporter       Lisa K. Bankins RMR
                          United States District Court
22                        6500 Cherrywood Lane
                          Greenbelt, Maryland 20770

23

24   Proceedings recorded by mechanical stenography,
     transcript produced by notereading.

25

**71**

1

```
 1                    P R O C E E D I N G S

 2          MS. FREITAS:  Good afternoon, Your Honor.  The

 3   Government calls the case of United States of America

 4   versus William Gazafi, Criminal Number RWT-13-0472.

 5   LisaMarie Freitas and Thomas Sullivan for the government.

 6   Also with us at counsel table is FBI Special Agent

 7   Jacqueline Dougher and we are here for sentencing.

 8          THE COURT:  Good afternoon.

 9          MS. FITZGIBBONS:  Good afternoon, Your Honor.

10   Amy Fitzgibbons with the Federal Public Defender Service

11   on behalf of Mr. William Sean Gazafi.  I am joined at

12   counsel table by Mr. John Chamble also from my office.

13          THE COURT:  Good afternoon.  All right.  Let

14   me -- yes, sir?

15          MR. CHAMBLE:  I'm sorry, Your Honor.  Before we

16   proceed, may we approach the bench?

17          THE COURT:  You may.

18          (Bench conference:)

19          THE COURT:  Mr. Gazafi, if you can hear me,

20   raise your right hand.  Okay.  All right.  Go ahead, sir.

21          MR. CHAMBLE:  Your Honor, my only concern is the

22   focus of this sentencing is what is a appropriate

23   punishment and there's very little factual dispute between

24   the government and the defense.  I notice that the

25   government has a number of exhibits, they intend to call
```

certain witnesses, which I'm mystified as to the purpose

since there's nothing in dispute.  I'm fearful of

unnecessary theater and prolonging this sentencing more

than necessary given that we're not disputing the

essential facts of the case.  So that's my concern.

        MS. FREITAS:  Certainly, Your Honor.  Actually,

this was not a plea agreement.  This was the defendant

pleading straight up to the indictment and as such, all of

the facts that were incorporated in the plea agreement we

offered came into evidence through the defendant's plea

letter and the facts that they agreed to first.  Secondly,

Your Honor, the government has a right pursuant to the

3553 factors and 3661 to present the full scope of the

nature and circumstances of the offense.  And furthermore,

of course, Your Honor, we need to set a clear record of

the circumstances of the offense.  We do have two

witnesses and our purpose is very brief testimony to make

sure our evidence is securely in the record, Your Honor,

and then argument.

        THE COURT:  All right.  Well, this is set for

two hours and I've got a case after this.  So we need to

stay within the parameters of the case and I want to make

sure the defense has plenty of time to put their position

on.  So streamline it as best you can.  I recognize you

have the right to put your case on and I'm not going to

```
 1    tell you you can't do that.  But try to be as efficient as
 2    you can.
 3              MS. FREITAS:  Yes.  We will, Your Honor.
 4              (In open court:)
 5              THE COURT:  All right.  Let me first begin by
 6    confirming with both counsel that you've had a chance to
 7    review the presentence report and in the case of the
 8    defense to review it with the defendant.  Is that correct?
 9              MS. FITZGIBBONS:  We have, Your Honor.  We have.
10              THE COURT:  All right.
11              MS. FREITAS:  We have, Your Honor.
12              THE COURT:  Yes.  Are there any disputes between
13    the parties as to the factual content of the presentence
14    report only?
15              MS. FITZGIBBONS:  No, Your Honor.
16              MS. FREITAS:  No, Your Honor.
17              THE COURT:  All right.  And any dispute with
18    respect to the probation officer's recommendation that I
19    find the offense level to be 47 and that's after
20    adjustment for acceptance of responsibility and a Criminal
21    History Category of 1.  Any dispute about that?
22              MS. FITZGIBBONS:  Your Honor, I don't dispute
23    that the offense level is 47.  I would object to the
24    stacking of the punishments, which I think I laid out in
25    my sentencing memorandum.
```

1          THE COURT:  Oh, I understand that.  But the

2     recommendation is that I find the combined offense level

3     for all the counts in this case to be 47.  Is there an

4     objection to that?

5          MS. FITZGIBBONS:  No.

6          THE COURT:  All right.  And I recognize that you

7     are suggesting that I ought to take the statutory maximum

8     and not multiply it any number of times.  The probation

9     officer's recommendation is that because the sentencing

10    guidelines were calculated out to life, that the only way

11    to replicate that is with a sentence that equates to life.

12    That's essentially what the probation officer's

13    recommendation is.

14          All right.  Well, I will adopt for guideline

15    purposes the contents of the presentence report as my

16    factual findings.  I will adopt for guideline purposes

17    that the offense level is 47, Criminal History Category 1,

18    which produces a recommended range of sentence of life.

19    But because that's in excess of the statutory maximum for

20    each count, the guideline range ends up being 360 months

21    per count.  And the probation officer has recommended

22    combining the first two counts to produce a 720-month

23    sentence and then the rest of the counts concurrent.

24          Now I have reviewed the sentencing memorandum

25    submitted by the government as well as by the defense,

1    including the letter received -- including a letter

2    received on Friday from the Public Defender with the

3    defendant's statement to me.  I've also received by way of

4    attachments to the government's memorandum victim impact

5    statements.  Is there any desire for any victims to

6    address the Court today?

7            MS. FREITAS:  Yes, Your Honor.  There are.  We

8    have the parents of Victims 1 through 4 present and they

9    would like to provide statements.

10           THE COURT:  All right.  Have them come forward.

11           MS. FREITAS:  Certainly, Your Honor.  I will

12   have the -- go victim by victim, Your Honor.  Victim 1.

13           THE COURT:  You may proceed.

14           MS. FREITAS:  Thank you, Your Honor.

15           THE WITNESS:  There is no way --

16           THE COURT:  Could you first identify yourself,

17   ma'am, with your name?

18           THE WITNESS:  My name is Christine.

19           THE COURT:  All right.  Thank you.

20           THE WITNESS:  There is no way to describe the

21   amount of dread that I have experienced at the thought of

22   coming to face the person who has committed one of the

23   most severe acts of betrayal imaginable.  However, someone

24   must give my daughter a voice in this.  And as her mother,

25   that responsibility falls to me.

1          This entire experience has been a living

2     nightmare.  Learning that your child has been a victim of

3     sex abuse is the worst thing to have to face, second only

4     to losing them altogether.  It is that much worse when the

5     offender turns out to be her own father, someone who is

6     supposed to love, protect and never harm her.

7          The fallout from the offender's manipulative,

8     selfish, grotesque, perverse, abusive and criminal actions

9     has been astonishing and extreme.  It has affected many

10    more people than just myself and my daughter.  It deeply

11    disturbs me to know the ripples extend so far that people

12    have even lost their careers because of this.

13         Speaking for my child, myself and my family,

14    however, the repercussions have been severe.  The

15    financial devastation and complete loss of the ability to

16    support my family is hard enough to handle.  We have lost

17    our home and we are now being forced to move and we will

18    be almost completely dependent on family until we are able

19    to recover.

20         But even this seems minor to what I know we will

21    be facing long term in regards to the emotional

22    devastation my daughter is suffering.  The extreme fear

23    and confusion she experienced while watching federal

24    agents attempt to beat down her father's front door with a

25    battering ram.  Degrading the loss of her father in the

1  same manner as if he had died now pale in comparison to

2  learning the truth about what has happened to her and her

3  friends.

4         While it is a blessing that she has apparently

5  no active memory of any abuse, the fact that she was

6  rendered incapacitated through the use of drugs almost

7  makes things worse.  It is not the monster who has hurt

8  her that is now gone from her life.  It is her father.  He

9  was supposed to love her.

10        She struggles deeply with trying to understand

11 that she is an incredibly astute and articulate little

12 girl who is now asking questions because she wants to know

13 the truth and while the answers remain general and age

14 appropriate, she is now haunted by reality, more questions

15 and a complete loss of her self-esteem, her innocence and

16 her trust of others.

17        She mentions on a regular basis the alienation

18 she feels, stating that she is no longer the same as her

19 friends at school and that something is wrong with her

20 now.  In her own words, that her body is now un-private

21 which I learned from her means that she feels completely

22 violated.  Her own father did this to her.

23        I will admit that in the beginning, there was

24 enough pity left in me to feel sorry for him.  I had once

25 been married to him.  I had once loved him.  But now that

1　　I have learned the full extent of his actions, I cannot

2　　believe that it would be safe to allow him the freedom to

3　　victimize children ever again.

4　　　　　　Additionally, I would ask that you consider my

5　　daughter specifically in making your decision.  The

6　　offender is an only child with very little extended family

7　　and none that he is close to.  The idea of his being

8　　released during his lifetime to no home and no family to

9　　turn to except my daughter, it haunts me, it bothers me.

10　　How hard it would be for her at any point in her adult

11　　life to have to decide whether or not to help the man who

12　　horribly violated her as a child or turn her back on him

13　　leaving me with no means to take care of herself.  It

14　　should never be her burden to bear that.  It shouldn't be

15　　her responsibility.  He needs to not have contact with

16　　her.  He needs not to be able to contact her in his

17　　lifetime or hers.  And I would pray that if that is taken

18　　into consideration, I do think about the sentence that he

19　　is to get.  Thank you.

20　　　　　　THE COURT:  Thank you very much, ma'am.  That's

21　　very helpful.

22　　　　　　MS. FREITAS:  Your Honor, Victim's 1 grandmother

23　　would like to speak.  Can you please state your first

24　　name?

25　　　　　　THE COURT:  All right.

1              THE WITNESS:  Jodie.  As the mother and

2    grandmother of the wife and children of Mr. Gazafi, I have

3    witnessed first hand the horrendous impact both

4    emotionally and financially that his behavior has had on

5    this family.  I, too, have been emotionally and

6    financially impacted.

7              In September 2013, a little over one year after

8    losing my husband to cancer, my life was once again

9    shattered by this terrible crime.  I am now finding myself

10   living between Maryland and Texas trying to help my

11   daughter with finances, childcare and household needs now

12   that she has become a single parent with no support

13   financially or otherwise from a spouse.

14             I watch with a broken heart as my teenage

15   grandson deals with his anger, shame and the embarrassment

16   of having his stepfather arrested and convicted of such

17   heinous acts.  I now have a distrust of all men.  And I'm

18   terrified at the thought of my two young granddaughters

19   being left alone with any male, no matter how well we

20   think we know them.

21             I worry about my granddaughter's mental and

22   emotional well-being as she grieves not just the loss of

23   her father, but the loss of trust that a parent should

24   give to a child, not take away.  She will most likely

25   suffer from emotional issues all of her life as she

1    becomes more knowledgeable of the extent of her father's

2    crime.

3            My daughter, who is a stay-at-home mom, at her

4    husband's request now struggles to figure out where she

5    will go once evicted from her home, which is now happening

6    and we are presently moving out of the home.  And she will

7    be living with me until hopefully she can get back on her

8    feet again.

9            While punishment is certainly due for the

10    hardship and trauma Mr. Gazafi has caused in our lives, my

11    request that he be given the maximum sentence for this

12    crime is based mostly on a need or not mostly, but it's

13    also strongly based on the need to protect other children,

14    who might be exposed to his danger and deviant behavior

15    were he to be released.

16            I do not believe that sex offenders can be

17    rehabilitated and I do believe that if released, this

18    behavior would not only resume, but escalate to a much

19    more dangerous level.  I don't believe that there is a

20    secure enough system in place outside of prison walls that

21    could protect other children from a sex offender like him.

22    A sentence of no less than 90 years would guarantee that

23    he would spend the rest of his life in prison and away

24    from innocent children.  Thank you.

25            THE COURT:  Thank you very much, ma'am.  That's

**81**

11

1    very helpful.

2           MS. FREITAS:  Your Honor, I would like the

3    grandmother who is raising Victim 2, she's going to give a

4    victim impact statement at this time.

5           THE COURT:  All right.  That will be fine.

6           MS. FREITAS:  Can you please state your first

7    name?

8           THE WITNESS:  Cheryl.  Judge, I've been asked to

9    come here today to tell you the impact of these crimes

10   against my family.

11          THE COURT:  Could you put the microphone a

12   little closer to your mouth so I can hear you better?

13   Thank you, ma'am.

14          THE WITNESS:  I'm not sure that the English

15   language has enough words in it to describe the horrors

16   that have been bestowed on my family and the impact to us.

17   My granddaughter has now been groomed so that she thinks

18   things are acceptable and any man or woman who chooses to

19   could walk up to her and do these same things and she

20   wouldn't think that they were better.  She wouldn't think

21   that there was anything wrong because of what he's done.

22   She now has to go through years and years and years of

23   counseling to unlearn these things.  And as a part of it,

24   she's going to go through all these things of feeling

25   guilt and feeling dirty and used and all those horrible

1    things you never want your child to have to experience in

2    a lifetime.

3          Not only that because he drugged her, she has to

4    go through testing for her kidneys and her liver to make

5    sure that there is no functional damage to them.  She's

6    experiencing short-term memory issues.  We're not sure if

7    it's related, but it sure seems to be because she didn't

8    have it a couple of years ago.  It's just something that's

9    been pretty recent.

10          It's all these questions about physical health

11    and mental health as she goes down the road.  How can she

12    live a normal childhood?  How can she live a normal life?

13    We are the people we were before.  We don't find the joy

14    in things that we used to.  We can't show her those

15    things.  We can't show her how to always look on the

16    positive side of life because of all these things that we

17    have to deal with.  We just can't keep the family as it

18    used to be.  We have to constantly keep on guard against

19    somebody who might have seen these pictures and can

20    identify her even without her face being there and would

21    potentially nab her off the streets.

22          I've left my job two and a half years early

23    because I'm going to be home schooling her to make sure

24    that she doesn't get hurt again.  I can't deal with the

25    fact that she is so vulnerable to any pervert that's out

1    there.  That I can't let that happen.  I have to protect

2    her every way I can.  I just can't -- I can't go back to

3    being the person I was.  She can't go back to being the

4    person she was or have the people that were trying to

5    raise her be a good upstanding person because we're having

6    to deal with all this.  It is the foremost thing in our

7    mind and we don't know how we're going to put it all back

8    together.

9         This man cared nothing for her.  When he was

10   drugging her, there was one morning that he woke us up out

11   of bed really, really early, I'm saying 6:30, 7:00 in the

12   morning and he brought her home to us saying that they had

13   a lot of things to do that day and that that's why he was

14   waking us up so early and bringing her back.  Very unusual

15   for when the girls were having sleeping overs.

16        And his other child that was with him, one of

17   the other victims kept saying that my victim did not want

18   to wake up that morning.  That she wouldn't wake up, she

19   wouldn't wake up.  They had a hard time getting her to

20   wake up and he kept shushing her.  She slept that entire

21   weekend with me having to force her to get out of bed to

22   eat.  And when I found out about all this, the reality

23   that smacked me hardest was the fact that I could have

24   lost her, that she could have died because of a drug

25   overdose where this individual didn't even have the

1    compassion to tell us what he had done so we could take

2    her for emergency medical treatment to potentially save

3    her life.  He would have rather just let her die in my

4    household than to do anything else.

5            Not only that, he plotted and planned for her

6    older sister to join the sleepover the night that he was

7    arrested.  He was again going to abuse and victimize a

8    second member of my family.  He has no compassion for any

9    of these kids or any of the things that he's done.  He has

10   no concern for the impact he's put on any of these kids.

11   And I don't think that he ever gave their well-being a

12   thought in his arrogance to think that he was okay to do

13   what he was doing.

14           I just don't know if I can sum it all up.  My

15   family will never ever ever be the same.  We will live the

16   rest of our lives in fear that somebody will again hurt

17   her or one of the other members of our family because this

18   person has made them publicly available in images of a

19   pornographic nature out there.  We have to constantly

20   guard on that every step of every day of our lives.  We

21   have to go through years and years of counseling.  We have

22   to go through years and years of testing for physical

23   issues that we shouldn't ever have to do for a child

24   because of the drug addiction stuff that he possibly gave

25   her with the Ambien that we don't even know how often he

```
1    did it.  We don't know the full impacts of any of these
2    things.  But we have to live with that every day for the
3    rest of our lives.
4           So the only thing, Your Honor, I would ask is
5    that when you pronounce sentence on this individual, may
6    God's vengeance guide your hand and guide it with all his
7    wrath.
8           THE COURT:  All right.  Thank you very much,
9    ma'am.  That's very helpful.
10          MS. FREITAS:  As Your Honor is aware, Victims 3
11   and 4 were siblings and their parents would like to give a
12   statement at this time.
13          THE COURT:  All right.
14          THE WITNESS:  My name is Trisha.  The statement
15   is written on behalf of me and my two now toddler age
16   daughters.  I never thought I would be standing here today
17   reading a victim impact statement to influence the
18   sentence you impose upon William Sean Gazafi.  I am
19   grateful for your time and for the opportunity you gave me
20   to write this letter as Sean's crimes have had a profound
21   effect on me.  No matter which words I choose, this letter
22   is inadequate.  I don't want to tell you how I feel.  I
23   want you to feel what I feel.  It's difficult to convey my
24   emotions to someone else who can really grasp the extent
25   of my overwhelming pain.  I look in my girls' beautiful
```

1    faces and my heart breaks knowing what happened to them.

2         The pain Sean has inflicted on me is a constant

3    heaviness in the pit of my stomach.  The regret and sorrow

4    I feel for what happened to my girls adds to the weight.

5    It's always there.  It's been a soul-crushing experience

6    for me and my family and I'm not sure how to get through

7    it.  Every day I struggle not to think about Sean imagine

8    smiling after a slap in the face, then imagine doing it 24

9    hours a day.  It's all I think about.  But I can't allow

10    it to affect our girls.  We have to conduct our household

11    business as usual for the sake of them.

12         I am shocked and disgusted to know Sean is a

13    pedophile and a child molester.  I never thought my girls

14    would be victimized in a sexual manner by Sean or by

15    anybody else, certainly not within the first two years of

16    their lives, never within the first six months of Jolie's

17    and quite possibly in the first two months of Casey's.

18    That was the first time Sean offered to babysit.  He was

19    alone with her.

20         Chad and I were married when I was 32 and he was

21    33.  We were well established in our careers.  We are

22    educated.  We are homeowners.  We are dedicated to our

23    friends and families.  Casey was born in December 2010.

24    Expecting our first baby was such a special time for us.

25    I cried with happiness when she was born and I first held

her.  I cried with relief each time I heard the babies'
hearts beat at every prenatal visit.  It was reassuring to
know they were alive and thriving and well protected.
They were sweet, tiny baby girls for us to love and to
raise well.

Casey is smart and outgoing.  She is demanding
and sweet at the same time.  Jolie came just thirteen
months later.  She was five and a half pounds and a very
scary delivery.  Thankfully, she turned out to be just
perfect and we are so grateful for that.  She completes
our family and brings such happiness into our home.  She's
quiet and smart, relaxed and content.  She and Casey have
completely different personalities.  They compliment each
other well.  They are the best of friends.

Sean had been a friend to Chad for years before
Chad and I had our girls.  Sean was a friend like any
other who watched each pregnancy progress and seemed
interested in my health and the health of the babies.  I
had no idea his interest went far beyond the interest
anyone else had.  He must have been thrilled to learn the
sonograms showed we were expecting girls each time.  In
Sean's mind, these were girls he could act out his sick
sexual urges on.  Innocent babies he could sexually abuse.
The things he did to them are the things I vowed to
protect them from since before they were born.

1          Jolie was just five months old when Sean
2    recorded a pornographic video of himself with her, a baby.
3    She was an infant, not even crawling.  Sean, a grown man,
4    a father, trusted member of our military and a church
5    goer, he thought it was appropriate to create a video of
6    his genitals and our Jolie to send a video out into the
7    world to others who was like him.  He thought it was
8    acceptable behavior.  He knows no boundaries.  He's a
9    threat to every child.

10          It was very surreal when the FBI came to our
11   house following Sean's arrest.  We were shown photos of
12   our girls and asked to identify the children.  One photo
13   was of Casey wearing a striped shirt.  She had her
14   pacifier in her mouth and her big round blue eyes were
15   staring blankly and expressionless at the camera.  Another
16   photo was of an infant, Jolie, she was wearing a pink
17   shirt, lying on the floor, holding a bottle of formula
18   with both hands.  She was looking right at the camera,
19   too, while Sean was molesting her and capturing it on
20   film.  If I look close enough, I'm sure I can see his
21   reflection in their eyes.  Although the photos we were
22   shown were cropped so they would not upset us, I can't
23   help but think of the photos that followed, the ones we
24   didn't see.  I wonder what sexual act Sean was inflicting
25   on them.

1    The shocks just kept coming.  Sean's crimes were

2    depicted on the evening news, in newspapers and in online

3    news sources and discussed on blogs immediately following

4    his arrest.  Sean's church posted his prison address

5    online asking its congregation for support as we are all

6    God's children.  What about my children?  What about all

7    the children he victimized?  Who on earth would send

8    letters of support to Sean in prison?

9    Friends shared the news story on Facebook, not

10   knowing my girls were the victims.  I read all the

11   comments to those posed.  They were the expected what a

12   horrible monster, I hope he dies in jail comments to how

13   do the parents not know, a six-month-old baby.  Well, it

14   was very painful to read the judgments other parents

15   imposed on me.  I know I didn't do this to my children.

16   Sean did.  I didn't knowingly allow this to happen to any

17   of these children.  Each piece of media was shocking and

18   disturbing.

19   Reading the indictment and complaint and arrest

20   warrant online was truly sickening.  To see that a

21   thousand other people read that also makes me sick.  I'm

22   not sure who would want to know such things.  But I

23   imagine most of the folks who searched out these documents

24   were former colleagues of Sean's and colleagues of my

25   husband.

1    To see the effect this has had on my husband is
2  very upsetting.  My heart breaks the entire situation.  I
3  can't imagine the pressure Chad must have felt knowing he
4  would have to come home and wake me to break this
5  disturbing news at 1:00 in the morning.  It was the worst
6  night of my life.  I can't imagine what it was like to be
7  him when the investigators pulled him aside at work to
8  tell him that Sean had victimized our girls with his
9  heinous crimes.  I can't imagine what Chad deals with at
10  work even now.  His colleagues were also Sean's colleagues
11  and everyone knows Sean and Chad were good friends because
12  it was in the news.  Everybody knows Sean was arrested and
13  they all know why.  Because they are reasonably
14  intelligent people, it seems clear Chad's co-workers are
15  aware that our girls are among Sean's victims.

16    Chad asked me if I was upset with him because he
17  was friends with Sean and he felt responsible for bringing
18  him into our lives.  I assured him he was not to blame at
19  all.  Sean knows right from wrong and he's the one who did
20  this and the blame belongs squarely on Sean.  Sean is a
21  disgrace to the military, to his church, to his family and
22  to his friends.  Sex crimes can destroy a person.  Sean
23  tried to and maybe even did destroy the mental well-being
24  of the girls he molested.  Thankfully, my girls were
25  probably too young to realize and understand what he did

1   to them.  I wouldn't be able to stand it if Casey and

2   Jolie grew up to be less than whole because of the sexual

3   abuse they suffered at Sean's hands.

4           I realize now Sean manipulated us in order to

5   gain private access to our girls to satisfy his disgusting

6   sexual urges.  We were perfect targets for him.  I am new

7   to the area.  Our families are hundreds of miles from

8   here.  He recognized this and used it to his advantage.

9   He scammed us so he could gain access to our baby girls

10  and share their naked photos with his pedophile friends on

11  the Internet.  And somehow Sean made me feel as though I

12  were in his debt each of the four or five times he babysat

13  for us.  All of it is just so discussing.  I let him into

14  our home and alone with our girls.  He was a wolf in

15  sheep's clothing.  I never knew the real Sean.  He was

16  Foot Fan Bill all along.

17          Every date night we arranged at Sean's

18  suggestion was really a date night for him.  It horrifies

19  me looking back.  He horrifies me.  Sean was arrogant and

20  bold to victimize my entire family like this.  It is

21  unbelievable the way he'd make everyone around him feel

22  inferior.  He had a know-it-all attitude especially when

23  it came to electronics.  He had the latest and all the

24  gadgets, IPad, IPhone, E-reader, laptop.  But now I'm

25  thankful for how techy he was because those electronics

**92**

1    became his undoing.  The photos and videos he saved on

2    these things tell a story about a very disgusting

3    individual who's not fit for society.  He had an

4    international life and now he sits in a jail cell and that

5    gives me some consolation.  He's not been able to

6    victimize anyone else here or internationally since

7    December.

8          What Sean did has changed our lives in many

9    ways.  Chad and I attended several counseling sessions at

10   genesis to try to reconcile the Sean we thought we knew

11   with this scheming child molester Sean really is and was

12   all along.  It is our hope that counseling will help us

13   continue to be good parents throughout this nightmare that

14   has consumed us.

15         We've considered moving and actually made the

16   decision to move out-of-state to get away from him and

17   away from our house where we can just start over, moving

18   the girls from their only home.  There's an urge to flee,

19   but also an urge to keep our routine as normal and

20   possible for the girls.

21         At work, this has affected me.  New clients

22   almost always run standard background checks on my

23   security clearance.  And this federal investigation will

24   turn up and it will need to be explained to some extent.

25   I really can't get away from it.  Chad can't get away from

1    it at work or at home.  We took time off after Sean's

2    arrest so we could go to New York and be with our families

3    and to weather the storm.  I've used several vacation days

4    to deal with what Sean did.  In addition to going home for

5    a week, I've had to use time for counseling appointments

6    and doctor's appointments for the girls.  Most of my

7    vacation time is gone.  We were saving it for a family

8    vacation that we will not get to have this year.

9         In addition to the time I was forced to take off

10   work, there were other financial implications.  Because we

11   have elected to move out of state on account of Sean's

12   crimes, we have incurred the expense of fixing up our

13   house to sell.  We will have to incur the expense of

14   relocating.  My husband will lose potential higher

15   earnings by accepting a new position at another base.

16   After 19 years loyally serving the Air Force, Chad was on

17   track at Andrews for his dream job and now he's

18   sacrificing that.  I'm not sure how to put a dollar value

19   on such a thing.  While I appreciate his dedication to our

20   family and what is best for us, it is difficult for me to

21   watch my husband walk away from Andrews where he has

22   worked so hard and traveled and sacrificed so much to get

23   ahead.  I can't imagine what it would be like for him to

24   stay here though either.  Everyone at work knows Chad's

25   daughters are Sean's victims.

1    Sean's actions have taken a toll on my physical
2    health.  My immunity is so weakened from the stress and
3    lack of sleep, that I get sick fairly easily.  I was on
4    three courses of antibiotics just in the month of October
5    alone.  I experience headaches almost daily.  It's a rare
6    day that I don't get a headache from the stress of the
7    situation.  I have always been extremely healthy and I
8    look forward to Sean's sentencing so maybe I can rest and
9    be in better health.
10    I am hesitant now to allow my girls to live a
11    normal life.  The sleepovers, play dates, school, going to
12    the beach, going in a playground, signing up for dance or
13    gymnastics lessons, I will have to weigh these things very
14    carefully as the situations arise.  I can't look around me
15    at the grocery store, the playground, the mall without
16    wondering if every man I see is a pedophile.  I think
17    twice when I put a dress and tights on the girls.  Their
18    costumes for Halloween are very conservative because of
19    Megan's Law.  I know exactly how many convicted sex
20    offenders live in our area.  I know about where they live
21    in relation to our home.  I've always checked the registry
22    periodically in an effort to keep my girls safe.  It did
23    not cross my mind that the real danger was a supposed
24    friend of ours.  It didn't cross my mind that as I checked
25    the registry, my girls had already been sexually molested

1    by someone we knew.  Because Sean disseminated photos and

2    videos of my girls to other pedophiles online, I

3    understand these images are now out in the world.  I have

4    chosen to be notified whenever their photos are traded.

5    These girls will be victimized over and over every time

6    one of their pictures are shared.  Whoever views their

7    images or shares them should also be prosecuted.

8            There's a live video feed provided at the girls'

9    daycare.  I have it on all day, every day.  I work on one

10   laptop and have the daycare video up on the other laptop.

11   The cameras give me peace of mind that our daughters are

12   being cared for while I work and they are not being abused

13   there.  Because I'm able to work from home most of the

14   time, I'll keep the girls home with me every now and then

15   instead of sending them to daycare.  I just don't want to

16   let them out of my sight.

17           Many days I resist the urge to just go pick them

18   up so they'll be home with me.  It's not a good way to

19   live and it's not practical for very long.  Logically, I

20   know I will have to send them out into the world without

21   me.  Maybe that gets better with time.  After what Sean

22   did, it is difficult not to shelter these girls.

23           In the future, I don't know how to tell the

24   girls that they can't trust everyone and why not everyone

25   they believe to be a friend can be trusted.  Not everyone

is looking out for them.  Some people have malice in their hearts.  I tell them that their bodies are their own.  And not to let anyone touch them in their bathing suit areas. Those are private areas not to be shared with anyone.  If they are made to feel uncomfortable by anyone, I tell them to come and tell me or daddy or one of their teachers.  It seems pointless to have this discussion with a two-year old and a three-year old, but I think they're getting it.

Thankfully, Sean was removed from society as Foot Fan Bill and Bill James' real identity was discovered.  There is no place in society for child molesters.  I am glad he is incarcerated with other violent criminals.  I hope they are able to peg him for who he is.

I am grateful for the undercover folks, with the FBI who weed out these disturbed individuals.  The undercover operations saved my girls from years of abuse. It's unfortunate that I will never know to what extent Casey and Jolie were abused.  I am aware of only what Sean was sick enough to capture on video and in photos and dumb enough to share it with an undercover agent.

Sean used my girls and our home to commit these disgusting acts.  Nothing is off limits to him.  My fear is that his behavior would only escalate had he not been caught.  He was likely to befriend other families or use

1    his innocent daughter to unknowingly lure other victims

2    for him to abuse.

3              So here we are, trying to mend our daughters

4    from the horrible sexual act Sean committed, trying to

5    mend ourselves, trying to keep our marriage in tact and to

6    keep our family in tact.  I'm not able to sleep well at

7    night.  I have dreams about Sean.  He's my first thought

8    in the morning.  He's my last thought at night.  It's a

9    rare occasion when a few hours pass and I think to myself,

10   wow, I haven't thought about Sean in a few hours.  We try

11   to busy ourselves so we are distracted enough to think of

12   happy things.  We try to create good memories for our

13   family.

14             Child molesters are the most dangerous and

15   predatory of all criminals.  Sean is the worst of them.

16   As a parent and as a judge, you have a responsibility to

17   rid society of these dangerous monsters and give justice

18   to each of the little girls Sean molested, a baby and a

19   toddler among them.

20             What Sean did is appalling, it's atrocious,

21   horrific, disgusting and sleezy.  No good is gained from

22   his crimes and so many people are suffering from his

23   actions.  I always try to look at the bright side of

24   things.  But there is no bright side in this.  No one wins

25   and everyone loses.  Sean is a threat to all children and

1    to all unsuspecting families.  Because Sean distributed

2    pornographic images of my girls on the Internet, the girls

3    will never be free from his crimes.  Sean arranged it so

4    they will be abused perpetually every time their photos

5    are sent or received.  He should never be free either.

6         I respectfully request the maximum sentence of

7    30 years for each of the six counts in the indictment to

8    be served consecutively and whatever restitution you feel

9    is appropriate.  Specifically, it would bring great

10    comfort to me and it may deter other pedophiles from

11    engaging in similar crimes if Sean served his 180 years at

12    the Supermax facility in Florence, Colorado.

13         I believe Sean is a security risk with his prior

14    high level U.S. security clearance and with his above

15    average technological knowledge.  Beyond that, Sean is a

16    pedophile who boldly committed egregious crimes against

17    innocent children and should never live outside of prison

18    walls.  Thank you.

19         THE COURT:  Thank you very much, ma'am.  That's

20    very helpful.

21         THE WITNESS:  My name is Chad.  Your Honor, I'm

22    the dad of two of the victims.  My relationship with the

23    defendant and the co-worker -- I'm sorry.  My relationship

24    with the defendant was a co-worker and friend for six or

25    seven years.  I don't know that there are words to

**99**

29

1    describe how his actions have affected me and my family.

2    It's really changed who I am as a person and how I go

3    about my life.  I can assure you that it's been an

4    emotional roller coaster.  But I'll keep this factual to

5    illustrate how this has changed us.

6         I learned about his crimes against my daughters

7    on September 6th.  Within a minute of informing me of his

8    crimes, I was told that I had to look at the situation as

9    the death of a friendship.  I was shocked and confused to

10   a point where I really didn't understand what they were

11   telling me.  But I knew enough to know that I didn't want

12   to know any details because I didn't feel like I could

13   handle them.

14        The word "abuse" kept being used.  After talking

15   to the agent for about 15 minutes, someone used the word

16   "molested."  It wasn't until then that I recognized the

17   severity of the situation.  It was late at night and I

18   knew that I would go home at some time that night.  So I

19   started to think about my wife.  I questioned whether I

20   should allow her to get a good night's sleep before

21   informing her and allowed her a few more hours to view the

22   world normally.  When I walked into the door, the first

23   thing I did was hug both of my girls and tell them that I

24   love them.  I decided to wake my wife and inform her

25   immediately.  I never did get the words out.  Based on the

1    direction of the conversation, she figured it out.  All I

2    could do was nod my head when she caught on.

3          The following day, we had to identify our

4    daughters in six pictures he had taken.  Thankfully, the

5    pictures were innocent, but the looks on their faces are

6    engrained in my memory to this day.  It was a look of fear

7    and confusion coming from babies.  The pictures forced me

8    to imagine what preceded and followed.

9          We took them to the doctors soon thereafter.

10   The doctor assured us that the girls were physically okay

11   and that they were too young to remember.  That is all

12   that I will ever need to know.  More details of the

13   incidents won't make me a better parent or a better person

14   and I still don't think my mind is capable of handling it.

15         Over the next few days, my wife and I sat around

16   asking all the questions.  We pieced together information

17   and realized how he was going about his crimes.  We

18   focused on our hatred and confusion towards him and we

19   wanted to know the details of the arrest.  We hoped it was

20   a humiliating and painful experience.  The hatred consumed

21   our lives.  We averaged about four hours of sleep at night

22   while trying to focus all of our attention on our

23   daughters when they were awake.  We were spinning our

24   wheels and it was to a point where neither of us had

25   answers.

1    I took ten days of leave and we headed to our

2  families for advice, comfort and normalcy.  My mind was

3  starting to move on when the story went public on

4  September 12th.  But again it consumed us.  We watched as

5  Google results multiplied by the minute and the story

6  spread across the country and around the world.  It wasn't

7  healthy, but I needed to know what the media was saying

8  and what people were reading.  I was infuriated more so

9  than ever and spent hours pacing that night.  Against my

10  better judgment, I started to read the transcript of a

11  conversation collected by the undercover agent.  I was

12  only able to read a few pages of that document and to this

13  day, I haven't read it all.

14    We returned to Maryland and I returned to work

15  hoping to focus my attention on anything else.  A friend

16  called me before I arrived to work and warned me that I

17  wouldn't be able to avoid the gossip.  I was assured that

18  leadership across the base was doing everything in their

19  power to protect my privacy.  But I didn't do myself any

20  favors by disappearing for two weeks.

21    With the details given in the news articles

22  combined with my disappearance, most of my current and

23  former co-workers had figured out that it was my babies

24  mentioned.  When I encountered co-workers for the first

25  time, it was unmistakably awkward.  I felt like I was a

ghost that they had run into.  I knew that it would take time to overcome that, but I had no choice.  And on top of the awkwardness, I had leadership checking on my well-being.

For a few weeks, it was daily meetings with different people throughout the day.  After some time, face-to-face meetings changed to emails and the frequency subsided.  Honestly, it felt nice to have an outlet and I fully appreciate the support they gave me.  However, in the time when I was looking to be a normal guy, these meetings were constant reminders of awful events.  Over time, I learned that isolating myself was the best approach until people could look at me the same.

Eventually, I spoke to the base chaplain on a few occasions.  He kept reminding me of Jeremiah 29:11.  The talks were productive.  But even if God had a plan for me, I questioned why his plans affected such innocent children.  I wondered why God's plan couldn't have been for two pedophiles to meet in a head-on collision prior to molesting innocent children.

So I decided to seek help from a psychologist.  A psychologist could only confirm that the anger and hatred I was feeling was natural and normal.  I only had two meetings with him and felt there was nobody out there who could really help me.

1          Eventually, it was December and my oldest

2     daughter's birthday was coming up followed by Christmas

3     and New Year's and then my youngest daughter's birthday.

4     I've understood all along they are the two victims.  So

5     with each occasion came an emotional appreciation for who

6     these girls are and how far they've come along.  I've

7     never appreciated birthdays, Christmas and New Year's as

8     much in my life.  It finally started to feel like there

9     were new beginnings.  2013 couldn't end soon enough.

10         We took more vacation after the holidays and

11    spent time with our family.  On our way back, we discussed

12    the need for change in our lives.  The truth is is that no

13    matter how much we tried, we can't be happy in Maryland

14    with memories surrounding us.

15         Our young babies were molested in their home by

16    a friend of the family while we were at various locations.

17    Each of these locations is a memory.  I would forget if I

18    had the ability.

19         The military was offering early retirement and I

20    played with the idea for a little while.  But I'm not

21    ready to retire.  So I asked for orders in mid January.

22    Three days later, I received them.  Since then we have

23    focused our attention on moving forward instead of trying

24    to fix a past that we can't change.

25         Your Honor, it's been almost a year since I was

**104**

34

pulled inside a small, yellow room and informed that my
daughters had been molested by someone who we considered a
close friend.  My daughters don't know what happened to
them and they never will.  They are healthy, happy, smart,
beautiful girls with bright futures ahead of them.  They
have always been loved immensely and they always will be.
Thankfully, my children are going to be fine.  It's me and
my wife who can't seem to put this behind us today.  There
isn't a way to make this go away.  There's a disgusting
reality that my daughters were put through.  I don't even
know all of the details, nor do I want to.

Our plan as a family was to finish my career in
Maryland and head to South Carolina or maybe Georgia.  We
were a normal, happy family.  We were focused on providing
happiness for our daughters and each other.  I have an
amazing job that very few people can say that they have
done.  My daughters have aunts, uncles, cousins and
grandparents just a few hours away and they were lucky to
have the opportunity to get to know them.

Financially, we were doing outstanding.  We have
been able to make numerous changes to an ordinary house
and make extra payments to maximize the return once I
retire while saving plenty of money for great vacations in
the future.  The good decisions made through our lives
were finally starting to pay off for us.  We both had a

35

1    very optimistic view on the future and people in general.

2    I was working toward a sociology degree and networking for

3    possible jobs after retirement.  When I woke up on the

4    morning of September 6, 2013, my world seemed like it was

5    better than it had ever been.

6            An unexpected conversation in a little yellow

7    room has changed my life in every way.  We've spent almost

8    a year trying to wrap our heads around one man's actions.

9    We've analyzed everything about him.  We've spent a good

10   deal of time trying to differentiate between our friend,

11   Sean, and Foot Fan Bill, the child molester.  This is a

12   man who was in the military.  He went to church.  He

13   seemed to make friends easily.  He was quick to point out

14   other people's flaws.  He managed to excel at his job and

15   gain recognition.  He was friendly and easy going.  That

16   was all manipulation.  As it turns out, his military

17   service was a path to exploit military families.  I

18   haven't read the Bible myself, but I'm pretty sure that it

19   doesn't forgive molesting or raping children.  He made

20   friends so that he could take advantage of them.

21           His quick judgments about people must have made

22   him feel better about being the lowest form of human

23   being.  The truth is that Sean never existed.  It was

24   simply the face that was sent out to the world to create

25   false perceptions in order to carry out selfish criminal

1    acts.

2         Finances are the least of my concerns.  We felt

3    a little bit of financial impact, but I feel the worst is

4    yet to come.  Our house is currently on the market to sell

5    for $50,000 less than what I purchased it for.  It's been

6    on the market since March and there hasn't been much

7    interest as of late.  Repairs, aesthetics and upgrades

8    would cost us between ten and fifteen thousand dollars

9    just to have the house ready for sale.

10        We've also had to travel to our next location to

11   look for a house.  With two children, we can't just wait

12   until we get there.  We put in an offer on a house and it

13   was accepted.  Closing costs and expenses on that house

14   are still to be determined.  That trip costs us over

15   $3,000 between airline tickets, rental car and

16   miscellaneous expenses.  In the best case scenario,

17   someone puts in a bid on our home and we are done with it.

18   If that occurs, there will be more expenses and closing

19   costs.  Since we're two months out, the most likely

20   scenario will be to rent the house after a refinance.  The

21   refinance will be costly and put us further behind.  I

22   have never rented a house out.  But further expenses would

23   depend on who I get as a tenant.  There is always the

24   possibility that the house doesn't rent at the price we

25   need.  Then we will be paying out-of-pocket.  I really

can't even give a ballpark number of how much this will cost us in the end.  It will probably be close to six figures.

My personal and professional life has been a huge struggle.  When I'm at work, I feel I could carry that huge elephant into every room I walk into.  Everybody is aware of my situation.  So they look at me differently and treat me differently.

I took my oldest daughter to a work function one day and even that was awkward.  People were looking at her differently instead of seeing her as a three-year-old girl.  As time went on that day, she was receiving special attention.  I haven't taken either of my girls to a work event since then.  I can't blame people.  Even now I wouldn't know what to say to someone in my shoes.

Over time, I have realized that I can't expect to live a normal life here.  I will always be that guy. The worst part over the last year has been the internal battle.  I've struggled the most with staying motivated. Not only has this case consumed me, but the way people look at me and my family and it defines us.

Many late nights are still spent wondering all the same questions.  I've had nightmares on occasion and I have lived most of the past year in anger and anxiety.  I knew someone for six years and didn't know he was

1    molesting children.  That alone caused me to lose faith in

2    humanity and lose trust in people in general.  Then I have

3    to live with the fact that my girls were molested.

4         I try to remind myself of an agent we spoke to

5    who said that he was the father of three and his kids

6    lived a normal life with sleepovers.  Maybe it's still too

7    soon, but I still watch closely when somebody other than

8    me or my wife hold our children.  That may be abnormal,

9    but there's a new normal that was introduced in our lives.

10        Hopefully, you can see the overall effect that

11   his crimes have had on myself and my family.  I believe

12   strongly in free will and the ability as Americans to live

13   our lives as we choose.  If our lives went as planned, we

14   would have lived happily in Maryland and made our choices

15   from there.  Sean's actions have turned our lives inside

16   out in every way.  There is a great deal of uncertainty

17   moving forward.  My wife and I can't live here any longer

18   with so many horrible memories all around us.  Our lives

19   moving forward aren't the ones that we've chosen.  And

20   that in itself will just be another reminder.

21        On behalf of my girls, I would like to thank the

22   agents for bringing this man to justice.  And also on our

23   behalf, I respectfully request that the Court imposes

24   maximum sentencing and ensures that he is unable to harm

25   another innocent person until the day he dies.  I would

1    like to sincerely thank you for the opportunity to speak.

2            THE COURT:  Thank you very much, sir.  That's

3    very helpful.

4            MS. FREITAS:  Your Honor, there are no more

5    victim impact statements that will be given at this time.

6            THE COURT:  All right.  Before I proceed

7    further, I've received a number of motions to seal on

8    this.  Unless there is any objection, I will enter orders

9    approving all the motions to seal.  There's also a motion

10   for an order of forfeiture.  Is that an agreed order?

11           MS. FITZGIBBONS:  Yes, Your Honor.

12           THE COURT:  All right.  I will enter the order

13   for forfeiture.  There is also an order for HIV and STD

14   testing.  Is there any opposition to that?

15           MS. FITZGIBBONS:  No, Your Honor.

16           THE COURT:  All right.  I will enter all those

17   orders.  All right.  I have applied the guidelines as

18   required.  I have considered the very eloquent victim

19   impact statements that are very helpful to me.  And the

20   guidelines produce the range that I mentioned when I went

21   on the bench.  I have reviewed the sentencing memoranda

22   submitted by both parties.  But I would like to give the

23   defense an opportunity now to argue for what they believe

24   will be an appropriate sentence under the statutory

25   factors under Section 3553(A).

1              MS. FITZGIBBONS:  Yes, Your Honor.

2              THE COURT:  And any allocution by the defendant

3    and any defense witnesses as well.

4              MS. FITZGIBBONS:  Thank you, Your Honor.

5    Mr. Gazafi would like to address the Court as well as the

6    individuals seated in the courtroom.

7              Your Honor, I don't envy your job.  This is a

8    very difficult case for so many reasons.  One of them

9    being I think the complexities of human nature that were

10   very eloquently articulated by the family that we just

11   heard from.

12             What we're asking for, Your Honor, is a sentence

13   to 30 years, which is very close to a life sentence for

14   Mr. Gazafi, who's in his early 40's.  And I believe that

15   that sentence serves the goals of punishment because it

16   represents an individualized sentence.  And there are

17   three factors that I laid out in my sentencing memorandum

18   that I would ask the Court to consider in determining

19   whether or not these sentences should run concurrently

20   because that's really a part of what the issue is.  And

21   those three factors are his military service, his

22   acceptance of responsibility and what I would call his

23   rehabilitative potential.

24             The government in its brief to the Court has

25   focused on the issue of deterrence and clearly that's

1    warranted here.  A sentence that deters both Mr. Gazafi

2    and other individuals are warranted.  We don't dispute

3    that.  We don't dispute that a substantial period of

4    incarceration is necessary.  But the Court still has to

5    balance where do we fall, what sentence is sufficient, but

6    not greater than necessary to serve those concerns.  A

7    sentence of 30 years?  A sentence to 40 years?  A sentence

8    to a hundred years as the government has suggested?  Is

9    there an appreciable increase in deterrent value when we

10   look at the different increments that are available to the

11   Court?  And I'm not sure there is much in terms of

12   incremental value, a difference between 40 years versus a

13   hundred years.  I cited, of course, a case where Judge

14   Posner I think laid that out very well.

15           My second concern is from an Eighth Amendment

16   perspective and a reasonableness perspective is asking for

17   a life sentence one proportionate to the offense.  Life or

18   a de facto life sentence which is what the government is

19   asking for is a sentence that is reserved in the federal

20   system.  Not that this is not a very, very serious and

21   horrific crime.  I'm not downplaying the seriousness of

22   it, but there is a fundamental difference between this

23   crime and sentences that would trigger a life sentence

24   such as intentional homicide.  If we look at Sentencing

25   Guideline 2A1.1, the application note tells us that that

1    is the most serious of criminal offenses.  So to give

2    Mr. Gazafi two and a half, the equivalent of two and a

3    half life sentences for this conduct I believe is

4    unreasonable under the Eighth Amendment.

5              The second issue with respect to the de facto

6    life sentence is a concern for proportionality as it

7    relates to the individual and the need for an

8    individualized sentence.  Very briefly I cited for the

9    Court the Supreme Court's most recent jurisprudence on

10   Eighth Amendment and proportionality and our concern that

11   we take into consideration this individual and his

12   particular conduct and come out with a sentence that is

13   just considering him.  Proportionality requires that kind

14   of individualized consideration.  And why I think he's

15   different and why I think he is deserving of the Court's,

16   quite frankly, mercy, I think relates most strongly to his

17   acceptance of responsibility, which I really think has

18   been extraordinary and distinguishes him from other

19   offenders that I have represented, that our office has

20   represented that have come before the court when charged

21   with similar crimes.

22             And acceptance of responsibility in this case,

23   Mr. Gazafi comes here having pled open to each and every

24   single count in the indictment.  And, you know, it may

25   have been tempting to drag things out, to wait, we didn't

1    get any benefit from pleading guilty at least from the

2    guidelines perspective, to drag things out until the very

3    last moment, to go through trial preparations or to go to

4    trial and he didn't do that because it wasn't the right

5    thing to do.  And he didn't want to put anyone through any

6    more pain and suffering than they have already

7    experienced.  So he pled without the benefit of a plea

8    agreement long before any trial date was set and put the

9    government on notice of his intention if the Court

10   remembers months in advance.  And that sets him apart and

11   it should be a strong consideration for the Court.

12          And it's interesting to me when I look at the

13   government's recitation of cases with these very, very

14   long and very, very high numbers in the context of child

15   production.  The case comparison I think is of limited

16   utility when we know nothing about the individual factors.

17   For example, five of the cases described in the

18   government's brief, Hinojosa, Sarras, Demeyer, Davis and

19   Cowan, all of those defendants didn't plead guilty.  They

20   went to trial.  And several of them after having the

21   victims of their crime testify, testified themselves, at

22   least two and then were subject to an obstruction

23   enhancement at the end of the day.  So I don't know how

24   this individual can stand in the same position as those

25   men.  It's just incomparable when their cases were

1    resolved by contested trials.  The other way --

2         THE COURT:  Well, let me ask you this.  The

3    Fourth Circuit in the Cobbler case in April upheld a

4    120-month sentence for a defendant who pled guilty in that

5    case.

6         MS. FITZGIBBONS:  Yes, Your Honor.  And I think

7    what's difficult for us to know is whether or not some of

8    the factors that are present here were present there.

9    One, his acceptance of responsibility; two, a experienced

10   clinician's assessment that he is in fact amenable to

11   treatment and that goes back to acceptance of

12   responsibility because he's been honest and forthcoming

13   about his offenses; and three, you have an individual here

14   who has had an exceptional life, an exceptional series of

15   circumstances, an exceptional period of service within the

16   armed forces, which I think bears mentioning to the Court

17   and should receive a serious consideration.  So certainly,

18   the Court could impose that kind of sentence.  I believe

19   that it's not proportionate, it's not proportionate to

20   this individual and I don't think that it would be

21   appropriate.  I talked about that piece of his acceptance

22   of responsibility.

23        The other thing that he did that I mentioned in

24   my sentencing memorandum is accepted responsibility on the

25   military side of the house as well.  And rather than going

**115**

45

1    through a drawn-out administrative separation proceeding,

2    he agreed to be separated from the military as quickly as

3    possible.  And the reason why he did that against the

4    advice of his military counsel was so that his family

5    would receive what's called transitional compensation.

6    And in doing that, it was his hope that the Air Force

7    would continue -- and I think they will eventually --

8    continue to pay his family his salary for another two

9    years while they're trying to get their feet underneath

10    him.  So that's another indication of his extraordinary

11    acceptance of responsibility.

12              I mentioned Dr. Weiner's evaluation and

13    assessment and I think it's worth spending a few minutes

14    on his assessment.  Dr. Weiner talked to Mr. Gazafi to

15    assess his amenability to treatment and to provide the

16    Court with some treatment recommendations, what can we do

17    going forward.

18              Dr. Weiner is a clinician and he deals with a

19    wide range of offenders.  You know, offenders who may be

20    are only looking at child pornography and offenders

21    unfortunately who have molested children.  He also works

22    with offenders, who after they are released from custody,

23    B.O.P. custody and require some kind of sexual offender

24    treatment as a condition of their release.  He is very

25    familiar with the components of the B.O.P. sex offender

1    treatment programs and as well as some of the other

2    programs offered through B.O.P.  He's been in practice for

3    over 40 years.  His C.V. reflects the fact that he's

4    worked closely with law enforcement agencies at both the

5    state and federal levels to ensure appropriate levels of

6    supervision for individuals convicted of sex offenses.

7            He had the professional integrity to evaluate

8    Mr. Gazafi based on the information before him.  And he

9    sees, I think he views the evidence from a clinician's

10   perspective and it's not his job to punish Mr. Gazafi

11   obviously and that's what he does day in and day out.

12           The government has criticized his report saying

13   that it's overly reliant on Mr. Gazafi's self-report.

14   That's not in fact the case.  Dr. Weiner was provided

15   every piece of discovery that the government gave me.  He

16   did not view the images because I think we as a team

17   decided it was not appropriate for him to do so given the

18   nature of the images.  So he looked at the complaint, the

19   search warrant application which included the chats, the

20   materials taken from the house, Mr. Gazafi's medical

21   records.  He looked at all of that.

22           The government has also criticized Dr. Weiner

23   for failing to look at NCMEC reports and forensic

24   analysis.  And the Court can't punish the defense or give

25   that criticism any weight when the defense didn't have

1   these materials until June 11th.  So materials can't be

2   held back, then provided and then the expert criticized

3   for not relying upon them.  If we had them, we would have

4   given them to him.  Unfortunately, we didn't.  So we

5   couldn't.

6            I think that part of the government's concern is

7   Dr. Weiner's assessment of risk and, you know, I see the

8   significance of the evaluation as being one of amenability

9   to treatment.  Risk is something that's so far down the

10  road, I'm not sure anyone can predict that at this point.

11  So the crux of the letter deals with Mr. Gazafi's

12  amenability to treatment and part of that relies on

13  Mr. Gazafi's willingness to engage in treatment and to be

14  honest.  And the Court can read the letter for itself, but

15  it's very clear.  The letter, you know, admits that

16  Mr. Gazafi has struggled with an addiction to pornography

17  for quite some time.  The letter does not overly rely on a

18  test that the government is critical on.  So I think that

19  the letter's credibility rests in its balance.  Dr. Weiner

20  says he's been fighting his own inner demons for well over

21  a decade and I think that's accurate and I think that

22  that's exactly what the government's case and aggravation

23  would show.

24           So I think the take-away from Dr. Weiner's

25  letter is here is someone we can work with, someone who

48

accepted responsibility for horrific, for horrific acts, who didn't minimize, who has taken every step that he can to minimize the harm that he's caused.

And we don't need to rely on Dr. Weiner to come to that conclusion. The Court has read Mr. Gazafi's letter. Essentially, it's his hope that he can just erase himself from everybody's consciousness. And, you know, I don't know how much more accepting a defendant can be.

And what's happened over the last nine months has been incredibly difficult in terms of his conditions of confinement and that's certainly not going to improve when he goes into the B.O.P. because any sentence this Court imposes is likely going to send him to the highest level of security. So this isn't going to be an easy path for him by any stretch.

And what he shared with me and I'm sure he will share with the Court is he can't not think about what he's done and the pain that he's caused every minute of every day and that is not going away. That's not going away.

So what we're asking the Court to do is give him some small chance that if he's committed to addressing his illness, that he'll be able to live the final years of his life, the final handful of years of his life as a free man and you can impose that kind of sentence because it's consistent with the statutory considerations. It doesn't

1    overly rely on deterrence, but also reflects the sentence

2    that considers rehabilitation, that considers the nature

3    and characteristics of this particular individual,

4    including a very long and distinguished history of

5    military service.  The Court can come to that conclusion,

6    give an extremely long sentence, sanction the conduct, but

7    still give him something to work for.  Still give him a

8    light at the end of the tunnel.

9          I would ask the Court to consider a B.O.P.

10    recommendation that places him closest to his parents'

11    home which is in Orange Park, Florida.  So if the judgment

12    and commitment could reflect closest to Orange Park,

13    Florida so that he could receive the support of his

14    parents while they remain living.

15          We'd also ask that the Court recommend that he

16    receive treatment for alcohol abuse, any mental health

17    treatment that the B.O.P. is willing to extend him.  He is

18    certainly willing as I mentioned to engage in sex offender

19    treatment.  I think that Dr. Weiner's concern was the

20    Court should try to get him into some kind of treatment

21    now because the sex offender treatment depending on the

22    Court's sentence may be a long way down the road for

23    someone who's amenable and willing.  The time to receive

24    those services may be now.  Thank you, Your Honor.

25          THE COURT:  All right.  Thank you.  Would your

50

1    client like to address the Court?  I would be glad to hear

2    from him.

3              MS. FITZGIBBONS:  He would, Your Honor.

4              THE COURT:  All right.  Have him stand up.

5              THE DEFENDANT:  Your Honor, there has never been

6    a man more remorseful and full of sorrow for his actions

7    in suffering his cause than I am today.  I come here today

8    with a broken and contrite heart.  To my colleagues, my

9    actions are both inexcusable and saddening.  That have

10   caused your tireless work to be put into question causes

11   me much sadness.  The job you continue to do under such

12   circumstances make me proud to have been at one time part

13   of that group.  Thank you for all that you gave me and I

14   am deeply sorry to have caused you pain.

15             To my former friends who trusted me and cared

16   for me when times were tough, you were always there for

17   me.  Your support and kindness allowed me to endure

18   situations that would have otherwise overwhelmed me.  I am

19   forever sorry that I dishonored that trust and abused that

20   kindness.  Please do not let my actions change the

21   wonderful people that you are.

22             To my former congregation, your love and

23   acceptance rescued me in a dark time and it is that same

24   love that led me to accept Christ as my savior.  Because

25   of that, I am alive today.  That I returned those

beautiful gifts with betrayal and pain causes me no end to remorse. Please know that me and my actions sway you from your walk with the Lord. He is with you and through his grace, we can all adore him and become stronger in our faith. Thank you for what you have done to my spiritual well-being and I'm deeply sorry to have caused you to suffer.

To my mother, my father and my family, I cannot begin to comprehend the depth of pain I have caused you in this awful period of my life. Nobody has a perfect life, but you are always there for me and that didn't change throughout this. You are gifts from God. And I am so totally thankful for your continued presence in my life. I am sorry for the pain that I have caused. But I will do everything I can once again to make you proud of your son.

Lastly, but most importantly, to the victims and their families, I will not cheapen your pain and suffering with simple platitudes. Please know that I am as sorry as a man can be and wish that I could undo what I have done. Since I cannot do so, I hope and pray that in time you can forgive me. If you are unable to do so, I fully understand. It is in my hope that through therapy and counseling that you can at least forget about me and put me out of your lives. In doing so, perhaps you can close the door of this awful chapter and not allow it or me to

1    affect your lives any further.  Thank you, Your Honor.

2              THE COURT:  All right.  Let me hear from the

3    government.  Are there any witnesses for the defense, by

4    the way?

5              MS. FITZGIBBONS:  No.

6              THE COURT:  Okay.  Thank you.  You may proceed.

7              MS. FREITAS:  Given the representations of

8    counsel at the bench, we won't call the witnesses, Your

9    Honor.  Should there be any factual disputes, they are

10   present.  It doesn't seem to me from defense that there

11   will be.  So we'll proceed with argument.

12             THE COURT:  Okay.

13             MS. FREITAS:  We have an exhibit, Your Honor,

14   that we would like to place so I can refer to it

15   throughout my argument.

16             As the Court is aware, the government is seeking

17   a sentence of at least a hundred years in this case and

18   the government does not ask for this sentence lightly.

19   This is a horrific case of child sex abuse and the

20   production of child pornography.  To make the record

21   clear, represent the victims and to present a clear

22   picture for the Court, I'll go through the 3553(A)

23   factors, not to the extent that the government did in

24   their memo, but enough to demonstrate the need for this

25   sentence.

1          Your Honor, this case began with the defendant

2     chatting online with an undercover officer and he wasn't

3     chatting in a regular chat room, a sports chat room, a

4     chat room about a hobby.  He was chatting in a chat room

5     about incest, a room dedicated to people who were sexually

6     interested in having a relations, sexual relations with

7     their children and that's where the undercover was and

8     that's why the FBI had an undercover officer in that chat

9     room.

10          I'll refer to this as the site as the website is

11     currently still under investigation by the FBI.  And I

12     want to talk about a few of the chats.  It's important

13     that the Court hear the voice of the defendant before

14     court today.  The first chat that took place was on

15     August 15th of 2011.  The defendant was utilizing the name

16     Bill_James.  When asked what he was into by the

17     undercover, he said "all sorts, young mostly, but pregnant

18     nursing moms, bondage and feet."  They went on to discuss

19     further and the defendant mentioned that he's "always on

20     the lookout for single moms, even dated a few below

21     standards to see if they had any kids he could get at."

22     He was always, Your Honor, on the lookout for children.

23     And I think, Your Honor, the crux of the government's

24     argument on page 2 early on in the chats, when asked, he

25     says "I've no real limits that I have found."  I think his

1   demonstrable interest in the young goes on.  He sent

2   pictures of the age group he was attracted to.  Little

3   girls, toddler age, prepubescent, little children in

4   bathing suits.  Your Honor, this was his age of

5   preference.  But this was 2011.  These were early in the

6   chats.

7           The next chat was August 23, 2012.  And again

8   this time, chatting is Foot Fan Bill.  And when asked, he

9   stated "I love all ages, different ages do different

10  things for me."  When asked by the undercover how long has

11  it been for you since you had one so young, he stated,

12  "well, last time I got to play, it was fairly innocent

13  about a month ago.  Buddy has two little girls, ages eight

14  months and 18 months.  Had about three hours alone while

15  they went out to dinner and drinks.  There is something so

16  incredibly erotic about having your cock out in front of

17  little girls, isn't it?"  And Your Honor, he's referencing

18  Victims 3 and 4.

19          He goes on in that chat, he says "I love going

20  to the pools, beaches and parks to see what you can see.

21  Another great place are the shopping malls with play

22  escapes for the little ones.  So many hot sexy little bare

23  feet and panty shots.  Hell, I've even had to go into the

24  restroom and jerk off a few times, there were so many sexy

25  little things."  When asked about pictures, he said "I

55

1    take private pics sometimes, but I don't share until I get

2    to know someone better."  He also talks about collecting

3    random pictures from the Internet later in that

4    conversation.

5            Later on, when asked by the undercover what he

6    has, he says do you have hardcore or just clothed young?

7    He says "he has all sorts.  You looking to share?  Sure."

8    The defendant says, "show me what you like."

9            Now the next chat, Your Honor, is probably the

10   most important.  And those are Exhibits A-1 through A-3

11   and this is Exhibit A-4.  This chat was August 15 of 2013.

12   This chat is important because it's the one that he sent

13   child pornography to the undercover in.  He starts off --

14   the undercover says do you play or just peeks, in

15   referencing Victim 1.  The defendant says "now it's just

16   naked, cuddling, et cetera and playtime after bed.  But

17   from eight months to around 4, it was much more."  He

18   talks about he "doesn't share personal pics until he's

19   talked to someone a bit because too many take them and

20   run."

21           He tells the undercover, "I can do the same with

22   her room.  I've got on cam and I show her sleeping to

23   other dads."  Again, this is Victim 1.

24           The conversation goes on.  He says -- when

25   they're talking about what they can show each other, the

1    defendant says "panties are easy.  One sec.  Got a couple

2    pair and her sexy white sheer tights I love."  And I'll

3    direct the Court's attention to Government's C-8.  These

4    are the white tights here, Your Honor, that he's

5    referencing.  And we'll see them in pictures when the

6    government plays examples from Government's Exhibit D.

7         He says and goes on in this chat because this is

8    a lengthy chat, Your Honor, and an important one.  He says

9    "I do have pics.  You don't have to show me a pic if you

10   don't want to.  I have no pics to prove Victim 1 is who I

11   say.  But like I said, once she is back, I'll be happy to

12   show her sleeping and such."

13        They go on.  This is the first picture, Your

14   Honor, that the defendant sends.  In this picture is

15   Victim 1 here and Victim 2 and he identifies them both for

16   who they are and who he's taking pictures of.

17        He also goes on, Your Honor, to send a few pics

18   and he says "here is some of her BFF, her best friend with

19   my cum on her feet."  And, Your Honor, I'll direct the

20   Court's attention.  This is one of many pictures the

21   defendant sent of his ejaculate on the feet of children.

22   As the Court is aware from the initial chat, he has a bit

23   of a fetish, if you will.

24        They continue to chat.  He describes here her

25   friend on the right and discussing feet pics that he can

1    send.  Ones with cum on them are mentioned.  He says

2    "panty peek.  I love the little panties."  And when he

3    said that, Your Honor, this is the picture that he sent.

4    He says "is that better?  She was sleeping.  She's a sound

5    sleeper."  When asked if he gets to touch her genitalia by

6    the undercover officer, he says "yes, I have lots of cum

7    pictures on her feet as well."

8        He tells the undercover officer "it would be

9    nice to have an active pair of feet to play with, there's

10    only so much you can do while they're asleep.  That's why

11    I've been more active towards her best friend lately who

12    always comes over."  He's talking about Victim 2.

13        He goes on and he says, when asked whether he

14    has hardcore pics, he says "yes, I have some and I share

15    for the same."  But what's interesting about this chat and

16    what's important, Your Honor, is further down, he says "I

17    focused on her lately."  He's talking about Victim 2, her

18    friend.  When asked if she's a hard sleeper, the defendant

19    says, "oh, yes, I love it, even gave her an Ambien once."

20    And, Your Honor, we'll discuss the defendant's use of

21    Ambien on Victims 1 and Victims 2 as my argument goes on.

22        Later in that chat, the defendant says "there's

23    just something about sexy bare feet that drives me nuts.

24    I have a two-week business trip coming up, but I should be

25    able to get on during it."  And, of course, his business

1   trip, Your Honor, is for his military job, his service in

2   the military that we've heard quite a bit about.

3           When asked about the picture, the undercover

4   says was that your cock or finger in the last one?  The

5   defendant says "finger.  Going to try and get her to take

6   a whole Ambien next time.  Maybe have lots more fun."

7           Your Honor, further on in that chat, the

8   defendant says "maybe we can work up to watching me cum on

9   her friend's feet while she sleeps."  The undercover says

10  what is the furthest you've gone with Victim 1 and her

11  friend?  The defendant says "when Victim 1 was young, she

12  sucked me and I did the same to her as well as lick, kiss

13  and finger her ass.  Also played with the two little girls

14  that were friend that I watch for sometimes.  About one

15  and two years old.  I was actually supposed to be over

16  there tonight, but they had to change their plans.  I told

17  them to pick a date when I get back and I'll let them have

18  a date night.  I love his two little ones.  The youngest

19  doesn't talk much at all.  The oldest is just starting

20  to."  When asked by the undercover, did you get shots of

21  them, he said "I have got a few so far, but not many.

22  Victim 1 is usually with me when I babysit."

23          They go on in that chat.  He talks about when he

24  gets back.  what does he say?  "I hope to babysit my

25  buddy's girls when I get back, too."  Your Honor, before

1    he left for his trip for work, the military trip, he was

2    already planning on molesting upon his return.

3            And the chat goes on.  He says "stockings and

4    bare are best and should be sleepover in my place coming

5    up, too."  That was the sleepover that Cheryl, the

6    grandmother and caretaker of Victim 2 was referencing he

7    was planning when they got back.

8            The undercover asks are they both hard sleepers,

9    were you able to lick their genitalia or was it too risky?

10   And the defendant says "her friend sleeps much harder, no

11   licks as she started to stir when I tried."  But later on

12   in talking about Victim 2, he says "only cum on her

13   friend's feet.  She sleeps the hardest."  The undercover

14   says so when you get to babysit them, in referencing

15   Victims 3 and 2, how far have you gone with them?  And the

16   defendant answered "not often, no.  Every once in a while.

17   Have cum on both, licked both, fingered the youngest ass

18   and got the head of my cock in the youngest mouth.  They

19   squirmed around so much, I needed both hands.  But I

20   should be able to get more next time.  The older one

21   adores me and youngest is very calm and mellow, especially

22   for being just over one year's old."

23           The defendant's says in another chat when he's

24   asked if he's ever ejaculated on Victim 1's feet and

25   Victim 2's feet at the same time, he says "sure and after

**130**

1    I see yours on cam, I'll be happy to show her sleeping.

2    Not just her friend.  Victim 1 is not near a sound

3    sleeper."  He then states "I've been trying to get in her

4    friend's pants a lot."

5            When asked by the undercover, he's trying to

6    find out the extent of the defendant's abuse, if he's ever

7    used a spy cam, he says "no, I never have.  When they take

8    baths together, I go in.  Hell, they usually want me in

9    the bathroom to talk."

10           Now, Your Honor, after the August 15th chat when

11   the defendant sent the undercover child pornography, he

12   did.  He sent not just the picture I showed the Court.  He

13   sent two other pictures.  The FBI immediately sent out an

14   emergency subpoena and identified him.  When they found

15   out who he was, that he worked for the Air Force and that

16   he was currently on assignment, the undercover continued

17   to chat and they waited for his return.

18           It's important.  We heard about his military

19   service which is a bit ironic since on that service, he

20   not only had with him all of his child pornography, but he

21   continued to chat at least with the undercover whom he

22   believed to be a like-minded individual.  And while we're

23   on that, Your Honor, just for clarification, the

24   Diagnostic and Statistic Manuals of Mental Disorder, I

25   just want to make sure I'm on the same page with the

1    Court, states the "paraphilic focus of pedophilia involves

2    sexual activity with a prepubescent child.  Individuals of

3    pedophilia generally report an attraction to children of a

4    particular age range.  The course is chronic."  So if I

5    use that word, I just want to make sure, Your Honor, we're

6    all on the same page.

7            Arrest and search warrants were issued and when

8    the defendant's plane landed at Andrews Air Force Base

9    August 31st, agents arrested him.  He had four hard

10   drives, a laptop, two IPad's and an SD card.  And, Your

11   Honor, on him were these two drives.  The child

12   pornography he produced, he took it with him when he

13   traveled on his military trips.  A forensic preview was

14   conducted on those hard drives and the horror of what the

15   defendant had done to these children began to reveal

16   itself.

17           In total, the FBI identified five victims.  Four

18   known, one that remains unknown.  They determined that the

19   defendant produced 1,467 images and 20 videos of children

20   and I want to be clear for the Court what I mean because

21   that's a different number than the number I'm about to

22   give of child pornography.  When I say that number, Your

23   Honor, that does not constitute all child pornography.

24   But it's important the Court understand that I'm not

25   talking about Halloween pictures, Easter pictures,

1    Christmas pictures, vacation pictures.  These are images

2    of his ejaculate on the children's feet, the children

3    naked, the children up-skirted.  We have videos of him

4    rubbing the children's feet on his erect penis while

5    they're sitting on the floor trying to watch a cartoon or

6    TV.  Those may not legally meet the definition of child

7    pornography, but it's absolutely important that the Court

8    understand the extent of his victimization of these

9    children.  172 images and ten of the videos are child

10   pornography.

11         What's even more frightening about these

12   pictures, Your Honor, which the government will play a

13   very brief sampling of for the Court is it's very obvious

14   some of these children are not conscious, particularly

15   Victims 1 and 2.  We know from the defendant's chats, he

16   used Ambien.  He gave the children an adult sedative,

17   incidentally, Your Honor, prescribed to him by the

18   military for which he is trying to get credit and a lesser

19   sentence.  The military prescribed this to him for his

20   job.  And I want to make sure the Court understands Ambien

21   is a sedative, also called a hypnotic.  It affects

22   chemicals in your brain that may become unbalanced and

23   cause sleep problems.  Ambien is used to treat insomnia.

24   Ambien may impair a person's thinking or reactions.  Some

25   people using this medicine have engaged in activities such

1    as driving, eating or making phone calls and later having

2    no memory of the activity.  Ambien may cause a severe

3    allergic reaction.  Stop taking Ambien and get emergency

4    medical help if you have any of these signs of an allergic

5    reaction.  Hives, difficulty breathing, swelling of your

6    face, lips, tongue or throat.  Do not give this medicine

7    to anyone younger than 18 years of age.  An overdose of

8    Ambien can be fatal when it is taken together with other

9    medications that can cause drowsiness.

10           And the defendant gave these to children so that

11   he could better facilitate his sexual abuse and sadistic

12   fetishes while they were passed out.  In doing so, he

13   risked the lives of at least two of these children and it

14   demonstrates the level that he went to to abuse them,

15   particularly so he could bind and assault them.

16           Your Honor, I want to talk about the five

17   victims of this defendant.

18           MR. CHAMBLE:  Your Honor, before we proceed with

19   this video presentation, may we approach the bench?

20           THE COURT:  Come to the bench.

21           (Bench conference:)

22           MR. CHAMBLE:  I'm a little concerned, Your

23   Honor.  I think this is an open courtroom.  And during the

24   government's presentation and in their zeal, there was

25   this picture displayed of a child's vaginal area which in

**134**

1    an open courtroom?

2            MS. FREITAS:  We do it in trial.  The

3    government's permitted to present to the Court.

4            THE COURT:  It's of marginal helpfulness to me.

5    I think the picture, I know enough of what it is --

6            MR. CHAMBLE:  I just question the need for it.

7            THE COURT:  Why don't we just move on?  I don't

8    think I need to see it.  I mean I really have a good

9    imagination of what this is all about.

10           (In open court:)

11           MS. FREITAS:  Your Honor, Victim 1 is the

12   subject of Count 2.  She was seven years old and had a

13   familial relationship to the defendant.  As stated in his

14   chats, he began molesting her at eight months to four

15   years of age.  Exhibit A-4, this is her when he said "when

16   victim was young, she sucked me and I did the same to her

17   as well as lick, kiss and finger her."  Victim's 1 images

18   have been trafficked by the defendant which I will talk

19   about later.  The images depicting Victim 1 as evidenced

20   in the created dates were created and taken in June of

21   2012.

22           Victim 2 is the subject of Counts 1 and 5.  She

23   was a neighbor of the victim and you heard her caretaker,

24   her grandmother speak in front of this court.  She was

25   invited over for sleepovers.  As evidenced by the chats

1    and the number of images produced, it is absolutely clear

2    that Victim 2 was the defendant's favorite.  There's no

3    doubt about that.

4         Further, Your Honor, what makes this victim

5    unique is unlike the pre-verbal Victims 3 and 4 who were

6    barely able to speak, he groomed Victim 2 and grooming is

7    a term of art used by law enforcement to describe the

8    psychological manipulation inflicted on a child by someone

9    preparing them for sexual abuse.

10        Now, Your Honor, this child is in several videos

11   fully awake and naked in front of the defendant.  There's

12   particularly one where he uses a hidden camera and has her

13   doing gymnastics which places her naked, her genitalia in

14   front of his mouth and that's on the camera.  During that

15   time, she repeatedly asks him when can we go downstairs,

16   when can we go downstairs and he continues to have her

17   pose naked in front of the camera, often spreading her

18   legs.

19        Now Victim 1 and 2, Your Honor, were both 7 and

20   they're good friends and they're similarly sized and

21   because the defendant in his pictures cut their heads off

22   in the pictures to further de-humanize them and show his

23   appreciation for them which is just in their bodies, it's

24   difficult to distinguish which ones he produced or which

25   ones were in the images he produced, Victim 1 or Victim 2.

1    Those images were also produced in 2012 and some in 2013.

2            The Court heard about Victim 3.  She's an

3    18-month-old female child, his buddy's kids as his chats

4    evidenced.  He stated about this one he has cum on,

5    licked, fingered anally and got the head of the cock in

6    her mouth.  Now, Your Honor, this is an 18-month-old baby

7    and she is seen drinking from a baby bottle in these

8    images.  This is Victim 3.

9            Victim 4 is five months old, Your Honor, and I

10   will state to the Court that there is a pedophilic

11   interest.  It's referred to as neppy in infants.  The

12   defendant's interest in babies far exceeded this one

13   video.  He actually abused a five-month-old child for his

14   sexual gratification.  Five months old.  It's impossible

15   unless you see the video to understand the scope of that,

16   of what a five-month-old baby is.  It's the farthest thing

17   from a sexual object that there can be.  And you watch him

18   as he removes the child's diaper and abuses this infant

19   for the camera.

20           Victim 5, Your Honor, is a child younger than 7,

21   but older than toddler age that we've simply not been able

22   to identify.  Her images are in Count 3 and they were also

23   produced in 2012.

24           What's interesting, Your Honor, is this

25   defendant, the scope of his online activities.  He was

1    communicating with and participating with an individual

2    who was shortly to be arrested who is on this board, KTF.

3    KTF is a bulletin board that is dedicated to those

4    sexually aroused by the feet of prepubescent girls.

5              And, Your Honor, there are many disturbing

6    things in this world.  KTF is amongst them, but I'd like

7    to show the Court as evidenced in the binder, these are

8    the feet of Victims 1 and 2, handcuffed and written on.

9    Your Honor, it's hard to believe that they would be awake

10    for this.  Here's another one, Your Honor.  Love for KTF,

11    kids teen feet.

12              It's quite interesting, Your Honor, when I hear

13    the defendant's conditions of confinement, I wonder if the

14    conditions of the children's confinement while he abused

15    them was ever a concern to him.  These children are

16    handcuffed.  They're bound.  They are tied up.  As the

17    Court has discussed not needing to see the exhibits, Your

18    Honor, these are not hair ties.  That's what they were

19    intended for.  But they were tied so that the children's

20    feet were together and their legs were spread apart.

21    There are children bound with this thong underwear so

22    their legs were hunched up behind their back so that he

23    could take pictures of their genitalia.  And these

24    handcuffs, Your Honor, were used on the children as well.

25    This is adult lingerie, put on these little girls while

1    they are unconscious and bound for the defendant.

2           So when the defendant discusses his rough

3    conditions of confinement, Your Honor, what about the

4    confinement of the children?  It's very difficult for us

5    to accept.

6           This is another image produced, Your Honor, by

7    the defendant of their feet.

8           We talk about the scope of what he produced.  We

9    have to talk about his distribution.  And, Your Honor, so

10   far his images have appeared in seven other cases.  We

11   have the first case that we have appeared in Iowa.

12          Now the next two cases are interesting, Your

13   Honor.  305-A, the two 305-A cases.  Those are national

14   operations into a group of websites operating on tour.  So

15   boards like Hurt to the Core, Little Lolitas, Torpedo,

16   those boards are currently under investigation.  These are

17   boards of members from all over the world.  I know, Your

18   Honor, because I assisted the agents working on that case.

19   Virginia.  We've got 305-C.  That's CE.  That's

20   Cincinnati, Department of Homeland Security and New York.

21   These are cases all over the country and shortly all over

22   the world.  The defendant has distributed these images as

23   well.  But, Your Honor, what about child pornography he's

24   received from other producers?  I mean we know he's

25   sharing.  We saw that in his chats.  And it's interesting.

1    We were going to put Special Agent Dougher on the stand to
2    testify that the National Center for Missing and Exploited
3    Children and the FBI have located five or have identified
4    on the defendant's computers seven children that have
5    never been seen before.  Seven children.  And that means,
6    Your Honor, that he's communicating with the individuals
7    that produced.  Three of those children are images the
8    defendant chatted with.  And when we look at some of the
9    chats he's engaging with as Foot Fan Bill, Foot Fan Bill,
10    the defendant, says "have you masturbated to the pics of
11    vids of my daughter's feet?  The other individual says
12    "that's a bit of a loaded question now, isn't it, but to
13    be honest, yes, I can't lie."  And the defendant says
14    "could you see that," referencing an image.  "She's on her
15    back, trying to get you a puffy mound shot.  She's squirmy
16    though.  Going to try to coax her on her tummy again.  Be
17    right back.  Going to let her get back to deep sleep,
18    kissing and nibbling her.  She's not a fan of sleeping on
19    her tummy though.  She's stirring a bit.  Two knuckles."
20    The individual he sent this to, Your Honor, is a live
21    feeding a sexual abuse of three children.  Two girls or --
22    excuse me -- of three children.  Two of them were of
23    sexual abuse.  One of a little girl and one of a little
24    boy.  So the defendant's communicating with other
25    producers.

1          Now, Your Honor, certainly, we have talked about

2    what the defendant has produced, what the defendant has

3    gotten from other producers, what the defendant has sent

4    to other individuals.  What about his -- all of his

5    commercial child pornography?  He had over 15,000 images

6    of videos depicting the rape and sexual abuse of children

7    as young as infant age.  And something else, Your Honor,

8    he has that I kind honestly say is a first.  He has

9    pictures of infants right after they were born still

10   containing the after birth on them.  That is how young his

11   sexual interest goes.  He sought and downloaded these from

12   the Internet.  Some of the worst.  There are pictures of

13   toddlers bound, lit on fire and urinated on.  That's the

14   defendant's sexual interest.

15          The National Center identified 2,038 image files

16   of known children and 117 video files of known children

17   from 138 series.  This was reflected in Government's

18   Exhibit E and many of these victims provided statements to

19   the Court.

20          The defendant's collection of infant/toddler and

21   toddler files are significantly larger than collections

22   seen by law enforcement agents.  As a matter of fact, we

23   were going to put our forensic examiner on the stand who

24   would have told you in 20 years, it's the worst collection

25   he has ever seen.  Twenty years of doing forensic

1    examinations, this is the worst collection of child

2    pornography he has seen.

3           The defendant amassed numerous images of

4    children, infants and toddlers.  And his series included

5    the sadistic abuse of prepubescent children which tracks

6    his own interest as we saw in what he produced, the

7    binding and tying of children.  And that, Your Honor, is

8    the nature and circumstances of this case.

9           I won't spend as much time on the other factors,

10   but I can't not touch on the seriousness of the offense

11   without touching on the impacts to the families.  They

12   have already talked about it and I can't possibly say it

13   any better for the Court.  But what I will say and this

14   pertains mostly to Victims 1 and 2 right now, Your Honor,

15   is what these children are going to have to deal with

16   every single day.

17          You know, never is a long time.  Never is their

18   children's lives and their children's children's lives.

19   Now there may be a day when we can remove these images

20   from the Internet, but that is not today.

21          The government included studies and research

22   done and the long term effects that Victims 1 and 2 will

23   suffer from.  But actually, I thought it would be better

24   to hear from other victims who have grown up and they're

25   adults and they're trying to recover from this and how

they can't.  One of them who is now in her 20's and has
suffered more than one nervous breakdown said "I'm writing
to let you know that I am still having emotional and
psychological problems due to knowing that the images of
me being abused as a child are circulated freely on the
Internet.  I wonder if people I know have seen these
images.  I wonder if the men I pass in the grocery store
have seen them.  I feel totally out of control.  They're
trading around my trauma like treats at a party.  I feel
like I'm being raped all over again by every one of them.
And I am afraid that someone from the police will call and
tell me they found more things or pictures in other
people's computers or in other cases.  Every time someone
else sees pictures or videos of me, it feels like they are
the ones who hurt me to begin with.  Like they are the
ones who did this stuff to me.  Like I am here for other
people's pleasure.  If you were looking at pictures or
videos of me or any child, you are hurting everyone you
look at.  You were the one abusing us.  You were the one
keeping my pain going for the rest of my life."  Those are
two victims, Your Honor.  And we have two victims here
whose images are on the Internet now.  They are out there
and this is them in 15, 20, 25, 35 years.

          The defendant doesn't have a child pornography
problem.  The defendant is the problem.  He has completed

1    the cycle of victimization for these children.  He abused

2    them, photographed it and disseminated them out for the

3    world to see.  And they will be reminded of this each and

4    every time they get a letter telling them, guess what,

5    your images are now being seen and been found by another

6    person.

7            The history and the characteristics of the

8    defendant, Your Honor, he wants the Court to consider his

9    military background.  This is a reason to give him a

10   lesser sentence.  We're not here for fraud or a bribery

11   case or embezzlement.  We're here because the defendant

12   used that military position as a means to groom the

13   parents of these victims and let them babysit their

14   children.  He used his military position to get to Victims

15   3 and 4 because he worked with their dad.  He used a

16   prescription drug prescribed by the military to drug

17   Victims 1 and 2 before he put them in this disgusting

18   lingerie and binds and ties and handcuffs and photographed

19   them.  He used his military trips to communicate with

20   other pedophiles.  But he wants you to take his military

21   position in consideration.

22           The Court's aware of the defendant's high level

23   clearances and we outline this in our memo.  He was a

24   security threat.  Any person who gets hired in a top

25   secret clearance goes through the training, Your Honor.  I

**144**

know because I have had it and as well as Special Agent
Dougher and Rob Marsh. You are immediately a target and
you're marked. He took with him on his trips child
pornography. He used Internet sources of WiFi to
communicate with others. And I'll tell the Court some of
the countries he's been to. Saudi Arabia, United Arab
Emirates, Bahrain, Omond, Jabuuti, Egypt, Kuwait,
Indonesia, India and Afghanistan. Those are countries
that definitely would be considered a threat. Each time
he traveled on and off that plane, Your Honor, he was not
searched. He carried with him his collection of produced
child pornography. To consider his service when it's no
relation to the crime at hand is what the Supreme Court
had in mind. To ask for and obtain consideration for
military service when you used your service to gain
victims and sexually abuse them is not.

Counsel touched upon Dr. Weiner's assessment,
Your Honor. I've been here four years and I've seen over
three dozen of his assessments and I've never seen one
that gives over a low to moderate risk for re-offending.

You know, the ATSA requires testing take into
consideration something other than the defendant's
statements. It's interesting. He's such a manipulative
person. He manipulated his own friends into leaving their
children with him. But it's just his statements that were

1    taken into consideration.  It's interesting he uses the
2    Static 99 test when those that created it stated it was
3    not designed for the contemplation of Internet crimes.

4            Furthermore and most amusing, Your Honor, is the
5    defendant is non-sadistic.  Okay.  Well, the DSM that I
6    read from earlier defines sadism as acts in which a person
7    derives sexual excitement from the physical or
8    psychological suffering including humiliation of the
9    victim.  This includes having complete control over the
10   victim.  Others will act out their sadistic fantasies with
11   non-consenting victims.  In all of these cases, it is the
12   suffering of the victim that is arousing.  Sadistic acts
13   involve restraint, blind folding, spanking and it is
14   chronic when practiced with non-consenting individuals and
15   is likely to be repeated until the individual is
16   apprehended.

17           So he's classified as non-sadistic.  Perhaps if
18   Dr. Weiner had done what so many others that do
19   psychologic evaluations in this district do and contacted
20   government and set up a time to look at the images, he
21   would have seen bound children, he would have seen
22   children handcuffed cruelly or maybe he would have seen
23   the images on the defendant's own computer of the kids
24   beaten, burned, urinated on that the defendant liked.  So
25   no, I don't rely on his report.

1            And even more than that, Your Honor, I'm exactly

2     curious.  What do you have to tell Dr. Weiner to become a

3     high risk re-offending and who would be dumb enough to do

4     that?  I mean if the defendant really told him everything

5     he did and Dr. Weiner really reviewed anything, how can

6     you place this defendant in a low to moderate risk of

7     re-offending category when everything his colleagues, who

8     put together the DSM, state is chronic and he will

9     re-offend until apprehended?

10            And I'm also curious.  And I did subpoena

11    Dr. Weiner.  He happens to be on vacation this week.  He

12    states the defendant could be released back into the

13    community.  Whose community?  Who wants this defendant

14    living near their children?  I doubt Dr. Weiner does.  The

15    defendant is not low risk.  A report based on the

16    defendant's statements should not be considered by this

17    Court.  Whether he is low risk or high risk, he should

18    never be given the opportunity.  He should get the same

19    sentence similarly situated defendants from all across the

20    country have gotten and one proportionate to the damage

21    he's inflicted upon these children.

22            You know, Your Honor, counsel points out that

23    the cases, you know, we don't know enough about them.  And

24    that's interesting because they all are the same charge,

25    production of child pornography and they are from the

1    First, Second and there's actually a Ninth Circuit case,

2    Your Honor.  1,380 months, 1400 months, 1500 months, 1700

3    months.  I mean the Ninth Circuit even said 120 years and

4    that was for five victims.

5         Of course, you know, counsel would bring that up

6    and bring up the issue of proportionality.  But the Fourth

7    Circuit recently addressed the proportionality argument in

8    the Cobbler case that Your Honor mentioned.  They

9    evaluated it through the Eighth Amendment's cruel and

10   unusual punishment clause.  A defendant can challenge his

11   sentence as disproportionate under two theories, as

12   applied or categorical, meaning the entire class of

13   sentences is disproportionate based on the nature of the

14   defense or the characteristics of the offender.

15        And the Fourth Circuit looked at this.  Cobbler

16   had one victim, Your Honor.  One victim.  One that he

17   sexually abused.  We have five children.  One who was five

18   months old.  The Fourth Circuit stated the unusual

19   severity was putting the child's life at risk by exposing

20   him to a communicable disease.  But I argue, Your Honor,

21   that by giving these children Ambien did the defendant not

22   do the same thing.  We heard from Cheryl who stated this

23   child came home and slept for two days and had to be

24   forced awake to eat.  We saw the effect stated by Ambien.

25   We know that the defendant is not only similarly situated,

1    but he's far worse.

2           And more interesting is that the attempted

3    comparison to the Scott Smallwood case.  As the Court is

4    well aware, I was one of two attorneys that handled that

5    case in front of Your Honor.  Scott Smallwood produced

6    seven video clips on two different days with one

7    seven-year-old boy.  Now there were allegations he

8    molested other family members.  But the government was not

9    able to prove that.  We had one victim.  Scott Smallwood

10   definitely had some creepy factors, but he didn't have any

11   other child porn.  He didn't have it on anything, any

12   computers.  He wasn't communicating with other producers.

13   He wasn't downloading child porn from the Internet.  He

14   didn't distribute the others he created of C.S., the

15   victim in that case.  And he certainly wasn't chatting

16   with other pedophiles.  He did not drug his victims.  He

17   didn't handcuff his victim's leg and feet.  So it's like

18   comparing apples to oranges.

19          I reached out to prosecutors who have been in

20   this office for years and not one heard of the defendant

21   whose actions were this bad.  Where does it lie in the

22   cases?  Thirty years?  Thirty years, Your Honor, is

23   insulting to the victims and it's not proportionate to the

24   crimes he committed upon them.  When you look at what's

25   proportionate and you think of how awful what the

1    defendant did to these children was.  180 years would not

2    be enough time.

3          Promoting respect for the law is not just about

4    this defendant.  It's about appreciating his societal

5    obligations.  What society views the laws ought to be to

6    punish people when dealing with the safety of children.

7    Society has no tolerance for the drugging and sexually

8    abusing of children.  Not to mention the dissemination of

9    child pornography on the Internet for the satiation of

10   pedophiles.  The role of the defendant's crime far exceeds

11   what Congress or the people ever contemplated someone

12   would do because, Your Honor, to think about something

13   like this is just too horrific.

14         When Congress says a crime is serious, it is not

15   a suggestion.  It's the will of the people.  The reason we

16   seek a sentence so high is to recognize the compelling

17   interest in protecting children from monstrous acts like

18   the ones this defendant perpetrated by the defendant and

19   it's to let those people on the Internet know that he

20   communicated with, that he asked in those chats, what do

21   you think of my daughter, what do you think of my son,

22   what do you think of my neighbor, what do you think of the

23   kids down the street, it's to tell those people that this

24   is not to be tolerated and that we are coming after you.

25   That's why we ask for a high sentence.

1          We cannot deter this defendant.  He is sexually

2     attracted to children by his own admission and engaged in

3     those acts.  Went beyond engaging, but cruelly used them.

4     He meets every definition for pedophilia.

5          So we think about general deterrence for people

6     like him, people he chatted with and sent images to,

7     people producing and hurting children.  People he traded

8     abuse with.  As the Court stated in U.S. v. Goldberg,

9     young children were raped and ordered to enable the

10    production of the pornography that the defendant both

11    downloaded and uploaded that he consumed and disseminated

12    to others.  The greater the customer demand, the more that

13    will be produced.  Sentences influence behavior or so

14    that's at least what Congress thought when making 3553.

15         The logic of deterrence suggests that the

16    lighter the punishment for downloading and uploading child

17    pornography, the greater the customer demand and the more

18    it will be produced.

19         The defendant is sorry, Your Honor.  He's sorry

20    he got caught.  If he hadn't been caught when that plane

21    landed on August 31st, he would have contacted Chad and

22    Trisha and set up a date night for them and had the

23    scheduled sleepover with Cheryl's two granddaughters.

24    That's what he's sorry for.  We have to protect the

25    public.  We have to protect children from this defendant.

1   Any sentence that lets him walk out of a jail will never

2   be able to protect the children in the community he

3   eventually moves to.  He must remain in jail for the rest

4   of his life.

5           You know, Your Honor, I do want to show the

6   Court something.  Your Honor, this is what a picture of a

7   child is supposed to look like.  That's Victim 1.  This is

8   Victim 2.  See, the defendant cut their faces out.  So I'm

9   going to show the Court and the defendant what pictures of

10  children are supposed to look like because the ones he

11  took are not.  This is Victim 4.  This is Victim 3.  This

12  is what he looked into when he sexually abused them, when

13  he bound them.  And this is what a picture of a child

14  should look like.  It's important the Court and the

15  defendant see the faces of these children because he

16  didn't put them in most of his pictures.  By doing that,

17  he de-humanized them.  That's who they are.

18          This defendant in conclusion, Your Honor, I want

19  to say he violated every law prohibiting child

20  pornography, accessing with intent to view, possession,

21  receipt, transportation, distribution, advertisement and

22  production.  He is the worst case scenario for child

23  pornography.

24          In eleven years of working child exploitations

25  cases solely, 98% of which have been child pornography,

1    three as a federal agent and eight as a federal

2    prosecutor, I have never seen such depravity in one

3    defendant.  What makes this case worse is that this

4    defendant hides behind his military service.  The military

5    values duty, honor and country, Your Honor.  Key amongst

6    these is honor.  That's why discharges are honorable or

7    dishonorable.  Without honor, a soldier, an airman, a

8    marine or a sailor is no more than a thug with a gun.

9    There is nothing honorable about sexually exploiting

10   children.  There is nothing honorable about pleasuring

11   yourself while watching the most vulnerable among us being

12   sexually abused, tied up and degraded.  This defendant is,

13   therefore, without honor and should be ashamed and

14   embarrassed to use the military service as a mitigating

15   factor.  If he were that convinced his service would

16   benefit him, let his punishment be determined by an

17   infantryman or a Marine recon or a Navy seal or an Air

18   Force combat controller.  Have the strength of character

19   to man up to the bar and pay the tab.  Do not hide behind

20   service ribbons.  Thank him for his service, Your Honor,

21   but do not let this man ever walk out of prison again

22   because he dishonors every man and woman who has worn that

23   uniform.

24        He stripped the human dignity from these

25   children.  And when he drug them, he took something more.

1    He took away their voice.  Their ability to say no.  Their

2    ability to stop him and their ability to have a future

3    without a world able to view their violation.  For all of

4    these reasons, we ask the Court to sentence him to no less

5    than a hundred years.  Thank you.

6            THE COURT:  All right.  I'm going to take a

7    five-minute recess and then I'll pronounce the sentence in

8    the case.  Thank you.

9            (Recess.)

10           (Bench conference:)

11           (It is the policy of this court that every

12   guilty plea and sentencing proceeding include a bench

13   conference concerning whether the defendant is or is not

14   cooperating.)

15           (In open court:)

16           THE COURT:  The defendant is before me today for

17   sentencing after having entered a plea of guilty to six

18   counts of the indictment, all of which charge sexual

19   exploitation of a minor for purposes of producing child

20   pornography in violation of Section 2251(A) of Title 18

21   United States Code.

22           I have applied the sentencing guidelines as the

23   first step in the sentencing process and they produce an

24   offense level of 47, which is off the charts.  It's higher

25   than any level authorized under the guidelines, which top

1    out at 43, and a Criminal History Category of 1, which

2    produces a recommendation under the sentencing guidelines

3    of life.  However, since the maximum per count is 30

4    years, that amounts to a recommended sentence of 360

5    months per count, not life.  Nevertheless since there are

6    six counts, the functional equivalent of a life sentence

7    could be fashioned in this case by imposing a sentence of

8    a sufficient number of years that it would be the

9    functional equivalent of a life sentence.

10            The government has recommended that I impose a

11    sentence of 1200 months or a hundred years.  The probation

12    officer has recommended the functional equivalent of a

13    life sentence by recommending 720 months by running the

14    first two counts consecutive and the rest concurrent,

15    which would be a sentence of -- that if he were to serve

16    it and have perfect good conduct credits would produce a

17    net sentence of 612 months or 51 years.  Those are the

18    recommendations that I have in front of me.  The defense

19    argues that they would believe that a sentence of 30 years

20    would be sufficient, but not greater than necessary to

21    comply with the purposes of sentencing.  So those are the

22    in effect the three positions that are before me for the

23    sentence in this case.

24            I have frequently said that the most difficult

25    thing I do is sentencing and this is perhaps the most

1    difficult child pornography sentencing I have ever had to

2    do.  And this is an especially bad day I suppose because I

3    had to do a child pornography sentencing in the morning.

4    So I will look forward to a respite from child pornography

5    cases after today.

6         The overall command of the sentencing statute is

7    to be impose a sentence that will be sufficient, but not

8    greater than necessary to comply with the purposes of

9    sentencing, which I'll address one by one in this case.

10   And the guidelines themselves recommend in a advisory

11   capacity that I'm required to consider, but give no

12   presumption of correctness to a sentence of life or what

13   would be the functional equivalent of a life sentence

14   would be consistent with that recommendation of life.

15   Rarely do I have before me cases in which the offense

16   level goes over the top of 43, which this one does.  It

17   exceeds it by four levels.  And so that certainly tells me

18   that the sentencing guidelines view this as a very

19   significant offense, worthy of significant punishment.

20        Let me address the factors under Section 3553 of

21   Title 18 of the United States Code, which is the federal

22   statute that governs the imposition of sentences in

23   federal criminal cases.  As I said before, that statute

24   requires that I impose a sentence that's sufficient, but

25   not greater than necessary to comply with the purposes of

1    sentencing that are set forth in paragraph 2 of

2    Subsection A.

3         Before addressing those specific factors, the

4    first matter addressed under Subsection A is the nature

5    and circumstances of the offense and the history and

6    characteristics of the defendant.  I will point out that

7    in terms of the nature of this offense, that this is one

8    for which very significant punishment has been specified

9    by Congress as well as by the sentencing guidelines.  The

10   guidelines and the statutory penalties in this case are

11   widely viewed as very harsh.  And the question is is that

12   a problem.

13        I think the Fourth Circuit answered that

14   question in its April 11 opinion in United States v.

15   Cobbler at page 18 of the slip opinion.  It said as a

16   general matter, "the prohibition of child pornography

17   derives from the legislative judgment that such materials

18   are harmful to the physiological, emotional and mental

19   health of children and that preventing the sexual

20   exploitation of this uniquely vulnerable group constitutes

21   a government objective of surpassing importance."  And the

22   Court went on to say "we further observe that the usual

23   severity of conduct of this nature is far exceeded by the

24   particular circumstances of this case."  And they went on

25   to discuss Cobbler's case in which he had possessed large

1    quantities of child pornography and also exposed his

2    victims to a communicable disease.

3         In that case, the Fourth Circuit had a case in

4    which the sentence that was upheld was 120 years.  And all

5    cases are different.  Judgments in criminal cases have to

6    be made on an individual basis.  But I thought that the

7    observation made by the Fourth Circuit with respect to the

8    relatively significant level of punishment reserved for

9    child pornography cases was worth repeating.

10        The nature and circumstances of the offense I

11   think have been graphically described by the government in

12   this case.  They represent perhaps the worst case of child

13   pornography that I've had the misfortune of coming into

14   contact with.  The most significant one before this was

15   the Smallwood case that both parties have mentioned

16   involving a Prince George's County school bus driver who

17   photographed sexual activities between him and the

18   children under his charge.  That case as horrific as it

19   was did not involve the depravity and the extent of

20   participation in production of child pornography as did

21   this case.

22        The defendant very appropriately points out that

23   he has a military career and that I should take that into

24   account and I do.  But I think what's significant is that

25   he used that military career and capacity to assist him in

1    the commission of his heinous crimes in this case by

2    taking advantage of volunteering to watch people's

3    children in connection with the military service gave him

4    the opportunity to prey on victims that otherwise he might

5    not have been able to prey on.  So I consider that

6    whatever benefit he gets by his military service is

7    checked and then some by the fact that he used that

8    military career in connection with the commission of his

9    crime.

10          It is quite disturbing to think that the Vice

11   President of the United States or the First Lady is flying

12   around the world with somebody on the plane carrying with

13   him a treasure trove of child pornography, much of which

14   he produced himself.  That is just shocking.

15          The history and characteristics of the defendant

16   are ones that are not atypical for defendants in child

17   pornography cases.  He has virtually no criminal history

18   whatsoever.  It is obvious that there is some demon inside

19   him that has caused him to become the sexual monster that

20   he has become.  And I am hopeful that the Bureau of

21   Prisons can delve into that and do the best they can to

22   help him overcome the demons that have caused him to

23   behave in this way, whatever those demons may be.

24          Now let me address the specific factors under

25   Subsection A(2).  I'm required to impose a sentence that

89

1   will reflect the seriousness of the offense.  Make no

2   mistake about it, this has got to be one of the most

3   serious offenses of this nature that I've ever seen.

4           I was considerably aided by the testimony of the

5   victims in this case.  I don't get victim testimony in all

6   cases.  But in many, I do.  And in some, the victim

7   testimony is helpful.  In others, it's neutral.  It

8   doesn't give me anything that I didn't already know in

9   terms of somebody being a victim of a crime, such as a

10  bank coming in and telling me they've lost a lot of money.

11          In this case, the victims have convincingly told

12  me that they didn't lose just money.  In many respects,

13  they've lost their happiness, their sense of well-being,

14  their sense of security.  This is not a minor matter.

15  This has got to be at the top of the scale of seriousness

16  of offenses in the child pornography arena, perhaps in all

17  arenas.  So this is right at the top of the charts in

18  terms of seriousness of the offense.

19          I am required to consider the need for the

20  sentence imposed to promote respect for the law and to

21  afford adequate deterrence to criminal conduct.  Nothing

22  less than a very substantial sentence would achieve either

23  one of those parallel goals.

24          I am also to consider the need to protect the

25  public from further crimes of the defendant.  This is a

1    absolutely horrific series of crimes reflected in these

2    six counts to which the defendant has pled guilty.  These

3    are crimes that the public should not have to tolerate at

4    any time under any circumstances.  And I consider

5    protection of the public to be of the highest order in

6    this case.

7         I am required to consider the need to provide

8    the defendant with educational or vocational training,

9    medical care or other correctional treatment in the most

10   effective manner.  I believe the only setting in which to

11   do that is in an incarcerated sentencing.  And I will make

12   appropriate recommendations to the Bureau of Prisons in

13   that regard.

14        I am required to consider the kinds of sentences

15   available.  That's not a significant factor in this case

16   because that's asking me to consider whether a

17   probationary or other type of disposition other than

18   incarceration will be appropriate and this is a case in

19   which incarceration is absolutely mandatory.

20        I am required to consider the need to avoid

21   unwarranted sentence disparities among defendants with

22   similar records who have been found guilty of similar

23   conduct.  That's the principal purpose of the sentencing

24   guidelines.  In this case, they recommend that I impose a

25   sentence of life or because of the statutory maximum of

1    360 months, which will be per count.  And the sentence

2    could be fashioned to string those counts together to

3    reach the functional equivalent of a life sentence.

4            I have reviewed the other cases that have been

5    brought to my attention by the defense in their

6    well-prepared sentencing memorandum or at least one of

7    which was mine.  I see poor Judge Heller had three of them

8    and I believe the longest of those sentences is the

9    sentence I imposed in the Smallwood case.  And as I said,

10   this was four victims.  There was simply him taking

11   pictures with using his cell phone camera.  If I recall

12   correctly, there was no indication of distribution.

13   Simply taking pictures for his own gratification.

14           This defendant in sharp contrast to Smallwood

15   has engaged in bizarre and hideous sexual behavior by

16   seeking out people for sexual activity recorded of the

17   most sadistic nature, has produced child pornography with

18   the worst thing I can think of, a family member, his

19   child, and has taken advantage of his role in the military

20   to volunteer to watch children for other people.  We have

21   one victim we can't even identify.  So the breadth of his

22   activity is dramatically greater than that of Mr.

23   Smallwood.  As hideous as his activity may have been, it

24   was with a small number of victims with no distribution.

25   It was simply production of child pornography.  And so I

1   find in terms of trying to be faithful to the goal of

2   substantially similar sentences with people with similar

3   records and similar conduct that the Smallwood case would

4   argue in favor of a substantially higher sentence than

5   Mr. Smallwood received.

6           And I've looked at the other cases mentioned at

7   page 7 and 8 of the defendant's well-prepared sentencing

8   memorandum and I find that all of those cases are of

9   lesser import than the grievous circumstances of this

10  defendant's conduct in this case.

11          He's brought disgrace upon his military career.

12  And as I said, I shiver to think of our Vice President or

13  First Lady flying around the country with him caring for

14  their needs while he's transporting personal computers

15  that have his pornography on it.

16          I am also required to consider the need to

17  provide restitution to any victims of the offense.  I have

18  not been provided with specific information that would

19  justify an award of restitution in this case.  Quite

20  frankly, I don't know how this defendant is going to be

21  capable of making restitution to anybody because he's

22  going to be in prison for so long.  And frankly, to order

23  restitution out of whatever limited funds he might have or

24  produce while he's in prison would remind these victims of

25  his existence and something I think from what I've heard

1    today, they would just as soon not do, not hear from him.

2            Would that it would be in my power to make an

3    enormous award of restitution, this is one of those cases

4    in which the amount of money that would compensate for

5    what happened to these victims is probably difficult to

6    even count.  The whole purpose of our damages system is to

7    try to compensate for harms with money.  This is one in

8    which I think the task would be almost incalculable to try

9    to do it.

10           We have young ladies who have been molested,

11   drugged.  I didn't mention that in terms of another

12   aggravating factor of this case in relation to others.  To

13   take a drug that shouldn't be used by people under 18 and

14   use it on little toddlers is just beyond the pale.  So as

15   I said, this ranks at the very top of the charts for me in

16   terms of any child pornography case I've ever had.

17           And I recognize that the defendant would like to

18   have the assurance that at some point he may walk out a

19   free man from prison.  I don't think this is one in which

20   I should make that happen.  His conduct is of the most

21   depraved that I've ever seen.  And I have grave

22   reservations about my ability to protect the public from

23   somebody who is engaged in a persistent course of conduct

24   like this as to whether he could ever be safely released

25   to the community.

1          There are six counts in this case.  I'm going to

2    impose a sentence of 30 years on each of the six counts.

3    I'm going to have Counts 1, 2, 3 and 4 be consecutive to

4    each other for a total of 120 years.  I'm going to have

5    Counts 5 and 6 be concurrent with those previous four

6    counts.  So that the total sentence is 120 years.

7          I'm going to recommend that he be placed in a

8    high level security institution because of his advance

9    training in matters that might permit him to get his way

10   out, such as USP Florence, high.  I'll recommend that he

11   receive sex offender specific treatment.  I'll recommend

12   that he receive alcohol treatment.

13         I will place him -- should he survive this

14   sentence, which I'm pessimistic that he will, but should

15   he survive this sentence, I will place him on a period of

16   supervised release of life on all six counts and I will

17   impose the mandatory and standard conditions adopted by

18   the court with the additional inclusion of the nine

19   recommended conditions contained in the presentence report

20   recommendation section, which counsel all have and will be

21   part of the public record.  But I will just briefly

22   summarize them rather than repeat them entirely.  But I

23   will impose those as recommended conditions on any

24   supervised release.  One is that he comply with sex

25   offender registration requirements, that he participate in

95

1   a sex offender treatment program, that he not have contact

2   with any victim or witnesses in this case by any means,

3   that he have no contact with any person under the age of

4   18 except with permission of the probation officer under

5   the circumstances described in that provision, that he not

6   own, use, possess or read any materials containing

7   sexually explicit conduct, that he not use any computer

8   systems or Internet capable devices without the permission

9   of the probation officer, that he not rent or use a post

10  office or storage facility without approval of the

11  probation officer, that he participate in a treatment

12  program relating to substance and/or alcohol abuse and

13  that he pay the special assessment of a hundred dollars

14  per count for a total of $600 if he has not done so

15  already.

16          I will also recommend to the Bureau of Prisons

17  in connection with his sentence that he not be permitted

18  to -- that his communications be monitored.  They have a

19  Communications Control Unit that I'm familiar with.  And I

20  will recommend that he be placed in the Communications

21  Control Unit for the purpose of monitoring any attempt to

22  communicate with victims in this case or their family

23  members.

24          I will not make an order of restitution in this

25  case for the reasons I've previously said.  I do believe

96

1    that it would be hard to count the number of dollars that

2    would be appropriate.  But this defendant is not going to

3    be making any money to make any restitution I'm sad to

4    say.

5         The defendant does not have the resources with

6    which to pay a fine.  So I will not impose one.  But were

7    he to have the resources, the sentencing guidelines are

8    from $25,000 to $250,000, which seems like a modest range

9    if I had somebody in front of me with an ability to pay.

10        I'm going to impose the special assessment of

11   $100 per count, for a total of $600.

12        Now before I continue to advise the defendant of

13   his rights to appeal, are there any other questions people

14   wish to raise before I finish sentence?

15        MS. FREITAS:  Yes, Your Honor.  I just have two

16   questions.  For the record, would the Court have reached

17   the same result even if it had decided the guideline issue

18   the other way and/or would the Court have imposed the same

19   sentence regardless of the advice of the guidelines?

20        THE COURT:  Absolutely.  I mean this is a case

21   in which if the guidelines had recommended 30 years, I

22   would have imposed the same sentence.  This is just

23   absolutely horrific.

24        I mean if Congress in its infinite wisdom has

25   decided that 30 years is the most you can get for

1    something like this, I can't for the life of me see why I

2    would be imposing anything other than the maximum for the

3    circumstances of this case.  This case is just horrific.

4    And I could certainly have imposed all six of them at 30

5    years a piece consecutive, but I think at some point the

6    mathematics becomes impossible to even count.

7            So that with a 120-year sentence with 15% for

8    discount for good behavior, the gentleman will have to be

9    a miracle man to emerge from prison.  But I would have

10    imposed the exact same sentence even if my guideline

11    application is wrong and there's just no circumstances

12    under which I would impose a lesser sentence in a case

13    like this.

14            MS. FREITAS:  Thank you, Your Honor.

15            THE COURT:  All right.  I want to advise --

16    anything else?

17            MS. FREITAS:  No, Your Honor.

18            THE COURT:  I want to advise the defendant of

19    his right to appeal.  You have a right to appeal your

20    conviction and sentence to the United States Court of

21    Appeals for the Fourth Circuit, which is the federal

22    appellate court that has jurisdiction over the decisions

23    of this court.  If you wish to do so, you must do so

24    within 14 days of today's date.  Otherwise your right to

25    appeal will be lost.

1        If you're unable to pay the filing fee, there

2   are procedures that your attorneys or the clerk of the

3   court can explain to you to have that filing fee waived.

4   But unless you initiate an appeal within 14 days of

5   today's date, your right to challenge your conviction and

6   sentence by way of appeal will be lost.  Do you understand

7   that, sir?

8            THE DEFENDANT:  Yes, sir.

9            THE COURT:  All right.  Anything further?

10           MS. FREITAS:  No, Your Honor.

11           THE COURT:  All right.  Thank you very much.

12           (Proceedings were concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25

# United States District Court
## District of Maryland

UNITED STATES OF AMERICA

v.

WILLIAM GAZAFI

**JUDGMENT IN A CRIMINAL CASE**

(For Offenses Committed on or After November 1, 1987)

Case Number: RWT 8:13-CR-00472-001

USM Number: N/A

Defendant's Attorney: Amy Fitzgibbons, Esq. and John Chamble, Esq.

Assistant U.S. Attorney: LisaMarie Freitas, Esq. and Thomas M. Sullivan, Esq.

## THE DEFENDANT:

☒ pleaded guilty to count(s) __1 – 6 of the indictment__

☐ pleaded nolo contendere to count(s) _____, which was accepted by the court.

☐ was found guilty on count(s) _____ after a plea of not guilty.

| **Title & Section** | **Nature of Offense** | **Date Offense Concluded** | **Count Number(s)** |
|---|---|---|---|
| 18:2251(a) | Sexual Exploitation of Minor for Purpose of Producing Child Pornography | April 19, 2013 | 1-6 |

The defendant is adjudged guilty of the offenses listed above and sentenced as provided in pages 2 through __6__ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984 as modified by U.S. v. Booker, 125 S. Ct. 738 (2005).

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ (is)(are) dismissed on the motion of the United States.

**IT IS FURTHER ORDERED** that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.

FILED
LODGED
ENTERED
RECEIVED

JUL 1   2014

AT GREENBELT
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY_____ DEPUTY

June 23, 2014
Date of Imposition of Judgment

Roger W. Titus                    July 1, 2014

United States District Judge                Date

Name of Court Reporter: Lisa Bankins

Case 8:13-cr-00472-RWT    Document 51    Filed 07/01/14    Page 2 of 6

Sheet 2 - Judgment in a Criminal Case with Supervised Release (Rev. 11/2011)                               Judgment Page 2 of 6

**DEFENDANT: WILLIAM GAZAFI**                                    CASE NUMBER: RWT 8:13-CR-00472-001

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of _360 months as to each of Counts 1, 2, 3 and 4 consecutive to each other_ and 360 months as to each of Counts 5 and 6 concurrent to all counts for a total of 1,440 months .

☒ The court makes the following recommendations to the Bureau of Prisons:

1. That the defendant serve his period of imprisonment in a high level security institution such as USP Florence (High) in Florence, CO.
2. That the defendant participate in a sex offender treatment program.
3. That the defendant participate in any substance abuse program for which he may be eligible.
4. That the defendant be placed in a communication controlled unit so as to preclude any communication with the victims or family members.
5. The Bureau of Prisons is requested to provide the Court with a report on the actions taken by it on these recommendations.

☒ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ a.m./p.m. on _____.

    ☐ as notified by the United States Marshal.

☐ The defendant shall surrender, at his/her own expense, to the institution designated by the Bureau of Prisons at the date and time specified in a written notice to be sent to the defendant by the United States Marshal. If the defendant does not receive such a written notice, defendant shall surrender to the United States Marshal:

    ☐ before 2 p.m. on _____.

**A defendant who fails to report either to the designated institution or to the United States Marshal as directed shall be subject to the penalties of Title 18 U.S.C. §3146. If convicted of an offense while on release, the defendant shall be subject to the penalties set forth in 18 U.S.C. §3147. For violation of a condition of release, the defendant shall be subject to the sanctions set forth in Title 18 U.S.C. §3148. Any bond or property posted may be forfeited and judgment entered against the defendant and the surety in the full amount of the bond.**

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____ at _____, with a certified copy of this judgment.

_____

UNITED STATES MARSHAL

By:_____

DEPUTY U.S. MARSHAL

Case 8:13-cr-00472-RWT   Document 51   Filed 07/01/14   Page 3 of 6

Sheet 3 - Judgment in a Criminal Case with Supervised Release (Rev. 11/2011)                                    Judgment Page 3 of 6

**DEFENDANT: WILLIAM GAZAFI**                                    CASE NUMBER: RWT 8:13-CR-00472-001

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of LIFE as to Counts 1, 2, 3, 4, 5 and 6.

### The defendant shall comply with all of the following conditions:

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

### A.    STATUTORY CONDITIONS OF SUPERVISED RELEASE

1) The defendant shall not commit any federal, state or local crime.
2) In any felony case, the defendant shall not possess a firearm or ammunition as defined in 18 U.S.C. §921.
3) The defendant shall not illegally use or possess a controlled substance.
4) The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as directed by the probation officer.
☐ The above drug testing condition is suspended based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)
5) Pursuant to Pub. Law 108-405, Revised DNA Collection Requirements Under the Justice for All Act of 2004, if applicable, the defendant shall cooperate in the collection of DNA while incarcerated in the Bureau of Prisons, or as directed by the probation officer.
6) If this judgment imposes any criminal monetary penalty, including special assessment, fine, or restitution, it shall be a condition of supervised release that the defendant pay any such monetary penalty that remains unpaid at the commencement of the term of supervised release in accordance with the Schedule of Payments set forth in the Criminal Monetary Penalties sheet of this judgment. The defendant shall notify the court of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay restitution, fines, or special assessments.

### B.    STANDARD CONDITIONS OF SUPERVISION

1) The defendant shall not leave the judicial district without the permission of the court or probation officer;
2) The defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;
3) The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4) The defendant shall support his or her dependents and meet other family responsibilities;
5) The defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;
6) The defendant shall notify the probation officer ten days prior to any change in residence or employment;
7) The defendant shall refrain from excessive use of alcohol;
8) The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9) The defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any persons convicted of a felony unless granted permission to do so by the probation officer;
10) The defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11) The defendant shall notify the probation officer within 72 hours of being arrested or questioned by a law enforcement officer;
12) The defendant shall notify the probation officer within 72 hours of being charged with any offense, including a traffic offense;
13) The defendant shall not enter into any agreement to act as an informer or special agent of a law enforcement agency without the permission of the court;
14) As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

Sheet 4 - Judgment in a Criminal Case with Supervised Release (Rev. 11/2011)                                    Judgment Page 4 of 6

**DEFENDANT: WILLIAM GAZAFI**                                          CASE NUMBER: RWT 8:13-CR-00472-001

## C.   SUPERVISED RELEASE
## ADDITIONAL CONDITIONS

1. The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense.

2. The defendant shall participate in a sex offender treatment program, to include a sex offender risk assessment, pyschosexual evaluation, Abel screen, polygraph testing and/or penile plethysmograph as directed by the U.S. Probation Officer. The defendant shall follow the rules and regulations of the sex offender treatment program as directed by the probation office.

3. The defendant shall not have contact with any victim or witness in the instant offense by any means, including in person, by mail, by telephone, via any device capable of connecting to the internet or through third parties. If any contact occurs, intentional or otherwise, the defendant shall immediately leave the area and report the contact to the U.S. Probation Officer within 24 hours.

4. The defendant shall have no contact with persons under the age of 18, unless approved by the U.S. Probation Officer. The defendant shall not congregate or loiter near schools, parks, playgrounds, arcades or other places frequented by children under the age of 18, unless approved by the U.S. Probation Officer. Any unauthorized contact with persons under the age of 18, intentional or otherwise, must be reported to the U.S. Probation Officer within 24 hours. This provision does not encompass persons under the age of 18, with whom the defendant must deal with in order to obtain ordinary and usual commercial services.

5. The defendant shall not own, use, possess, view or read any materials, including pictures, photographs, books, writings, drawings, videos, or video games, depicting and/or describing "sexually explicit conduct," or frequent any place that is involved with pornography, as defined in 18 U.S.C. § 2256(2).

6. The defendant is not to use computer systems, Internet-capable devices and/or similar electronic devices at any location (including employment or educational program) without the prior written approval of the U.S. Probation or Pretrial Services Officer. The defendant shall cooperate with the U.S. Probation and Pretrial Services Office monitoring of compliance with this condition. Cooperation shall include, but not be limited to, participating in a Computer & Internet Monitoring Program, identifying computer systems, Internet-capable devices and/or similar electronic devices the defendant has access to, allowing the installation of monitoring software/hardware at the defendant's expense, and permitting random, unannounced examinations of computer systems, Internet-capable devices and similar electronic devices under the defendant's control.

7. The defendant shall not rent or use a post office box or storage facility without prior approval from the U.S. Probation Officer. If approved, any changes must be reported 72 hours in advance. The defendant shall permit the probation officer to conduct random inspections of any approved storage facility.

8. The defendant shall satisfactorily participate in a treatment program approved by the probation officer relating to substance and/or alcohol abuse, which may include evaluation, counseling, and testing as deemed necessary by the probation officer.

9. The defendant shall pay the special assessment in the amount of $600.00 as directed herein.

Sheet 5, Part A - Judgment in a Criminal Case with Supervised Release (Rev. 11/2011)                                    Judgment Page 5 of 6

**DEFENDANT: WILLIAM GAZAFI**                                            CASE NUMBER: RWT 8:13-CR-00472-001

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $ 600.00 | $ | $ |

☐   CVB Processing Fee $25.00

☐   The determination of restitution is deferred until Click here to enter a date.. An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐   The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
|  | 0 | 0 |  |

| **TOTALS** | $    0 | $    0 |
|---|---|---|

☐   Restitution amount ordered pursuant to plea agreement _____

☐   The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐   The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐   the interest requirement is waived for the   ☐   fine   ☐   restitution

    ☐   the interest requirement for the   ☐   fine   ☐   restitution is modified as follows:

\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

Sheet 6 - Judgment in a Criminal Case with Supervised Release (Rev. 11/2011)                                Judgment Page 6 of 6

**DEFENDANT: WILLIAM GAZAFI**                                CASE NUMBER: RWT 8:13-CR-00472-001

## SCHEDULE OF PAYMENTS

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

Payment of the total fine and other criminal monetary penalties shall be due as follows:

A   ☒   In full immediately

B   ☐   $_____ immediately, balance due (in accordance with C, D, or E); or

C   ☐   Not later than _____; or

D   ☐   Installments to commence _____ day(s) after the date of this judgment.

E   ☐   In _____ (*e.g. equal weekly, monthly, quarterly*) installments of $_____ over a period of _____ year(s) to commence when the defendant is placed on supervised release.

The defendant will receive credit for all payments previously made toward any criminal monetary penalties imposed.

Unless the court expressly orders otherwise, if this judgment imposes a period of imprisonment, payment of criminal monetary penalties shall be due during the period of imprisonment. All criminal monetary penalties except those payments made through the Bureau of Prisons Inmate Financial Responsibility Program, are to be made to the Clerk of the Court.

If the entire amount of criminal monetary penalties is not paid prior to the commencement of supervision, the balance shall be paid:

☐   in equal monthly installments during the term of supervision; or

☐   on a nominal payment schedule of $_____ per month during the term of supervision.

The U.S. probation officer may recommend a modification of the payment schedule depending on the defendant's financial circumstances.

Special instructions regarding the payment of criminal monetary penalties:

☐   Joint and Several

Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☒   The defendant shall forfeit the defendant's interest in the following property to the United States:
    (See Forfeiture Order Attached)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## SOUTHERN DIVISION

**UNITED STATES OF AMERICA**                 *

**v.**                                       *       **Crim. No. RWT-13-0472**

**WILLIAM GAZAFI**                           *

        *    *    *    *    *    *    *    *    *    *    *

## NOTICE OF APPEAL

Defendant, William Gazafi, by and through his attorneys, James Wyda, Federal

Public Defender for the District of Maryland, and Amy Fitzgibbons, Assistant Federal Public

Defender, hereby appeals the sentence imposed in this case on June 23, 2014.


Respectfully submitted,

JAMES WYDA
Federal Public Defender
  for the District of Maryland


/S/
_____
AMY FITZGIBBONS, #97952
Assistant Federal Public Defender
Federal Public Defender's Office
6411 Ivy Lane, Suite 710
Greenbelt, Maryland  20770-1405
(301) 344-0600
Fax No. (301) 344-0019
amy_fitzgibbons@fd.org